**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

**NO. 05-3431**

---

**UNITED STATES OF AMERICA,**

**Plaintiff/Appellee,**

**v.**

**JEFFERY WILLIAM PAUL,**

**Defendant/Appellant.**

---

# APPELLANT'S BRIEF

---

**Respectfully submitted,**

**SEAN D. O'BRIEN, #30116**
**JENNIFER A. MERRIGAN, #56733**
**305 East 63rd Street**
**Kansas City, Missouri 64113**
**816-363-2795 • Fax: 816-363-2799**

**ROBERT L. MCGLASSON**
**Georgia Bar No. 492638**
**1024 Clairemont Ave.**
**Decatur, GA 30030**
**404-314-7664 • Fax: 404-373-9338**

***Attorneys for Appellant***

## TABLE OF CONTENTS


**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUMMARY AND REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

ARGUMENT 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

ARGUMENT 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

ARGUMENT 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108




Appellate Case: 05-3431 Page: 2 Date Filed: 07/03/2007 Entry ID: 3327284

<u>**TABLE OF AUTHORITIES**</u>

**FEDERAL CASES**

*Anderson v. White*, 32 F.3d 320 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 104, 105

*Blackledge v. Allison*, 431 U.S. 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 95

*Bracy v. Gramley*, 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brunelle v. United States*, 864 F.2d 64 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 95

*Campbell v. Lockhart*, 789 F.2d 644 (8th Cir. 1986) . . . . . . . . . . . . . . 3, 14, 88-90

*Colorado v. Connelly*, 479 U.S. 157, 167 (1986) . . . . . . . . . . . . . . . . . . . . . 14, 104

*Crenshaw v. Wolff*, 504 F.2d 377 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Coast Trades Council*, 485 U.S. 568 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Edgemon v. Lockhart*, 768 F.2d 252 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 81

*Ford v. Wainwright*, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Houston v. Lockhart*, 982 F.2d 1246 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 96

*In re Murchison*, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Liljeberg v. Health Services. Acquisition Corp.*, 486 U.S. 847 (1988) . . . . . . . . . 65

*Lindhorst v. United States*, 658 F.2d 598 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . 96

*Lonchar v. Thomas*, 517 U.S. 314 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*McCleskey v. Zant*, 499 U.S. 467 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92-94

*McFarland v. Scott*, 512 U.S. 849 (1994) . . . . . . . . . . . . . . . . . . . . . . 54, 56, 60-62

*Medina v. Barnes*, 71 F.3d 363 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Murray v. Delo*, 34 F.3d 1367 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

*Nachtigall v. Class*, 48 F.3d 1076 (8th Cir.1995) . . . . . . . . . . . . . . . . . . . 47, 78, 79

*Neitzke v. Williams*, 490 U.S. 319 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*O'Rourke v. Endell*, 153 F.3d 560 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 83

*Rees v. Peyton*, 384 U.S. 312 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 83

*Rohan v. Woodford*, 334 F. 3d 803 (2006) . . . . . . . . . . . . . . . . . . . . 12, 13, 44, 82

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82

*Roper v. Simmons*, 543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . 12, 78, 80-85

*Salinas v. United States*, 522 U.S. 52 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Saunders v. United States*, 236 F.3d 950 (8th Cir. 2001) . . . . 11, 12, 49, 65-72, 77

*Smith v. Armontrout*, 888 F.2d 530 (8th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . 91

*Speedy v. Wyrick*, 702 F.2d 723 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*St. Paul Fire and Marine Ins. Co. v. F.D.I.C.*, 968 F.2d 695 (8th Cir. 1992) . . . . 81

*Stanley v. Lockhart*, 941 F.2d 707 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 44



Appellate Case: 05-3431 Page: 4 Date Filed: 07/03/2007 Entry ID: 3327284

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . 12, 54, 59

*Strickler v. Greene*, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tennard v. Dretke*, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Toney v. Gammon*, 79 F.3d 693 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. DeWitt*, 366 F.3d 667 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . 92-94

*United States v. McCray*, 849 F.2d 304 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . 105

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000) . . . . . . . . . . . . . . . . . 33-42, 44

*United States v. Pepper*, 486 F.3d 408 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Rogers*, 448 F.3d 1033 (8th Cir. 2006) . . . . . . . . . . . . . . 14, 92-94

*United States v. Thompson*, 403 F.3d 1037 (8th Cir. 2005) . . . . . . . . . . . . . . . . 104

*United States v. Tucker*, 78 F.3d 1313 (8th Cir. 1996) . . . . . . . . . . . 14, 97, 98, 103

*Wade v. Armontrout*, 798 F.2d 304 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 104

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 104

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . 12, 18, 44, 46, 50

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 83

*Winfield v. Roper*, 460 F.3d 1026 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**STATE CASES**

*Carter v. State*, 706 So.2d 873 (Fla. 1988) . . . . . . . . . . 11, 18-22, 25-27, 29, 49-51

*People v. Owens*, 564 N.E.2d 1184 (Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 30, 64



Appellate Case: 05-3431 Page: 5 Date Filed: 07/03/2007 Entry ID: 3327284

*State v. Debra A.E.*, 523 N.W.2d 727 (Wis. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 82

**FEDERAL STATUTES**

18 U.S.C. §924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. §1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. §3592(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-100

21 U.S.C. §848(q)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 78

21 U.S.C. §2106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 102

28 U.S.C. §455(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 7, 8

28 U.S.C. §2244(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. §2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 7, 8

28 U.S.C. §2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. §2106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83



Appellate Case: 05-3431 Page: 6 Date Filed: 07/03/2007 Entry ID: 3327284

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

Jeffery William Paul is one of the first federal prisoners within the Eighth Circuit to petition for relief from a conviction and sentence of death pursuant to 28 U.S.C. §2255 since the United States reinstated the death penalty. Because he was only eighteen years old at the time of the offense, he is one of the youngest people on death row in America. This is an appeal from the order and judgment of the United States District Court for the Western District of Missouri denying appellant's petition without allowing discovery, investigation, an opportunity to amend his petition, and without conducting a hearing. The District Court's order of October 26, 2005, denied Mr. Paul's application for certificate of appealability. On January 25, 2007, this Court certified three issues for appeal. Because of the legal and factual complexity of the issues raised in this death penalty case, appellant respectfully requests thirty minutes of oral argument.



Appellate Case: 05-3431 Page: 7 Date Filed: 07/03/2007 Entry ID: 3327284

## **JURISDICTIONAL STATEMENT**

Appellant was convicted and sentenced to death for murder on federal land, and using a firearm in a crime of violence. See 18 U.S.C. §§1111, 924. This Court affirmed his conviction, *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000). Mr. Paul on December 17, 2002, moved pursuant to 28 U.S.C. §2255 to set aside his conviction and sentence, alleging violations of federal laws and the Constitution. The district court denied the motion without a hearing on January 31, 2005, and on June 27, 2005, denied appellant's timely motion to reconsider filed pursuant to Federal Rule of Civil Procedure 59(e). A timely notice of appeal was filed on August 24, 2005. This Court on January 25, 2007, issued a certificate of appealability. The judgment denying relief is unpublished and is reproduced in the Addendum at 1. This Court has jurisdiction pursuant to 28 U.S.C. §§1291 and 2253.



Appellate Case: 05-3431 Page: 8 Date Filed: 07/03/2007 Entry ID: 3327284

## STATEMENT OF ISSUES

1. Whether Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Appellant's Mental, Medical and Physical History?

2. Whether Trial Counsel Were Ineffective for Failing to Investigate and Assert Appellant's Incompetence to Stand Trial?

3. Whether Federal Law Guaranteeing Meaningful Access to the Courts Requires That a Prisoner Challenging a Capital Conviction and Sentence Be Mentally Competent During Habeas Corpus Proceedings, and If So, Whether That Guarantee Was Violated in This Case?

4. Whether Mr. Paul's Right to Due Process of Law, as Guaranteed by *Brady v. Maryland*, 373 U.S. 83 (1963), Was Violated When Key Government Witnesses Clandestinely Received Cash Rewards After the Jury Was Told No Such Rewards Would Be Forthcoming?

5. Whether Improper *Ex Parte* Communications Between the Government and the District Court Warrant Assignment of a Different Judge Pursuant to 28 U.S.C. §2106?



Appellate Case: 05-3431 Page: 9 Date Filed: 07/03/2007 Entry ID: 3327284

## STATEMENT OF THE CASE

Jeffery Paul was convicted in the U.S. District Court for the Western District of Arkansas for the June 22, 1995, homicide of 82-year-old Sherman Williams. He is among the first federal prisoners to petition this Court for relief from his conviction and capital sentence pursuant to 28 U.S.C. §2255 since the United States reinstated the death penalty. Defense counsel called no witnesses to defend the charge, and called only Mr. Paul's mother in mitigation of punishment. Because the offense occurred when he was only eighteen, Mr. Paul is among the youngest people on death row in America.

**Trial Evidence**.

No physical evidence tied appellant to the homicide. Medical Examiner Frank Piretti testified that Mr. Williams died of a gunshot wound to the head. There were also small pellets in his chest, consistent with shot from a large caliber revolver. T. 596, 603. The gunshots were the only injuries.[1] The murder weapon was never found. Shoes recovered from Ingle, but allegedly belonging to appellant, held no trace of blood. T. 535, 608, 670. A fingerprint on the ashtray of Mr. Williams' car, found in a gravel pit, matched Ingle's right middle finger. T. 612-13, 619, 777-80.

---

[1]This Court wrote that Mr. Williams' head was nearly detached from his spine, *State v. Paul*, 217 F.3d at 994, but Dr. Piretti found no evidence that Williams had a broken neck or any injury other than the gunshot wounds. T. 598-600.



Appellate Case: 05-3431 Page: 10 Date Filed: 07/03/2007 Entry ID: 3327284

The primary evidence against appellant consisted of statements he allegedly made to Kris Rogers, Chris LaPaglia, Dan Coughlin and Cindy Wallace.[2] Rogers claimed appellant admitted he shot and kicked an old man, breaking his neck and dislodging his eye. T. 665-69. Appellant allegedly told LaPaglia he killed someone by kicking him, breaking his neck. T. 707-08, 714. Dan Coughlin testified Jeff said he killed a man in Arkansas, but gave no details. T. 758-59. Cindy Wallace testified that appellant said he was involved in a murder in which an old man was shot and killed, T. 729; another time he said the man was "beaten up really bad and one of his eyes was out of its socket." T. 731. In other versions, Ingle shot the victim. T. 743-44. In his statement to the FBI, appellant said that Ingle instigated and carried out the murder and that he "could not do twenty years in prison for a murder that he only witnessed and did not commit." T. 808, 812-14. The government's evidence lasted barely over one day.

Defense counsel's primary attack on the government's witnesses focused on expectations of rewards, which the witnesses and the government denied. *See* T. 563-64, 569-70, 691-92, 724. The defense presented no witnesses. The jury on June 23, 1997, found appellant guilty. T.910-13. After a fourteen-minute recess, the penalty

[2]Appellant's brother, Jason Paul, testified that he drove Jeff and Ingle to a pawn shop a mile and a half from where Williams' body was found. T. 783-87. Later that day, he saw appellant and Ingle driving a car similar to Mr. Williams' car. T. 788-89. On July 3, 1995, Jason and Jeff moved to Florida. T. 794-95.



Appellate Case: 05-3431 Page: 11 Date Filed: 07/03/2007 Entry ID: 3327284

phase commenced. T. 923.

The Government called Mr. Williams' daughters, Mary McKuin and Carol Sherman, to testify about the devastating impact of their father's death. T. 943-950. Mr. Williams' co-worker, Lawrence McCullough, described his career with the Farmer's Home Administration and his positive character. T. 950-961.

Defense counsel told the jury that appellant's father was "from an alcoholic... vagabond family that models irresponsible behavior 24 hours a day," T. 928, and that his mother, Paula Paul, was "an over-protective mother [who] is blind to her son's bad behavior, bails him out of his punishment." T. 929. He never mentioned Dennis Paul's violence, mental illnesses suffered by Jeff and his family, or Jeff's positive traits.

Mrs. Paul was the only defense witness. She testified that her husband, Dennis Paul, was a "pathological liar" who falsely claimed to be a martial arts expert and a decorated war veteran. T. 1042-43. Mrs. Paul outlined Jeff's schooling and criminal history, T. 1014-1033, and pled for Jeff's life, T. 1048, but never discussed his mental condition, his father's violence, or the family history of suicide and mental illness.

Defense counsel played a tape of Ingle admitting his guilt to a fellow prisoner, implicating appellant, but suggesting that Mr. Paul was not the gunman. T. 1058-1110. The defense case lasted little more than three hours.



Appellate Case: 05-3431 Page: 12 Date Filed: 07/03/2007 Entry ID: 3327284

After deliberating less than two hours, the jury sentenced appellant to death. T. 1159, 1161. The jury found every aggravating circumstance submitted, except the Government's claim that appellant had committed prior acts of violence. T. 1164-65. The jury unanimously rejected four statutory mitigating circumstances, T. 1167, and only three jurors found a fifth mitigator that factors in appellant's background weighed against a death sentence. Half failed to find his youth mitigating. T. 1166.

The trial court imposed a death sentence. T. 1173-1175. This Court affirmed, *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000).

**2255 Proceedings.**

The district court on January 30, 2002, appointed Robert McGlasson to represent appellant in proceedings under 28 U.S.C. §2255. A00237. McGlasson's motion to appoint co-counsel, filed May 20, 2002, was denied the same day. A00238; A00255. Appellant filed his §2255 motion on December 17, 2002, A00286, simultaneously requesting discovery about rewards received by Government witnesses, A01155.

Appellant alleged that the Government withheld evidence of rewards to witnesses, A00561-567; that trial counsel failed to conduct a reasonable investigation into mitigating evidence, A00586, A00596-607; that trial counsel failed to investigate adequately appellant's mental condition, A00586, 00596-607; and that appellant was not competent to proceed at the time of his trial, A00524-547, A00591-92. The



Appellate Case: 05-3431 Page: 13 Date Filed: 07/03/2007 Entry ID: 3327284

motion also faulted counsel for not investigating evidence supporting Mr. Paul's innocence of a capital offense. A00363-69, A00586-87, A00592-613. In connection with each of the above claims, Mr. Paul requested an opportunity to amend his petition upon completion of investigation and discovery. A00624-25. The Government opposed Mr. Paul's §2255 motion and request for discovery. A01223.

Mr. McGlasson again moved for co-counsel when he suffered temporary paralysis for several months. A01361. On September 15, 2003, the district court begrudgingly appointed co-counsel, warning, "I don't mean by bringing in, or permitting a second defense counsel to come in, to start all over with new theories.... I would really be off-put by that if that happened." A01399-1400.

On November 21, 2003, the district court heard appellant's *ex parte* request to allow mental health experts to evaluate him in the wake of a nearly successful suicide attempt by hanging. A01422. Counsel advised the court that on November 19, 2003, Mr. Paul "expressed bizarre and apparently delusional beliefs about one of his attorneys and about a person who has been visiting him. Mr. Paul was very agitated, still expressing suicidal wishes and tendencies, and unable to respond rationally to attempts to communicate with him." *Id*. The court granted counsel's request, but withdrew his order upon receiving a letter from appellant asking to be executed. A01630. Counsel's request to reinstate the order allowing a mental evaluation was ignored. A01577a. Counsel also moved for a mitigation specialist to investigate

appellant's claims of ineffective assistance of counsel. A01731.

On June 21, 2004, the district court denied appellant's discovery motion. A01631. Mr. Paul, in letters dated July 14 and 15, again asked to dismiss his § 2255 motion. A01671-74. He wrote that he had been "misguided and or, blatantly deceived as to the nature of the case against me," that he had been "kidnaped by the system," and could achieve "no real definition of what is going on." A01674. Mr. Paul said he "felt compelled externally" to demand execution. A01673-74. The court scheduled a video hearing on Mr. Paul's request for August 6, 2004. A01690.

The day before the hearing, Assistant U.S. Attorney Steve Snyder and Bureau of Prisons employee, Brad Shoemaker, gave the court *ex parte* information suggesting that appellant's letters were a manipulative delay tactic. A01691a, A01706-07. The court refused to allow further inquiry into the *ex parte* communications, A01719-22, absolved the Government of improper intent, and proceeded to hear Mr. Paul's request to die, A01705.

Mr. Paul again withdrew his *pro se* request for execution. A01781. Counsel requested travel funds to investigate appellant's background and mental condition, "which is at the heart of several issues in the case." A01778. On January 31, 2005, the district court filed orders denying Mr. Paul's §2255 motion, A01863, counsel's request for travel funds and Mr. Paul's request for a mitigation specialist. A01957.

Appellant moved to reconsider under Rule 59(e), tendering witness declarations



Appellate Case: 05-3431 Page: 15 Date Filed: 07/03/2007 Entry ID: 3327284

describing his family history of mental illness and suicide, Jeff's positive character traits, and episodes of parental assaults upon appellant. A01962-74. Witnesses also provided mitigating context for criminal behavior described by Mrs. Paul. A01964-66. Ingle admitted he shot Mr. Williams and appellant tried to stop him. A02253-55. Drs. Anthony Semone and Seymour Halleck attested that Mr. Paul is mentally impaired. Add. 99-101; A02294-96, A02248-52. The court on October 26, 2005, denied Mr. Paul's post-decision motion, and Mr. Paul on November 23, 2005, filed his notice of appeal.

The district court denied appellant's application for a COA, and this Court granted a COA on three issues.



Appellate Case: 05-3431 Page: 16 Date Filed: 07/03/2007 Entry ID: 3327284

## SUMMARY OF ARGUMENT

**Argument 1:** Trial counsel failed to conduct a reasonable investigation into Jeffery Paul's background and character. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Mitigation specialist Tena Francis identified Heather Miller, Deputy Sheriff Michael Roberson, Zach Dryden, Richard McCaslin and others who were never interviewed. A02243. She warned that "there was obviously a lot more information" regarding the mental health of appellant and his family. A02244. Counsel presented only appellant's mother, who testified neither about her husband's violence against appellant, nor the family's history of suicide and mental illness. Because "counsel were on notice" of compelling mitigation, their performance was deficient. *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Mr. Paul was prejudiced because counsel failed to discover abundant mitigating evidence, including:

- Extraordinarily violent punishment inflicted by his father;
- Suicide attempts and psychotic symptoms predating the crime;
- Family history of suicide and psychiatric hospitalization;
- Mr. Paul's positive character traits;
- Evidence mitigating his role in the crime and his prior criminal conduct.

New evidence supports every mitigating factor rejected by the jury and raises "a reasonable probability that the result of the sentencing proceeding would have been

different." *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

**Argument 2:** Trial counsel violated their "duty to conduct the 'requisite, diligent' investigation into his client's background," *Williams v. Taylor*, 529 U.S. 362 (2000), and failed to question appellant's competence in spite of "plenty of 'red flags' pointing up a need to test further." *Rompilla v. Beard*, 545 U.S. 374, 392 (2005). Dr. Semone warned that appellant was incompetent and would worsen under the stress of trial. A01037c. "The failure of trial counsel to request a competency hearing where there was evidence raising a substantial doubt about a petitioner's competence to stand trial may constitute ineffective assistance of counsel." *Speedy v. Wyrick*, 702 F.2d 723, 726 (8th Cir. 1983).

Appellant was prejudiced because Drs. Semone and Halleck agreed he "never should have been allowed to go to trial without medication" and he was "certainly incapable of proceeding through the penalty phase." A02326.

**Argument 3:** Mr. Paul's incompetence during habeas proceedings impaired counsel's pursuit of claims which could "potentially benefit from his ability to communicate rationally," *Rohan v. Woodford*, 334 F. 3d 803, 807 (2006), and raises concerns of fairness and due process of law, *Id.* 813-14. Since an incompetent prisoner cannot initiate or terminate habeas proceedings, *Nachtigall v. Class*, 48 F.3d 1076 (8th Cir.1995), *O'Rourke v. Endell*, 153 F.3d 560, 567 (8th Cir. 1998), neither should he be compelled to move forward on a petition he has already filed.

Expert and lay witnesses establish that appellant was incompetent during proceedings below. This Court allowed an evaluation of appellant, which concluded that he is mentally ill and could not communicate rationally with counsel. He was unquestionably incompetent after he hung himself in November 2003; since then he has not had a lucid conversation with counsel. Fundamental fairness requires that Mr. Paul's fact-intensive issues be litigated after he regains competence.

**Argument 4:** The Government's case depended upon appellant's alleged statements to Kris Rogers and Chris LaPaglia. T. 707-08, 730-31. The defense requested evidence of witness rewards, A00028, but the Government represented to the jury that no rewards were forthcoming, A00054. T. 905-06. Appellant, through FOIA, obtained heavily redacted FBI documents establishing Rogers and others received cash for "assist[ing] in the successful prosecution" of Mr. Paul. A01443; A00267-68. The Government admitted paying rewards, but attempted to distinguish between rewards "in exchange for testimony" and for "coming forward and providing information." A00268.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), including impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, (1985). Evidence of rewards is material because Rogers' and LaPaglia's testimony about appellant's statements

was central to the prosecution, and their claims appellant had an injured foot or a bloody shoe was the only reference to physical evidence of active participation in the homicide. T. 670, 683.

**<u>Argument 5:</u>** The district court made extrajudicial statements openly expressing anger that the prosecution was considering waiving the death penalty in Mr. Paul's case, and Government representatives engaged the district court's staff in improper *ex parte* communications pertaining to issues pending before the court. Under the procedures described in *United States v. Tucker*, 78 F.3d 1313, 1323-25 (8th Cir. 1996), Mr. Paul moves this Court to direct that upon remand, this case be assigned to a different judge "to preserve the appearance as well as the reality of impartial justice." *Id.* at 1325. This court commonly enters such a directive when the district court has been improperly exposed to matters favorable to one party or unfavorable to the other. *United States v. Rogers*, 448 F.3d 1033, 1035 (8th Cir. 2006); *Brunelle v. United States*, 864 F.2d 64 (8th Cir. 1988). The Government's *ex parte* communication of substantive, prejudicial information to the district court's staff warrants the same relief.



Appellate Case: 05-3431 Page: 20 Date Filed: 07/03/2007 Entry ID: 3327284

## STANDARD OF REVIEW

This Court reviews a district court's judgment on the pleadings *de novo*, "without deferring to the district court." *St. Paul Fire and Marine Ins. Co. v. F.D.I.C.*, 968 F.2d 695, 699 (8th Cir. 1992). Since all of the issues presented herein were denied on the pleadings, without allowing discovery, investigative resources, an opportunity to amend, or conducting a hearing, the standard of review as to all issues is *de novo*. The question before this Court "is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)." *Id.*; *See also Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001).



Appellate Case: 05-3431 Page: 21 Date Filed: 07/03/2007 Entry ID: 3327284

## ARGUMENT 1

**Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Appellant's Mental, Medical and Physical History.**

Because Jeffery Paul was only eighteen years old when Sherman Williams was shot, he is among the youngest people on death row in America. A reasonable investigation would have proven that he possesses all the characteristics that compelled the Supreme Court to prohibit the execution of juveniles:

> Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, . . . "[a] *lack of maturity and an underdeveloped sense of responsibility* are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions."
>
> ... [Second,] *juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure*.
>
> ... [Third,] *the character of a juvenile is not as well formed as that of an adult*.
>
> ... These differences render suspect any conclusion that a juvenile falls among the worst offenders.

*Roper v. Simmons*, 543 U.S. 551, 569-570 (2005) (emphasis added, internal citations omitted). The Court found unacceptable the risk that young offenders would be unjustly executed:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death.

*Id.*, 572-73. Although Mr. Paul's age does not automatically spare his life, "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Id., 574. Because trial counsel ignored obvious avenues of investigation, the jury condemned Mr. Paul to die without hearing evidence of his positive character, his father's violence against him, or his mental illness which runs throughout his family. Because of counsel's deficient preparation, Mrs. Paul's testimony diminished the mitigating value of Jeff's life history, and presented aggravating evidence of Jeff's criminal history devoid of mitigating context.

Counsel's performance is governed by *Strickland's* familiar standard. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In assessing counsel's performance, "prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." *Wiggins v.*



Appellate Case: 05-3431 Page: 23 Date Filed: 07/03/2007 Entry ID: 3327284

*Smith*, 539 U.S. 510, 522 (2003), citing *Strickland*, 466 U.S. at 688-89. The Court recognized counsel's duty to conduct a thorough investigation of the client's background:

> The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). . . . Cf. *id*., 11.8.6, p. 133 (. . . among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences).

539 U.S. at 524-25 (Court's emphasis).

Courts reviewing capital cases must determine whether trial counsel satisfied his "duty to conduct the 'requisite, diligent' investigation into his client's background." *Id.*, citing *Williams v. Taylor*, 529 U.S. 362 (2000). This assessment "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 522, quoting *Strickland*, 466 U.S. at 689. The Court explained:

> In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.



Appellate Case: 05-3431 Page: 24 Date Filed: 07/03/2007 Entry ID: 3327284

*Wiggins*, 539 U.S. at 527. Where facts known to counsel suggest further investigation would be fruitful, the failure to investigate results from "inattention, not reasoned strategic judgment." *Id.*, 526. Where, as here, counsel fails to present substantial mitigation evidence, "we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. at 523.

Because the district court refused Mr. Paul's requests for discovery, investigation, and mental evaluation, and failed to conduct a hearing, the record is incomplete, and all contested factual issues remain unresolved. Nevertheless, trial counsel's deficient investigation, sparse presentation at trial, and the evidence now available establishes that Mr. Paul was prejudiced by trial counsel's failure to investigate.

**A. Trial Counsel's Deficient Investigation.**

Trial counsel retained mitigation specialist Tena Francis to investigate Mr. Paul's life history on December 19, 1996, less than six months before trial. A02241. Although counsel moved to authorize payment for her services in late December, 1996, she was advised on February 12, 1997, that her work would be *partially* funded. *Id.*

When Ms. Francis and trial counsel Lynn Williams met with Mr. Paul in Butner, North Carolina, he "was extremely emotional and Mr. Williams made no

effort to calm him." A02242. She asked Mr. Williams to leave so she could conduct a meaningful interview. *Id.* They then went to Mississippi for an unproductive interview with Dennis and Paula Paul. *Id.* She advised counsel that she needed to interview the family again after obtaining documents of Mr. Paul's life history. *Id.*

In late March, 1997, Ms. Francis met with counsel and Mr. Paul again. *Id.* Although the investigation was far from finished, she had exceeded the hours authorized by the trial court, and suggested that counsel request additional funding. *Id.* A motion was filed on April 7, but three weeks later the court still had not ruled. *Id.* On counsel's word that funding would be forthcoming, Ms. Francis returned to Mississippi and interviewed appellant's family again. *Id.* She saw evidence of Mr. Paul's chaotic family, and "that Jeff's father had been... emotionally unstable when Jeff was a child." A02243.

On April 28, 1997, the magistrate authorized an additional 160 hours of investigation. *Id.* On May 5, 1997, Judge Hendren reduced the authorization to 100 hours, which Ms. Francis had already reached. *Id.* At a May 7, 1997, telephonic hearing, Judge Hendren "was quite angry" that Ms. Francis had exceeded the hours originally approved. *Id.* He reluctantly authorized additional time, admonishing her, "Young lady, this is it. This is all you get." *Id.* When Ms. Francis consumed the balance of funds without completing the investigation, she asked trial counsel to seek additional funds, but he refused. *Id.* Mr. Williams advised Ms. Francis not to

interview witnesses in the Hot Springs area, as he would do that himself. A02245.

Ms. Francis advised counsel that she "had not yet begun to explore the family history of education, mental health, employment, military history, and criminal history." She told counsel that appellant's parents "were not being totally forthcoming with us because of embarrassment, guilt, and anxiety associated with some of the most important historical information." A02244. She told counsel there was "a lot more information to be developed in order to have a true understanding of Jeff Paul's life history," including a family history of mental illness. *Id.* Ms. Francis identified witnesses to significant events in appellant's life, including Heather Iacobacci (now Miller), Deputy Sheriff Michael Roberson, Zach Dryden, Richard McCaslin and others who were never interviewed. A02243. When her employment was terminated, Ms. Francis "had not conducted the necessary one-on-one interviews with the family about very sensitive subjects relevant to Jeff's development, environment and mental health history." *Id.*

The Government evaluation found Mr. Paul competent because he "gives no history to suggest a psychotic thought process or extreme mood disorder that would have caused him to be unable to appreciate the nature and quality of his alleged offenses."A00097. On April 4, 1997, before consulting a mental health expert, defense counsel stipulated to the Government's report, and waived a competency hearing. A00102. Based on that stipulation, the trial court found appellant competent



Appellate Case: 05-3431 Page: 27 Date Filed: 07/03/2007 Entry ID: 3327284

without a hearing. A00127.

Defense psychologist Anthony Semone found that Jeff was profoundly self-destructive and prone to acute psychotic episodes. Add. 99. Dr. Semone warned that he "had doubts about Mr. Paul's present competency to stand trial" based upon "several flagrant and emotional outbursts committed by Mr. Paul during the interviews with him and his attorneys." *Id.* He "concluded Jeffery Paul was suffering from an underlying severe mental disease," and that his emotional outbursts "were a direct product of that disease and were not feigned behaviors." *Id.* Dr. Semone told counsel that Jeff needed medication to maintain competence. A00137c.

On May 19, 1997, less than a month before trial, counsel moved for an investigator, A00140, explaining that "counsel does not have the time to conduct the investigation himself." A00141. The trial court denied the motion the next day. A00150.



Appellate Case: 05-3431 Page: 28 Date Filed: 07/03/2007 Entry ID: 3327284

## B. Trial Counsel's Deficient Representation.

### 1. Guilt-or-Innocence Stage of Trial.

The primary evidence against Mr. Paul, aside from his association with Trinity Ingle on the day of the event, consists of statements attributed to appellant, some denying responsibility, while others admit guilt to widely varying degrees.[3] Defense counsel elicited Cindy Wallace's testimony that Jeff told "tall tales," T. 745, and attempted, unsuccessfully, to impeach witnesses with expectations of cash rewards, T. 570-74, 692, 724. Defense counsel otherwise conducted little or no cross-examination, and called no witnesses. The jury on June 23, 1997, found Jeffery Paul guilty of murder. T. 1178.

### 2. Penalty Stage of Trial.

After the guilty verdict, the court recessed for fourteen minutes, then commenced the penalty stage. T. 923. The prosecution told the jury it would prove statutory aggravating circumstances that the murder was committed in a heinous, cruel or depraved manner; that it was committed for pecuniary gain; and that Sherman Williams was vulnerable because of his age. T. 925. The Government also argued appellant's alleged lack of remorse, Mr. Williams' good character, and the impact of

[3]Compare the testimony of Kris Rogers and Cindy Wallace, T. 669, 731, to pathologist Frank Piretti's testimony that there was no evidence that Mr. Williams suffered a broken neck or any injuries other than gunshot wounds. T. 598-600.



Appellate Case: 05-3431 Page: 29 Date Filed: 07/03/2007 Entry ID: 3327284

his death upon his family. T. 925-926.

Defense counsel's mitigation theme was that appellant's father "model[ed] irresponsible behavior 24 hours a day," T. 928, and his mother, Paula, was "over protective" and "bail[ed] him out of his punishment" for bad behavior. T. 929. There was no mention of appellant's violent upbringing, mental illness or positive qualities.

Paula Paul was the only defense witness. T. 971-1051. She testified that the family moved frequently because of her husband's unstable employment. T. 972-1017. Dennis' family were all alcoholics or drug addicts, T. 983-985, and Dennis was a "pathological liar" who made farfetched claims that he was a martial arts expert and a decorated war veteran, T. 1042-43.[4] Jeff also was a "tall teller", and would claim he saw gigantic bears in the woods. T. 1041.[5]

Jeff was successful in church, scouting, and school, except for math, until the seventh grade when the family moved to Hot Springs and he began receiving failing grades. T. 987-1006. Mrs. Paul said a children's hospital diagnosed Jeffery with "Attention Hyperactivity Deficit Disorder" and put him on Ritalin through the eighth grade. T. 1011. Jeff has no concept of time or geography, and cannot comprehend

---

[4]Cf. James Massey A02277, Hubert Massey A02267, Martha Massey A02284, Heather Miller A02261 and Suzie Teague Add. 102-107, describing physical violence against Mr. Paul by his father.

[5]Cf. Dr. Seymour Halleck A02313, describing Mr. Paul's documented false admissions to murder.



Appellate Case: 05-3431 Page: 30 Date Filed: 07/03/2007 Entry ID: 3327284

maps. T. 1037.

Mrs. Paul outlined Jeff's criminal history, beginning with shoplifting, which was never charged, T. 1014-1015, an auto theft for which he was sent to Rivendell, T. 1021-1024,[6] shoplifting a $1.99 pair of earrings, T. 1030, and "a terroristic threatening incident with a shotgun" for which Jeff spent several months in jail before being put on probation, T. 1031-33. Jeff violated his probation and was sent to Varner State Penitentiary. T. 1035. Jeff returned from Varner in March, 1995, and by June had been fired from his second job, which had "[s]omething to do with being in a room that he wasn't supposed to be in." T. 1036-37. Mrs. Paul asserted that Jeff was wrongly accused of three offenses. *See* T. 992, 1029-31.

Mrs. Paul briefly described two traumatic events in Jeff's life. At age eight, he suffered a knife wound to his face, which required over two hundred stitches and reconstructive surgery that involved moving his teeth around. T. 990. Dennis told her that "Jeffery just slipped and fell on the knife." T. 991. Mrs. Paul later learned that Dennis was throwing knives, but made Jeff keep that a secret. *Id.*[7] When Jeff was

---

[6]"All I know is that Jeff and another little boy were walking around one day and decided they wanted to go to Florida. And there was a car sitting out in front of a local barbeque place with the keys in it and they got in it and kinda left." T. 1022. Cf. Zach Dryden, A02239-40.

[7]Cf. A02292, Deputy Michael Roberson, who described how Dennis Paul stood him against a wall, blindfolded, and threw knives at him.



Appellate Case: 05-3431 Page: 31 Date Filed: 07/03/2007 Entry ID: 3327284

twelve, he saw a man shoot a boy who was standing within a few feet of him. T. 1016. After witnessing "this little boy's head being blown off," Jeff had nightmares and had to be with Mrs. Paul constantly. *Id.*

Mrs. Paul attempted unsuccessfully to negate evidence implicating appellant in the crime. She disapproved of Trinity Ingle. T. 1038. Mrs. Paul never saw Jeff come home with bloody shoes or bloody clothes, T. 1040, and she never saw him limping that summer, T. 1043. Jeff never told her he killed anyone, and she never tried to send him overseas. T. 1040. Jeff often talked about joining the French Foreign Legion, but she never took him seriously. T. 1040-41. In July, 1995, the family moved to Mississippi because Hot Springs was not a "good environment to bring up two younger boys." T. 1044.

Mrs. Paul visited Jeff in Key West. He had a steady job and sent money home regularly. T. 1045. She promised to visit Jeff regularly in prison. He reads the Bible and would help other prisoners. T. 1046-47. Mrs. Paul said that Jeff's little brothers love him and would miss him, and that she "cannot imagine the devastation [his execution] would do to me." T. 1048.

Defense counsel played an audio tape of Ingle's statements to fellow prisoner Jonah Jones. Some of Ingle's statements implicated Mr. Paul, but others suggested that he was not the trigger man. T. 1058-1110. Ingle told Jones, "At first, you know, he didn't even want to shoot him . . . and you know, we started walkin', and I was



Appellate Case: 05-3431 Page: 32 Date Filed: 07/03/2007 Entry ID: 3327284

like, 'Naw, man, fuck that country mother fucker.' You know?" T. 1103.[8]

The jury rejected the mitigation case almost entirely. After finding every aggravating circumstance except for one,[9] T. 1164-65, the jury unanimously rejected four of five statutory mitigating circumstances.[10] The jury unanimously found non-statutory mitigating factors of parental neglect, parental abdication of responsibilities, chaotic family instability, and that Mr. Paul identified with criminal peers. T. 1176. Eight jurors found that Mr. Paul's parents modeled irresponsibility and, although Mr. Paul was only eighteen, only six found that his youthfulness was mitigating. *Id.* None found the mitigating circumstance of "reversed parental role models". T. 1167. The trial court sentenced appellant to death. T. 1173-1175.

---

[8]Cf. A02253-55; Ingle unequivocally accepts full responsibility for the homicide.

[9]The jury rejected the proposition that Mr. Paul had committed prior acts of violence. T. 1164-65.

[10]The jury unanimously rejected mitigating circumstances that appellant's participation in the offense was relatively minor; that he did not have a significant prior criminal history; that he was experiencing emotional disturbance; and that a person of equal or greater culpability would not be punished by death. T. 1167. Only three jurors found that other factors in Mr. Paul's background weighed against sentencing him to death. T. 1166.



Appellate Case: 05-3431 Page: 33 Date Filed: 07/03/2007 Entry ID: 3327284

## C. The Postconviction Proceedings.

### 1. Postconviction Counsel's Investigation.

#### a. Guilt-or-Innocence Issues.

Anticipating the district court's hostility toward fact development, counsel began investigating Mr. Paul's background and character without awaiting authorization to hire a mitigation specialist, and this Court permitted a partial mental evaluation of Mr. Paul during this appeal. That investigation produced substantial evidence to support appellant's claims.

As previously noted, many of Jeffery Paul's pretrial statements were mitigating or exculpatory. His inculpatory statements to Cindy Wallace were told as though from a dream in which Ingle forced him to participate in the crime or be shot. T. 730. He subsequently told Ms. Wallace that Ingle killed Mr. Williams, and that he was completely innocent. T. 743. In his statement to Agent LaVoie, appellant said Ingle decided to rob Mr. Williams, and Jeff followed him, kicking Mr. Williams once in the chest, but not intending serious harm. T. 810-11. As they walked away, Ingle said he didn't want to do time for robbery, so he turned back and shot him in the head and shoulder, then pulled him off the trail. T. 811. Mr. Paul told Agent LaVoie he could not do 20 years for a murder he had only witnessed, but did not commit. T. 812-813.

A reasonable investigation would seek corroboration of Mr. Paul's less inculpatory statements. Defense counsel knew Ingle had recently been convicted of

Mr. Williams' murder. Although Ingle was the only eye-witness, counsel made no attempt to interview him. Ingle would have provided testimony against his penal interest, consistent with the physical evidence, exonerating Mr. Paul of any intent to kill. A02253-55. Ingle followed Mr. Williams up the trail on Hot Springs Mountain, then at gunpoint demanded his keys and wallet. A02254. Ingle states that appellant "was trying to get me to leave, saying, 'come on, let's go.'" *Id.* Ingle ordered appellant to bind Mr. Williams with the duct tape, then they started to leave. *Id.* Ingle saw that Mr. Williams "was looking right at me." *Id.* Ingle described what happened next:

> I turned to go back, but Jeff grabbed me by the arm and said, "let's just leave him and get out of here." Jeff kept arguing with me but I yanked free of him holding me. I still had the gun in my hand and Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what I was going back up the mountain for, I made sure he knew if he put his hands on me again trying to stop me I would have shot him, too, and it would have been two people left up on that mountain.
>
> So I walked back up the trail and asked the guy if he was going to call the cops. He said no but of course I knew he was lying. So I stood over him and shot him in the chest but one shot was rat shot which I had forgot was in the chamber. I heard Jeff yelling at me to stop, But I turned back around and shot Mr. Williams with the real bullet in the head.

A02254-55. Ingle's declaration is consistent with the physical evidence and Mr. Paul's statement to Agent LaVoie, denying involvement in the shooting. T. 810-814.



Appellate Case: 05-3431 Page: 35 Date Filed: 07/03/2007 Entry ID: 3327284

Postconviction counsel's reasonable investigation produced other evidence establishing the unreliability of Mr. Paul's inculpatory statements. Garland County Deputy Michael Roberson lived with the Paul family briefly. He would have testified that it "makes sense that Jeff tended to exaggerate his 'badness' to gain status with his peers, as he had learned this from Dennis." A02293. Consistent with Deputy Roberson's experience, Psychiatrist Seymour Halleck found two documented instances in which Jeff made false claims that he committed a homicide. A02313. Dr. Halleck could have explained Jeff's tendency to "exaggerate[ ] his 'badness'" to gain approval. A02293.

In a similar case, counsel was found ineffective for failing to use his client's mental illness to challenge the reliability of his admissions to murder:

> While a defendant's mental condition of itself cannot justify the suppression of his confession absent evidence of police coercion, see *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), *evidence of a defendant's mental state can be used to impeach the credibility of a confession once admitted.* . . . Mr. Ward's failure to uncover evidence that Mr. Williamson's mental illness distorted his perception of reality and caused delusions deprived counsel of a potent weapon with which to challenge the State's most direct evidence.

*Willliamson v. Ward*, 110 F.3d at 1520 (10th Cir. 1997) (emphasis added). Mr. Paul's case is remarkably similar.

Mr. Paul's close friend, Richard McCaslin, could put Jeff's false inculpatory

claims into context:

> Jeff was very insecure about his image. Because the approval of other people was important to him. He would talk tough and brag about things that he had not even done. . .
>
> The kids Jeff and I hung out with called themselves a "street gang," but it wasn't a real gang. We were just a bunch of teenagers hanging out together and acting tough. . . . Talking tough is just what we did to get accepted by the other kids who were also trying to act tough. . . .
>
> But that didn't stop Jeff from making up stories about committing crimes that never really happened. For example, he made up a story about shooting a kid at a shopping mall, but it never happened.

A02256-57. FBI Agent Tom Ross interviewed McCaslin before trial, and told him that Jeff shot and kicked an old man. A02257. McCaslin replied this "did not sound like something Jeff would do." A02258. These witnesses would have provided important context to Jeff's statements.[11]

Counsel's failure to investigate prevented the presentation of character evidence of grandparents, Martha and Hubert Massey A02284, A02267, his uncle, James Massey A02276, and other people who saw his kind and compassionate nature,

---

[11]The district court found that counsel's failure to present testimony of Mr. Paul's history of false confessions"is a tribute to their wisdom and competence." Add. 87. The record establishes, however, that they attempted to pursue this theory through Government witness Cindy Wallace, *see* T. 745, and again in the penalty phase through Mrs. Paul, T. 1043. These attempts failed in the absence of persuasive corroborating evidence.



Appellate Case: 05-3431 Page: 37 Date Filed: 07/03/2007 Entry ID: 3327284

including Heather Miller A02260, Suzie Teague Add. 102, and Richard McCaslin A02256. Mrs. Teague would have testified that she could imagine "Jeff may have been caught up with another person who may have done the killing, but it would take some hard evidence to convince me that Jeff Paul himself actually shot an old man...." Add. 105. A fully informed jury would likely find Jeff less culpable than Ingle in Mr. Williams' homicide. A reasonable juror hearing this evidence might refuse to convict Jeff Paul of the capital charge, and would spare him from execution.

**b. Mitigating Evidence.**

Even though the district court denied appellant the means to investigate Jeff's mental health, background, and character, the limited investigation by undersigned counsel produced mitigating evidence far more probative and persuasive than that presented by trial counsel. Relying on the same leads that Tena Francis provided trial counsel, postconviction counsel interviewed witnesses critical to a reliable mental health assessment. Counsel also uncovered persuasive evidence of Mr. Paul's positive character traits, his history of traumatic assaults by his father, and other mental health impairments, mitigating his behavior.

In addition to requesting investigative resources, appellant asked the court to permit mental health experts to evaluate him. A01422, A01738. Dr. Halleck explained that an accurate history is necessary to a reliable evaluation:

> [I]t would be very important to ascertain additional family

> and medical history. I would be particularly interested in whether there were persons in his family tree who had been diagnosed with schizophrenia or other major mental illness. A thorough investigation and evaluation could enable me to determine the nature and extent of Mr. Paul's mental illness, and how it affected him during any of the events leading up to his conviction and sentence.

*See* Add. 96-97. An accurate family history could help resolve whether Mr. Paul's behavior resulted from a serious disability, as opposed to a flawed character. In addition, Mr. Paul's background and psychological disabilities are mitigating, regardless of whether they are causally connected to the offense. "Virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). Undersigned counsel used Ms. Frances' witness list to discover credible witnesses who described Jeff as a compassionate and sensitive young man from a troubled home dominated by a severely assaultive father who abandoned his family for months at a time in pursuit of delusional fantasies. Therefore, a reasonable investigation into appellant's family history and mental health issues was essential to a constitutional trial.

Postconviction counsel interviewed Richard McCaslin, who spoke with Mr. Paul often before trial. He recalls that Jeff was tearful and "very paranoid and



Appellate Case: 05-3431 Page: 39 Date Filed: 07/03/2007 Entry ID: 3327284

rambling and not making any sense." A02259.[12] McCaslin could provide insight into Mr. Paul's positive character and troubled background. When Mr. Paul was under stress, McCaslin saw him "pace back and forth real bad, and he would pick at his face until it would bleed. When I would see that he had a lot of open sores on his face, I knew things were real bad at home." A02256. McCaslin is familiar with Jeff's positive qualities:

> ... he was not violent by nature. In fact he was a kind and compassionate person, especially with my children. Two of my children have physical or developmental disabilities, and Jeff used to play sports with them and treat them very well. He and my children loved each other very much.

A02257. Trial counsel never interviewed Mr. McCaslin or his wife, Melissa, in spite of their close relationship with appellant. A02259. Melissa McCaslin lived near the Paul family, and was willing to testify "about the way Jeff's family was, and about Jeff's positive, nurturing relationship with our children." *Id.* McCaslin also would have directed counsel to other potential witnesses who knew Mr. Paul well and would have testified for him. *Id.*

Tena Francis told counsel that she had not finished interviewing Mr. Paul's family, even though there was significant information to be obtained. Hubert Massey, Mr. Paul's maternal grandfather, had important family history of numerous suicides,

---

[12] McCaslin's observations about Mr. Paul's deteriorating mental condition are discussed in Argument 2.



Appellate Case: 05-3431 Page: 40 Date Filed: 07/03/2007 Entry ID: 3327284

attempted suicides, and involuntary psychiatric commitments of Jeff's aunt and uncle.[13] Mr. Massey had attempted suicide by shooting himself in the chest with a shotgun. A02272. His grandfather, Joe Card, had killed himself with a shotgun. *Id*. His nephew, Buford, suffered from chronic alcohol and drug addiction before hanging himself in a county jail. A02273. Buford's sister, Pat, was mentally disabled. *Id*. His wife's sister, Lenora Baker, attempted suicide by slitting her wrists, and was involuntarily committed to a mental hospital. *Id*. Another uncle, Troy Baker, shot himself to death, and Mrs. Massey's father, James Baker, suffered from chronic, severe depression. *Id*. Mr. Massey's son, James, has been hospitalized and disabled by schizophrenia. A02273-74.

Hubert Massey observed, "The household Jeff was raised in was not a very safe place for a child." A02267. He explained, "Dennis was a violent man, and he was unpredictable and often absent from the family." *Id*. Although he and his wife "could see very clearly what was happening to the kids, including little Jeff, . . . Paula was our daughter, and she loved Dennis, and we could do nothing about that." A02267-68. He could have testified that Jeff was "repeatedly" assaulted by his father, who would lift him off the ground by his ears, and hold him in the air as he screamed,

[13]Mr. Massey stated, "The lawyers who represented Jeff at his trial never spent any time with me or my wife asking me questions about Jeff, or his childhood, or our families." A02274.

"Stop daddy, stop." A02268. Mr. and Mrs. Massey heard Jeff "screaming his head off" while his father was "wailing the tar out of [Jeff] in another room." *Id.* On other occasions, "Dennis would hit Jeff and throw him against the wall in anger." *Id.* Dennis "seemed to want to torture little Jeff for no good reason." *Id.* In spite of his father's brutality, Jeff was a good boy. "He was very gentle and loving. He really cared for animals, and would always want to save some little creature that he had picked up from somewhere." *Id.* Although Jeff had no money, he would work to earn change to buy his grandfather his favorite candy, a Three Musketeers Bar. *Id.*

Mr. Massey recalls when Dennis Paul hit Jeff in the face with a throwing knife:

> Dennis claimed that the boys were just goofing around throwing knives at trees and that one just ricocheted off and hit Jeff in the face. But we knew that Dennis had been "teaching" the martial arts boys about knife throwing and knife fighting, and one of the boys had said that Dennis was involved in injuring Jeff during one of these "practices."

A02270. Jeff's face was left "badly scarred, while he was just becoming a teenager, and he was always very self-conscious about the scar and always afraid to talk about what had happened." *Id.*

Deputy Michael Roberson took martial arts lessons from Dennis Paul, and describes the terrifying experience of being blindfolded and made to stand against a wall while Dennis Paul threw knives at him. "I believe Jeff got his face cut . . . when Dennis was practicing one of these martial arts 'techniques' with him." A02292.



Appellate Case: 05-3431 Page: 42 Date Filed: 07/03/2007 Entry ID: 3327284

Deputy Roberson recalls, "Dennis had a tendency to lose control in fits of rage when he felt like he was losing control of someone else or the situation." A02292-93. Deputy Roberson also saw that Dennis Paul "imparted negative gang-type values in Jeff." A02293. In his experience, "Jeff was not really a tough guy, but he was well-trained by his father on how to project a tough-guy image. Jeff believed that by doing so he could win the approval of his father." *Id.* Deputy Roberson was never contacted by trial counsel. *Id.*

Martha Massey, appellant's grandmother, would have corroborated her husband's testimony, and added that "the children just couldn't count on Dennis even being there, and then when he was around, he was unpredictable and often raging. It was a very difficult situation for children to grow up in." A02285. Nevertheless, Jeff was "the sweetest one of the whole bunch," and a very caring and loving child who brought her flowers. *Id*. Although Mrs. Massey wanted to help her grandson, "[t]he lawyers for Jeff at his trial never spoke with me, and never asked me any questions about Jeff or the family or anything." A02286.

James Massey, Mr. Paul's maternal uncle, would have testified, "The most prominent thing that sticks in my mind about that family was how violent Dennis was with his kids, especially Jeff." A02277. Dennis Paul "couldn't reign in his temper," and would "start raging," becoming physically violent toward Jeff . *Id.* He saw Dennis throw Jeff across the room into a wall, while Jeff was "screaming in pain and



Appellate Case: 05-3431 Page: 43 Date Filed: 07/03/2007 Entry ID: 3327284

fear." A02278. Dennis would grab and choke Jeff to the point that James worried he would "severely injure Jeff, or even kill him." *Id.* James Massey also observed early signs of mental illness in Jeff:

> While Jeff was a child he would see things, mostly people, in the room with us, which were not there. He would ask me if I saw them, and I would tell him I didn't. . . .
>
> Most of the time the people he saw were dark figures, almost always male, older, wearing dark clothing. They were strangers. Sometimes he told me they would talk to him. I don't remember what they would say to him. He was almost always scared when he would see these figures.

A02278-79. [14]

Like everyone else familiar with Jeff, James Massey would have testified that Jeff "had a kind and caring disposition; he just couldn't stand to see anything get hurt or injured." A02279. Watching the trial, Mr. Massey was "troubled that the lawyers never let the jury know really anything about these good parts of Jeff. There were just so many stories they could have been told about Jeff's caring, sensitive side." *Id.* Trial counsel never interviewed him, but James went to their office. "The lawyer did not ask me any questions, even though I told him I would be glad to be of any help I

[14] James saw Jeff's "acting out" during his trial. A02281. He "could tell there was a lot more going on than just an angry teenager having a fit." A02283. His observations are discussed in more detail in Argument 2, below.



Appellate Case: 05-3431 Page: 44 Date Filed: 07/03/2007 Entry ID: 3327284

could." A02283.

Heather Iaccobacci Miller dated Jason Paul. She saw Dennis Paul "get raging angry, out of the blue" several times. A02261. Once, as Jeff lay on his bed, she watched as "Dennis ran in there in a fit of anger, yelling and cussing, got on top of Jeff, and started hitting him." *Id.* Later that night she found Jeff wandering around, his face covered with bruises, and she took him to her house. She saw Jeff on several other occasions when it was clear Dennis had beaten him up. A02261-62. She recalls that Jeff loved his dog, Ashley, very much. "One time in one of his rages Dennis threw Ashley down the stairs and broke one of its legs. Jeff doctored it as best he could, and nursed it back to health. But from then on Ashley always had a limp and a crooked leg." A02263.

Ms. Miller remembers Jeff nursing wounded animals back to health. A02264. In her experience, "Jeff was actually a very gentle and sensitive person. But I do think his father's pushing him to be badder and tougher than he was actually had the effect of sending Jeff into this gang group to prove himself." *Id.* She believes that Jeff associated with people like Ingle as "just an escape for him away from his bad home life." A02263. She was never contacted by Jeff's trial attorneys. She was "still a teenager, and so I didn't know enough to reach out myself." A02266. Tena Francis gave trial counsel Ms. Miller's name as a potential mitigation witness. A02246.

Ms. Miller's mother, Cyrilda Sue Teague, would have told the jury that "the

Jeff Paul that I knew was a very decent, kind, gentlemanly person." Add. 102. However, "[t]he thing that I feel the most awful about poor Jeff was how his father treated him." Add. 103. She knew that Dennis Paul "would beat Jeff black and blue repeatedly." *Id.* Jeff often came to her house for refuge after the beatings. "Many times his face and head would be scraped, cut, and bruised" or "his mouth would be all cut up" and "he would have black eyes. . . He would have been beaten from head to toe." *Id.* One time his eye "was swollen so badly he couldn't see out of it." *Id.* She lifted up his shirt and saw "bruises all over him–on his back, his stomach, his arms." Add. 104. When she asked Jeff what happened to him, he would say, "Dad got mad at me." *Id.* She said, "This wasn't any sort of normal punishment." Add. 103. "I'm no doctor, but I'd just bet if they did some kind of scan on his body, they would find all sorts of cracked bones and things that went untreated." Add. 104.

Mrs. Teague wanted to call the police or take Jeffery to the doctor, but "Jeff would stop me. My daughters would also plead with me not to call. Jeff and my daughters were very afraid of Dennis, and they were fearful that if I reported him, that Dennis would come after me." *Id.* "He would be crying, and I would just hold him and hug him." Add. 103. Unlike Paula Paul, Mrs. Teague is able to acknowledge some responsibility for Jeffery's traumatic childhood:

> given what I saw with Jeff, they really did make me afraid to get involved with the Paul family problems. So all I would do would be to hold Jeff, try to bandage him up as



Appellate Case: 05-3431 Page: 46 Date Filed: 07/03/2007 Entry ID: 3327284

> best as I could, and make sure he knew that he always had a place he could come to, where he was safe and loved.

Add. 104-05.

Mrs. Teague "could see Jeff 'bragging' about things, even bad things, if he felt the group he was operating in would respect him more. That was how damaged his home life left him." Add. 106. Unfortunately, trial counsel never contacted her. She "would have been happy to testify about anything the lawyers thought useful to help Jeff," and regrets not knowing how to seek them out. *Id.*

Zach Dryden was on Ms. Francis' witness list because he was involved in the auto theft which Mrs. Paul described. A02246. When undersigned counsel interviewed Zach, he was enrolled in college and working in the family business, Dryden Pottery, in Hot Springs. A02239. Zach described the incident not as a car theft, but as Mr. Paul's attempt to "get away from his home life, and I was sort of along for the ride." *Id.* He and Jeff were walking along the railroad tracks, and Jeff "wanted to run away from his father. Jeff was scared of him, and did not like the methods that his father would use to punish him." *Id.* They agreed to run away together:

> It was not a well-planned adventure. We walked through the parking lot of a barbecue place just off Airport Road, hoping to find a car with the keys in it and maybe some money, then we would run away and get a job and live on our own. We were fourteen years old.

*Id.* They had $14 between them, and ran out of gas in Memphis. The police found them at the airport, and called Dennis Paul, who went to get them. *Id.* On the way home, "Mr. Paul yelled at Jeff, and told him that if he didn't have to take him back to the police station, he would beat the crap out of him. I was actually glad that he had to take us to the police department after hearing that." A02240. Mr. Dryden felt certain "that if I had not been there he would have beaten the daylights out of Jeff." *Id.* Mr. Dryden was never contacted by trial counsel, but "would have told them everything I know about Jeff and his home life, and our little episode together." *Id.*

The lay witnesses described above persuasively support the findings of Drs. Semone and Halleck that Mr. Paul is mentally ill. Dr. Semone told trial counsel that his testing "demonstrated the presence of a 'psychotic panic' or an acutely psychotic decompensation, and that this condition could worsen under stress.. . ." Add. 98. Dr. Semone "noted, as examples that had already occurred, his suicidal tendencies when he was arrested and at the jail."Add. 99. The expert mental health testimony is discussed in further detail in connection with Argument 2, below.

Even though trial counsel had actual notice of these important witnesses, the jury heard nothing remotely like their testimony. Instead, trial counsel presented only Mrs. Paul, who gave a sketchy account of Jeff's childhood that was protective of her husband, and avoided discussion of Dennis Paul's violence or the extensive family history of mental illness.

### 2. The District Court Ruling.

The district court denied relief because "petitioner fail[ed] to specifically identify the witnesses to be actually called and the substance of their testimony," Add. 88, and because, "in light of the content of the testimony of petitioner's mother and the fact that the jury apparently accepted it, the proposed additional testimony would have been cumulative at best." Add. 89. As is clear from the above facts, neither conclusion is supported by the record.

Mr. Paul's §2255 gave adequate notice to the district court and the Government of the facts and law underlying his ineffective assistance of counsel claim. Further, appellant advised Judge Hendren that through no fault of his own or his counsel, he was not finished investigating counsel's ineffectiveness, and requested leave to amend his petition after the completion of discovery and investigation. A00624-25. Toward this end, he moved for funds to investigate issues relating to Mr. Paul's culpability, emphasizing the need for a complete history to reliably assess appellant's mental health. A00104. Mr. Paul also moved for access to appellant by mental health experts. A00135, A00138. Both requests were denied, even after Mr. Paul's suicide attempt, request for execution, and apparent deterioration increased the need for an evaluation. *Id*.

The district court's denial of relief without permitting discovery or investigation is tantamount to summary judgment. A plaintiff who makes specific allegations

which, if proven, would entitle him to relief is entitled to the fact-development procedures necessary to flesh out his claims without undue interference. Cf., *e.g.*, *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("[Fed. R. Civ. P.] 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."). The district court nevertheless relied upon *Saunders v. United States*, 236 F.3d 950 (8th Cir. 2001), to deny relief on the pleadings. Mr. Paul's specific allegations distinguish his petition from that in *Saunders*, where the prisoner's petition revealed his inability "to show either deficient performance or prejudice." 236 F.3d at 952. Unlike Saunders, appellant alleged that trial counsel "failed adequately to investigate, develop and present, numerous affirmative and factual defenses at both phases of trial," A00615, citing *Williams v. Taylor*, 529 U.S. 362 (2000). A00619. The petition alleged that "Mr. Paul suffers from . . . serious mental disorders," A00623, and that "teachers, neighbors, friends, counselors, probation officers and others were available and would have testified on Mr. Paul's behalf had the defense developed and presented this evidence to the jury." A00623. Appellant challenged counsel's exclusive reliance on Mrs. Paul:

> By the time Mrs. Paul left the witness stand, not only had defense counsel failed to scratch the surface on the mitigating aspects of their client's character, background, record, and the circumstances of the offense, they had assisted the government in proving several aggravating factors which would have otherwise not been proven.



Appellate Case: 05-3431 Page: 50 Date Filed: 07/03/2007 Entry ID: 3327284

A00613. Since the Government presented no evidence of appellant's prior criminal history, Mrs. Paul's testimony is the only evidentiary basis for the jury's rejection of the mitigating factor that appellant did not have a significant criminal history. T. 1166.

Appellant's motion identified specific deficiencies in the defense investigation and presentation, including:

- the failure to interview "institutional employees and the psychological counselors, doctors and therapists [who] were also aware that Jeff would often, through after-the-fact lies, insert himself into violent situations where he was either never present or where he had had no active role." A00613.

- the failure to interview "friends, family associates, experts, counselors, teachers, etc.,... about the devastating impact of Mr. Paul's behaviors on his son Jeff. They witnessed physical abuse as well as the effects of the emotional abuse and instability." A00612.

- the failure to present "psychologists, neuropsychologists, and psychiatrists, who could have testified about Jeff's serious mental disorders. . . Rather than viewing whatever the jury perceived to be Jeff's role in the offense as the product of an evil bent of mind, the jury's picture would have been that of a severely injured and under-developed young man suffering from serious medical and mental conditions for which he was neither responsible nor capable of controlling." A00610-11.

- the failure to interview "[a]ssociates and friends [who] knew Jeff as a caring, protective, kind, and insecure person." A00607.

Mr. Paul's petition set forth specific facts demonstrating the unreasonableness of limiting the mitigation case to appellant's mother. Paula Paul was a poor choice to carry the entire mitigation case, as she contributed to the family's chaos and



Appellate Case: 05-3431 Page: 51 Date Filed: 07/03/2007 Entry ID: 3327284

dysfunction. She could not tell the jury about Jeff "weeping when being forced to witness his father abuse animals." A00603. The petition alleged that counsel "was well aware of the fact that much information had been kept from Mrs. Paul by both Jeff and his father." A00606. Further, appellant alleged that "merely informing the jury of Jeff's criminal conduct, without more, merely aided the Government in its attempts to paint Jeff (falsely) as a deviant sociopath lacking in redeeming qualities." *Id*. Mrs. Paul was not asked about Jeff's positive behaviors, including adopting sick and injured animals, and his protectiveness of her. A00603. The petition explained that Mrs. Paul "was, after all, *an integral* part of the very dysfunctional system that grossly impacted how Jeffery Paul came to the place he did in facing federal capital murder charges." A00598.

Postconviction counsel's investigation demonstrates the error in the district court's reasoning. The declarations submitted to the district court substantiate Mr. Paul's allegations of ineffective assistance of counsel. They adequately address any concern as to the general nature of the allegations. Further, both lay and expert witnesses were named in Mr. Paul's request for investigative resources, A02245, A01741-42, and in his request for access to Mr. Paul by mental health experts, A01739. It was disingenuous of the district court to deny relief to Mr. Paul for failing to name witnesses after denying the resources to interview those very witnesses.

Mr. Paul could not satisfy the district court's rigid application of *Saunders*

without the benefit of the resources with which to do so. The district court's ruling is inconsistent with 21 U.S.C. §848(q)(4)(B), which "grants indigent capital defendants a mandatory right to qualified legal counsel *and related services* 'in any [federal] post conviction proceeding.'" *McFarland v. Scott*, 512 U.S. 849, 854 (1994) (emphasis added). The right to "related services" includes "not only [ ] qualified counsel, but also to 'investigative, expert or other services . . . reasonably necessary for the representation of the defendant...'" *Id*., 860 (O'Connor, J., concurring) (quoting §848(q)(9)).

When the district court rendered judgment on the pleadings, counsel filed witness declarations with a Motion to Reconsider pursuant to Rule 59(e). A01962. All of the declarations discussed above were before the district court when it ruled that "the arguments and supporting affidavits submitted by petitioner in support of his current motion to reconsider or vacate *raise issues that were previously addressed by the Court in one way or another* and they do not alter the Court's conclusions." A01995 (emphasis added). It is clear that the district court's ruling does not rest upon a technical pleading defect.

**D. Mr. Paul Has Demonstrated Ineffective Assistance of Trial Counsel.**

The district court ruled that the new mitigation witnesses would be "cumulative at best" to Mrs. Paul's trial testimony. Add. 88. That rationale is supported by neither the facts nor the law. Paula Paul never mentioned Dennis Paul's physical assaults

upon Jeffery, nor did she discuss the family history of suicide and mental illnesses, or Jeff's own psychiatric symptoms. She did not establish the existence of a single statutory mitigating circumstance.

The district court did not address *Strickland's* performance prong, but concludes that appellant was not prejudiced by counsel's failure to investigate. Nevertheless, appellant points out that counsel's performance was clearly deficient. Trial counsel's failure to discover and present any of the evidence discussed above violated their duty to "discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Like the ineffective attorneys in *Wiggins*, trial counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524.

Mr. Paul's counsel had notice that Mr. Paul's friends and family possessed mitigating evidence of a far more compelling nature and quality than Mrs. Paul could provide. Tena Francis named all of the witnesses discussed above, except for Sue Teague, who would inevitably be found after interviewing her daughter, Heather Iacobacci. A02246. Further, trial counsel's elicitation of Mr. Paul's auto theft conviction established counsel's awareness of Zach Dryden. As in *Rompilla v. Beard*, 545 U.S. 374, 383 (2005), "counsel were on notice" of this compelling mitigation.

Further, as in *Rompilla,* a reasonable investigation would have pointed counsel to additional fruitful investigation. The prejudice from counsel's inadequate investigation goes beyond the issue of punishment, as undiscovered evidence would have influenced the pretrial mental evaluation, and the trial court's competency finding. *See* Argument 2, below.

The evidence tendered below is far more reliable, probative and mitigating than that presented by trial counsel. The district court failed to abide by its duty to determine whether "the entire postconviction record, *viewed as a whole and cumulative of mitigation evidence presented originally*, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Williams v. Taylor*, 529 U.S. 362, 399 (2000) (emphasis added). Mr. Paul satisfies that test if even "a single juror concludes that mitigating evidence outweighs aggravating evidence." *Wiggins v. Smith*, 539 U.S. at 537.

There is a reasonable likelihood that jurors would not convict Mr. Paul of a capital offense upon hearing evidence of his character, his tendency to exaggerate his "badness," and Ingle's acceptance of responsibility for the homicide. Further, jurors would likely find statutory mitigating circumstances that appellant's participation in the crime was relatively minor, and that Ingle, though more culpable, was not sentenced to death. Zach Dryden would have persuaded jurors that Jeffery's prior



Appellate Case: 05-3431 Page: 55 Date Filed: 07/03/2007 Entry ID: 3327284

criminal conduct was insignificant. Friends, family and mental health experts would have convinced jurors that appellant was emotionally disturbed during the offense. More than three jurors would have found the statutory mitigating circumstance that factors in appellant's background mitigate against a sentence of death. *See* T. 1166. Further, non-statutory mitigating circumstances based on Jeff's upbringing would have been given mitigating effect.

While the jury found nonstatutory mitigating factors based on Dennis and Paula Paul's bad parenting, those considerations are trivial in comparison to the damage done to Jeffery. The trial evidence did not support the submission of mitigating factors based on mental illness or inhumane parental punishment. Even though Jeff was barely old enough to be eligible for death, only six jurors found that his youthfulness was mitigating. T. 1167. A competent defense would have moved one or more jurors to spare him based on his youth.

Judge Hendren's refusal to acknowledge core facts demonstrates that "the District Court did not give full consideration to the substantial evidence petitioner put forth in support of the prima facie case." *Miller-El v. Cockrell*, 537 U.S. at 322, 341 (2003). His obligation flows from Mr. Paul's "[entitlement] to careful consideration and plenary processing of [his claim,] including full opportunity for presentation of the relevant facts," *Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977), and from appellant's constitutional right to a fair assessment of whether "the available

mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [his] moral culpability." *Wiggins v. Smith*, 539 U.S. at 538.

This Court should reverse the judgment below, and remand with directions to issue the Writ of Habeas Corpus conditionally discharging Mr. Paul from his conviction and sentence, or in the alternative, remand with directions to assign the case to a different judge, and to permit Mr. Paul a fair opportunity to develop the facts supporting his petition.



Appellate Case: 05-3431 Page: 57 Date Filed: 07/03/2007 Entry ID: 3327284

## ARGUMENT 2

**Trial Counsel Were Ineffective for Failing to Investigate and Assert Appellant's Incompetence to Stand Trial.**

Trial counsel made a series of ill-informed decisions which resulted in Mr. Paul facing his capital trial and sentencing hearing while incompetent to proceed:

- Counsel stipulated that appellant was competent and waived a competency hearing before conducting a defense examination;
- Counsel failed to reopen the competence issue after Dr. Anthony Semone found appellant incompetent to proceed;
- Counsel failed to complete a reasonable investigation of Mr. Paul's background and mental health history prior to trial;
- Counsel failed to request a competency evaluation when, as predicted by Dr. Semone, appellant acted out during trial.

Had counsel performed competently, there is a reasonable likelihood that Mr. Paul would have been found incompetent to proceed, and that his eve-of-trial psychotic breakdown would not have scuttled the defense.

"Courts have 'long recognized a particularly critical interrelation between expert psychiatric assistance and minimally effective assistance of counsel.'" *Blake v. Kemp*, 758 F.2d 523, 531 (11th Cir. 1985). This Court imposes on counsel a duty to litigate the competence of a mentally ill client. "The failure of trial counsel to request a competency hearing where there was evidence raising a substantial doubt about a petitioner's competence to stand trial may constitute ineffective assistance of

counsel." *Speedy v. Wyrick*, 702 F.2d 723, 726 (8th Cir. 1983), citing *Crenshaw v. Wolff*, 504 F.2d 377, 380 (8th Cir. 1974), *cert. denied*, 420 U.S. 966 (1975). *Accord*, *Campbell v. Lockhart*, 789 F.2d 644 (8th Cir. 1986). Although strategic decisions are presumed reasonable, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 446 U.S. at 691. Furthermore, "Once there is... evidence [of possible incompetence] from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence." *Lindhorst v. United States*, 658 F.2d 598, 607 (8th Cir. 1981). Although the Government's examiners concluded that appellant was competent, defense counsel's expert disagreed, and counsel were on notice of witnesses to symptoms probative of appellant's severe mental impairments.

The record shows that trial counsel knew facts that should have prompted investigation of appellant's competence. On October 16, 1996, counsel gave notice of intent to rely on an insanity defense, A00005, and on October 31, 1996, and moved for a competency evaluation, A00049, indicating counsel's awareness of mental health issues. On November 26, 1996, the district court ordered a mental evaluation. A00059-63. Thus, counsel's conduct suggested concern about appellant's competence.

Information in the Government's case raised mental health concerns. Government witness Chris LaPaglia met appellant when both were committed to a



Appellate Case: 05-3431 Page: 59 Date Filed: 07/03/2007 Entry ID: 3327284

psychiatric facility for children. T. 704. Counsel knew of appellant's commitment to Rivendell through his mother, T. 1024, and records obtained by mitigation specialist Tena Francis. A02245-46. Further, they knew of appellant's suicidal response to his arrest; he begged the arresting officer, "Shoot me, shoot me, shoot me with that shotgun!" T. 807.

Counsel also personally observed Mr. Paul's agitated behavior. Ms. Francis observed that appellant distrusted counsel, and they argued constantly. "They were at odds to the point of me having to ask Mr. Williams to leave me alone with Jeff for the duration of my interview with Jeff; the tension caused by having them both in the same room was just too distracting." A02242. On April 4, 1997, Ms. Francis wrote Lynn Williams, "advising him that I had obtained some of Jeff's medical, educational and other records, but the records collection effort was incomplete." A02242. She told him:

> I knew that all of Jeff's siblings had been in therapy, but did not know the nature of any diagnosis or treatment. . . [T]his is particularly important in this case because of the likelihood that such an investigation would enable the defense to refute the conclusions of government examiners that Mr. Paul had an antisocial personality disorder. . . . [T]here was obviously a lot more information to be developed in order to have a true understanding of Jeff Paul's life history, which included the possibility of a history of mental illness within the family.

*Id.* On the very day that Ms. Francis wrote that memo, trial counsel filed a written



Appellate Case: 05-3431 Page: 60 Date Filed: 07/03/2007 Entry ID: 3327284

stipulation that appellant was competent. A00102.

Psychologist Anthony Semone evaluated Mr. Paul for the defense, and observed the same dynamic between appellant and counsel witnessed by Ms. Francis. He "had serious concerns" about appellant's competency "based upon several flagrant and emotional outbursts shown by Mr. Paul during the interviews with him and his attorneys." Add. 99. After examining appellant, Dr. Semone concluded, "Jeffery Paul was suffering from what I believed to be were consistent with, and had psychological testing evidence for, an underlying severe mental disease, and that the behaviors the attorneys were concerned about were a direct product of that disease and were not feigned behaviors." *Id.* Dr. Semone "was also concerned that the stresses of an ongoing trial would lead to further deterioration in his mental stability." *Id*. On May 9, 1997, Dr. Semone advised counsel:

> . . . it is my professional opinion, within a reasonable degree of psychological certainty, that your client, Jeffery William Paul, is not now able sufficiently to understand the charges against him. In my opinion, he is also now unable to cooperate sufficiently with you in effectively assisting in his own defense.

A00137c. Dr. Semone cautioned that appellant's condition "reflect[ed] an exigent obstacle to Mr. Paul's being able to participate in his own defense." *Id.* He further warned that the stress of trial could trigger a "psychotic panic" which could "produce paranoid projections and delusional ideas which might be masked by other conditions



Appellate Case: 05-3431 Page: 61 Date Filed: 07/03/2007 Entry ID: 3327284

where he would appear hostile, demanding, perplexed and possibly disoriented." Under those circumstances, "concerns about his competency would become more elevated." Add. 99-100.

Counsel appended Dr. Semone's letter to an *ex parte* motion for funds filed May 12, 1997, asking for a psychiatric evaluation by Dr. Kuo, whose report was never filed with the trial court. A01036. The issue of competence was never again raised by counsel or the court, and no adversarial hearing was ever held on appellant's competence or any related issue.

As Dr. Semone predicted, appellant's behavior became more disorganized, disruptive, and self-defeating as his capital trial progressed. By the penalty phase, he was completely disheveled, without the coat and tie he had worn earlier, with his shirt hanging out of his pants. His personal hygiene deteriorated; he was unkempt, unshaven, and had not bathed. He argued with counsel loudly enough to be heard by spectators. He directed loud and profane remarks at the jury and the court, as described in his petition:

> Throughout the trial proceedings, Mr. Paul engaged in distracting, disruptive, threatening, and hostile outbursts and behaviors. Mr. Paul frequently talked in a loud, distracting tone of voice, sometimes with defense counsel, and sometimes just in open court, and made a point of passing notes to counsel with obvious displeasure. He made angry gestures and had angry facial expressions during much of the testimony. He mouthed such words as "mother-f_ _ _er," when jurors were watching him. He

> frequently held his head in his hands and made noises. After the guilt-phase verdict was announced, and as the jurors were leaving the courtroom for a recess, Mr. Paul yelled at one of the prosecutors, "you're a b _ _ch."

A00527-28. Counsel admonished Jeff severely for his disruptive behavior loudly enough to be reported in the newspaper. A00528.

Jeff's uncle, James Massey, attended the trial, and watched helplessly as Jeff deteriorated:

> He stopped talking to his lawyers; he withdrew into himself; his face had a dazed and blank stare on it most of the time. By the end, Jeff looked so confused and bewildered; it looked to me like he didn't really know where he was.... I could tell that by the time that trial was over, he was not really there; he was disconnected, completely out of it and aloof. . . . Something very awful happened to Jeff in that courtroom, and it seemed to me like no one was paying any attention to it, except when Jeff's emotions would bubble up and he would have an outburst.

A02281-82.

Jeff's behavior was so detrimental that counsel rested after presenting only one mitigation witness. Dr. Semone was in court waiting to testify; he observed

> . . . the kind of mental deterioration that I anticipated might well occur in my initial correspondence with his trial attorneys. I saw how Mr. Paul's appearance changed: his demeanor appeared remote and uninvolved from the proceedings at times, and, at other times, he appeared to have significant difficulty controlling his emotions. On those occasions he engaged in outbursts and blatant gesturing. I was concerned as to how the trial judge might react to these behaviors, fearing that he may see them as



Appellate Case: 05-3431 Page: 63 Date Filed: 07/03/2007 Entry ID: 3327284

> hostile reactions toward him and the proceedings, rather than as the overt symptoms of a probable underlying mental disease.

Add. 100. Dr. Semone stands by his opinion that appellant was incompetent. Add. 101.

Although appellant's acting out is not reflected in the trial transcript, his emotional state is revealed by his comments to the court immediately after the verdict: "I don't see how you can do this. I never killed nobody. I'm not a murderer. Shit.... Go on and kill me now. Fuck it. I'm not waiting around five years. Go on and kill me now." T. 1172. Without further inquiry, the court sentenced him to death. T. 1173-1175. Even though appellant behaved in precisely the way Dr. Semone predicted were he to succumb to psychosis, counsel failed to inform the court or the jury that Dr. Semone believed appellant's behavior was caused by mental illness.[15]

All of this information was known to counsel before or during trial, and unquestionably established a duty, pursuant to *Speedy v. Wyrick, supra,* to raise appellant's competence. Further, there is substantial information that counsel *should have known* had they conducted a reasonable investigation, including appellant's family history of mental illness and the uncommonly frequent incidence of suicide,

---

[15]Although Mr. Paul's decompensation was equally obvious to the court, it made no inquiry into his competence. Appellant respectfully urges this Court to reconsider its denial of a COA on the issue of whether the court's inaction violated *Drope v. Missouri,* 420 U.S. 162 (1975). *See* A00538-47.

discussed in Argument 1.[16] Appellant's personal history is also replete with evidence of mental and emotional disturbance and attempted suicide.

Ms. Francis advised counsel that she had not finished interviewing appellant's family. A02244. Appellant's Uncle James Massey knew that Jeff's mental illness predated the offense and worsened at the time of trial; "while Jeff was a child he would see things, mostly people, in the room with us, which were not there." A02278. Jeff's behavior during trial was inconsistent with his usual demeanor and ability to function. Massey's testimony strongly corroborates appellant's severe mental disorder.

The list of witnesses Ms. Francis gave counsel included Richard McCaslin, Mr. Paul's best friend who visited him frequently in the jail. McCaslin observed, "As the trial approached, Jeff's wheels in his brain started breaking." A02258. "[Jeff] said they were controlling him, but he didn't say who or how." *Id*. He thought his lawyers were "part of the government or something," were working against him, and were "messing with [his] memory." *Id*. Jeff was tearful, "very paranoid and rambling and not making any sense." A02259.[17] His observations clearly indicate symptoms of a

---

[16]Hubert Massey, appellant's grandfather, identified at least five suicide attempts, three successful, among the family, and at least three relatives hospitalized with diagnosed psychiatric ailments. A02272-74.

[17]McCaslin's observations are consistent with those of appellant's postconviction counsel. *See* A02327-28.

major mental disorder. Nevertheless, Mr. Paul was convicted and sentenced to death without the benefit of this important mental health history.

Appellant's §2255 petition alleged that trial counsel failed to investigate adequately his background and mental health, and failed to raise his competence to proceed. A00591-92. The trial court noted Jeff's self-defeating behavior in his order denying relief; "petitioner's conduct at trial was surely ill-advised and not in his best interest." Add. 72. Denying counsel's repeated requests for a mental evaluation, Judge Hendren stated:

> Based on its own recollections of petitioner's trial, the Court agrees that petitioner was disruptive and uncooperative with his own attorneys and the trial court. . . . As the court recalls it, petitioner's conduct at trial was similar to the conduct he exhibited during the video teleconference call conducted August 6, 2004, with respect to petitioner's aborted request to cease post trial review. As can be seen on that video tape, petitioner was quite expressive and showed in his body language, facial expression and agitated demeanor that he was not doing what his lawyers wished him to do.[18] Petitioner's lawyers had trouble controlling him during that teleconference even as his trial defense lawyers had trouble controlling him during trial. . . . Prior to trial, petitioner was diagnosed as having an antisocial personality disorder and the Court believes his conduct at trial was, at most, a manifestation of that disorder.

---

[18]The videotape of the August 6, 2004, hearing demonstrates that Jeff was argumentative with his lawyers, and physically fought over the microphone when counsel attempted to describe his suicide attempts and discuss his mental health. *See* A01806, A01831-33, A01838-39.



Appellate Case: 05-3431 Page: 66 Date Filed: 07/03/2007 Entry ID: 3327284

Add. 69-70. Ignoring Dr. Semone's report, Judge Hendren concluded, "the medical opinions available support the conclusion of mental competence." Add. 72. Judge Hendren's reasoning is inconsistent with the rule that doubts about competence cannot be resolved "by resort to conflicting evidence." *Lindhorst v. United States*, *supra*, 607.

Dr. Seymour Halleck concluded, based on far more information than was available at trial, that:

> At the time of his capital murder trial, Jeff Paul may not have had a total understanding of the nature and severity of the charges against him. As the trial progressed to the penalty phase, he could not communicate rationally with his attorneys. He did not have sufficient concentration and memory to understand the events of the trial. He did not have sufficient impulse control to exercise appropriate courtroom demeanor. In my opinion, he never should have been allowed to go to trial without medication. *He was certainly incapable of proceeding through the penalty phase*.

A02326 (emphasis added). Had Judge Hendren paused to inquire, Dr. Semone was present to testify that Mr. Paul was incompetent to proceed. Add. 99-101.

The district court refused to permit development of the facts surrounding this issue. He blocked attempts to evaluate appellant, even after his nearly-successful suicide attempt, and denied funds to investigate. A01960. Instead, he relied solely on the government's evaluation, which was never subjected to adversarial testing, and which was contradicted by Dr. Semone's report and Dr. Halleck's preliminary



Appellate Case: 05-3431 Page: 67 Date Filed: 07/03/2007 Entry ID: 3327284

assessment tentatively finding Mr. Paul severely disturbed. Because Judge Hendren refused to authorize him to enter the prison, Dr. Halleck interviewed appellant by telephone. In that conversation, "Mr. Paul expressed some very bizarre and disjointed ideas and beliefs" that indicate severe mental illness. A02323.

Dr. Halleck's findings are described in detail in Argument 3, below, and are discussed here because they are probative of appellant's competence during trial, especially in light of the district court's observation that "petitioner's conduct at trial was similar to the conduct he exhibited during the video teleconference call conducted August 6, 2004. Add. 70. Although the court prevented exploration of appellant's competence, his observations provide a useful baseline from which to deduce his mental condition during trial.

Notwithstanding the foregoing facts, Judge Hendren ruled, without allowing an evaluation, that "[t]he medical evidence does not support petitioner's contention nor does the other evidence known to the Court." Add. 70. That conclusion is not supported by the record, which includes reports of Drs. Halleck and Semone and supporting historical data. In a similar case, trial counsel failed to investigate his client's competence. *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997). Williamson became verbally abusive in court, threatening his trial counsel, who swore, "On the whole I found my representation of Mr. Williamson to be an extremely unpleasant experience and I was glad to get this case over with." *Id.*, 1512.



Appellate Case: 05-3431 Page: 68 Date Filed: 07/03/2007 Entry ID: 3327284

Williamson's counsel limited investigation to a psychiatric report finding Williamson competent to proceed and two letters from psychologists questioning his ability to function. Trial counsel failed to explore the issue further, blaming time and resources. The Tenth Circuit "agree[d] with the district court that [trial counsel] did not exercise reasonable professional judgment in deciding to limit his investigation of his client's mental condition to the three documents described above, and to rely solely on Dr. Garcia's letter in deciding not to request a competency determination." *Williamson*, 110 F.3d at 1517. Habeas relief was granted because Williamson's impaired ability to defend himself undermined the reliability of his trial.[19] The Tenth Circuit noted that "an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' -- the basic fairness of the trial itself." *Cooper v. Oklahoma*, 517 U.S. 348, 354, 364 (1996).

This case also strongly resembles *Rompilla v. Beard*, 545 U.S. 374, 382 (2005), where pretrial mental health examiners found "nothing useful" to the defense, but reconsidered their findings after postconviction counsel uncovered Rompilla's history of mental illness and parental violence, which raised "plenty of 'red flags' pointing up a need to test further." *Id.*, 392. Rompilla's counsel were ineffective for failing to

[19]After receiving habeas relief on the competence issue, Ronald Williamson was exonerated by DNA evidence. Williamson is the subject of John Grisham, The Innocent Man, Doubleday, New York (2006).



Appellate Case: 05-3431 Page: 69 Date Filed: 07/03/2007 Entry ID: 3327284

uncover information that "the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders." *Id.*, 391. Similarly, Dr. Halleck's report, A02308, demonstrates that a reasonable investigation would have enabled counsel to recognize Mr. Paul's psychotic breakdown. Even if Judge Hendren could not be persuaded of appellant's mental illness, counsel could have presented the evidence to the jury to mitigate Mr. Paul's behavior before and during his trial.

Even though the district court obstructed factual development of appellant's ineffectiveness claim, the evidence is uncontradicted that he suffered from mental illness rendering him incompetent to assist counsel. This Court should reverse the judgment of the district court, and remand the case to a different judge, with instructions to issue the writ of habeas corpus conditionally discharging Mr. Paul from his conviction and sentence.



Appellate Case: 05-3431 Page: 70 Date Filed: 07/03/2007 Entry ID: 3327284

## ARGUMENT 3

**Jeffery Paul Was Incompetent During Proceedings Below, in Violation of Federal Law Guaranteeing Meaningful Access to the Courts.**

### I. Facts Relevant to Appellant's Competence.

On November 18, 2003, while Mr. Paul's petition was pending in the district court, he attempted suicide by hanging himself. The corrections officer who found him later described the incident to counsel. *See* A01846-47. During his rounds, he saw that appellant had hung a towel over the window of his cell. The officer could nevertheless see that appellant "was hanging by his neck in his cell so that his feet could not reach the floor, and he appeared dead or unconscious." *Id.* After waiting for back-up and fumbling for a key, four officers rushed into the cell. "Mr. Paul was not breathing, and his face was a deep shade of purple." *Id.* After three attempts to revive him, appellant gasped, and resumed breathing. *Id.* Counsel have not had one rational conversation with him since. Mr. O'Brien had only one substantive conversation with him about the facts of the case, which occurred on his first visit, October 1, 2003. A02329-30.

O'Brien's office was alerted about appellant's suicide attempt by another prisoner when counsel were in Arkansas to argue appellant's discovery motion. Appellant's caseworker told Mr. McGlasson that "Mr. Paul had been exhibiting crazy behavior. . . He was delusional, and that he had been seen regularly by the mental health staff . . .[and] that he had been put in a special cell, a monitoring cell." A01567.



Appellate Case: 05-3431 Page: 71 Date Filed: 07/03/2007 Entry ID: 3327284

The following day, McGlasson spoke with Jeff by telephone, and recounted that conversation in an *ex parte* hearing:

> Mr. Paul could not very well articulate anything rationally to me over the telephone. . . he was clearly delusional. He was going off about believing that . . . Mr. O'Brien was a judge, and had already gotten him out of jail, and . . . telling me he had been on national TV, having engaged in some very bizarre and disgusting acts on his own body, and he said they'd been broadcast over national TV. He wanted to know if I had received money for these television appearances that he made.

A01568. Jeff's speech was "floridly... delusional ranting. . . I could not communicate with him rationally at all. He did not seem to understand even what I was talking about." *Id.*

Counsel immediately moved *ex parte* to permit Drs. Seymour Halleck and Karen Froming to enter the prison to assess appellant's condition and investigate claims for relief. A01422.[20] The court on December 2, 2003, ordered the penitentiary to admit the mental health experts. A01575.

On December 4, 2003, the district court received a letter from Mr. Paul asking the court to "[p]lease consider my appeals dropped." A01579. The court wrote both

[20] The U.S. Bureau of Prisons prohibits mental health examiners from entering prisons without a court order. McGlasson was then employed by the Federal Public Defender in Atlanta, Georgia, which could fund the experts' fees and expenses. A01500. However, McGlasson could not obtain investigative services through that office. A01402.



Appellate Case: 05-3431 Page: 72 Date Filed: 07/03/2007 Entry ID: 3327284

parties, inviting comment no later than December 12, 2003, A01578, and withdrew its order allowing experts into the prison, as if appellant's letter resolved any questions about competence. A01577-78.

On November 25, 2003, O'Brien telephoned Jeff's family, and was advised that they were told by Randy White, the Unit Supervisor at Terre Haute, that "Jeff had put his foot through a glass window, cutting himself, which required stitches." A02330. The previous Sunday, Jeff called home and said strange things indicating he was "just not right mentally." *Id.* His statements were "bizarre ramblings." He insisted that he was married, but "he couldn't remember [his wife's] name" *Id.* He was frustrated when his mother told him he had never been married. She said it was "reminiscent" of her brother's behavior when he was diagnosed with schizophrenia. *Id.* Jeff told his parents he wanted no further contact with them. *Id.*

In a November 26, 2003, telephone call with O'Brien, appellant asked for medication because he was "too aware" of things around him. He believed that while he slept someone was replacing his old memories with new ones that were detailed and complex. He believed he had signed papers authorizing his chemical castration and permanent commitment, which motivated him to write the judge. A02331. His thoughts were "coming very fast, and he has a hard time sorting them out." *Id.* Delusional thoughts dominated his conversation. *Id.*

Counsel visited Jeff on December 8, 2003, and observed cuts on his knuckles

and wrists from breaking safety glass windows with his bare hands and using the shards to cut his wrists. A02332. He was fixated on bizarre thoughts similar to those he had expressed on the phone. Jeff felt "as if someone is putting his finger into the back of his head, and controlling his thoughts and movements... he spontaneously gets new memories of conversations that intrude into his head." *Id.* Jeff wrote the court because he "couldn't help it." *Id.*

On December 8, 2003, appellant signed a notarized document withdrawing his request to dismiss his case. A01784. The next day, counsel transmitted appellant's affidavit to the court, and requested "leave to proceed with the evaluation authorized by this Court on December 2, 2003." A01735-36.

Between December 2003 and June 2004, "[his] thought processes did not improve." A02333. Counsel arranged for Dr. Halleck to interview appellant by telephone. Although the conditions were not optimal, Dr. Halleck observed:

> Mr. Paul expressed some very bizarre and disjointed ideas and beliefs....During my conversation with him, Jeff was experiencing racing thoughts, and expressed concerns that his thoughts were being broadcast. He reported hearing continuous voices.

Add. 95. Dr. Halleck quoted some of Jeff's bizarre statements suggesting that his attorneys were plotting against him, and that his words, thoughts and actions were "programmed." *Id.* It was Dr. Halleck's "firm impression at that time that Mr. Paul was very likely experiencing a serious psychotic illness which could interfere with his



Appellate Case: 05-3431 Page: 74 Date Filed: 07/03/2007 Entry ID: 3327284

ability to make rational choices or understand his legal rights." A02333.

O'Brien visited Jeff on June 30, 2004, "to attempt to accomplish some substantive work on his case, and get a lay-person's assessment of his mental condition." *Id.* "I struck out completely in my attempts to get Jeff to talk about any aspect of his case. He continued to be very paranoid and tangential." *Id.* O'Brien attempted to discuss events and witnesses, but Jeff replied, "you could read my mind and get the information so why do you have to ask. It's not fair that you can read my mind but I can't read yours." *Id.* Jeff expressed concern that O'Brien was "controlling" his situation and had the power to release him from prison. *Id.* O'Brien "kept trying to turn the conversation back to Jeff's teenage years and some of the people he associated with, but he wouldn't respond to any inquiry in concrete terms." A02333. "Throughout this visit, Jeff's speech was very tangential and illogical, and he frequently stopped in mid-sentence and failed to complete his thoughts." A02335. O'Brien saw that Jeff had new self-inflicted injuries. He had stitches and numerous scabs in both hands. "He kept picking at the upper portion of his right arm near the shoulder, and when he raised his short-sleeved tee-shirt I could see small open sores. He wouldn't talk about them." A02334.

The court on July 19, 2004, wrote counsel regarding letters appellant had written, on July 12 and 13, 2004, asking to be executed. A01671-01674. The court directed counsel to respond to appellant's request in writing by July 26, 2004.

A01670. Counsel requested additional time to visit with appellant because "the nature, form and gravity of the request raises substantial issues." A01675. The court denied the motion and scheduled a video-hearing for August 6, 2005. A01688-89.

Appellant's letters reflected the need to evaluate him before proceeding further. He wrote Judge Hendren, "I believe I have been misguided and or, blatantly deceived as to the nature of the case against me," and that he had "literally been kidnapped by the system and have no reliable source to acquire answers needed to remedy an unbearable situation." A01673. His confusion was obvious in his complaint, "I look at the law books, listen to others discuss the filings and pray. But still achieve no real definition of what is going on." A01674. He "felt compelled externally" to demand his death sentence. *Id*. Appellant said he was suffering "a living death" and "a supernatural amount of punishment." *Id*. He stated, "I don't know what reward or pleasure all who led me to this received in return. But I object." *Id*. Counsel argued that the court should reinstate the December 2, 2003, order allowing a mental health evaluation. A01857.

When counsel visited Jeff on August 4, 2004, his condition had not changed. He told counsel his fate had been predetermined; when he was a child, his mother told him "that he would end up in this specific time and place." A02335. He believed "an unseen malevolent entity had pre-ordained his future," and that he was living an "Orwellian nightmare" in which "there were forces at work preventing him from



Appellate Case: 05-3431 Page: 76 Date Filed: 07/03/2007 Entry ID: 3327284

having any of the things that normal people have." *Id.* Jeff asked counsel not to discuss his mental problems at the video- hearing. *Id.* In the evening after the visit, O'Brien spoke with Dennis Paul, who confirmed:

> Jeff continues to "have a problem distinguishing between what really happened and false memories." He said that Jeff questions his mother about whether or not she is his real mother, or whether she is even real. Her conversations with Jeff are very unnerving to her, and she frequently ends them in tears.

A02336. Dennis said that Jeff's behavior "is very reminiscent of his uncle, James Massey, who has been diagnosed with schizophrenia." *Id.*

At the video-hearing, appellant asked to be executed. Counsel attempted to advise the court about Mr. Paul's mental illness and suicide attempts, to which appellant replied, " No, you should not. You should not... Just shut up for a minute," and pressed the mute button. A01831. Throughout the hearing, counsel struggled to inform the court about appellant's suicidal disposition and mental problems, which appellant tried to obstruct:

> MR. O'BRIEN: Your Honor, what we started to say before when Mr. Paul hit the –
>
> DEFENDANT: No.
>
> MR. O'BRIEN: – mute button –
>
> THE DEFENDANT: I – I was given a disciplinary, and I've – I've – I've done my segregation time for it and paid for the window, okay?

> MR. O'BRIEN: The correction office who checked us in this morning . . . Officer Purdue.
>
> THE DEFENDANT: He's not saying anything – anything that –
>
> MR. O'BRIEN: He was outside the door of Mr. Paul's cell in November last year when Mr. Paul had hung a towel over the window of his door so no one could see inside, and he hung himself –
>
> THE DEFENDANT: No.
>
> MR. O'BRIEN: – from a window.
>
> THE DEFENDANT: No, no, no, no, no.
>
> MR. O'BRIEN: – and was hanging with his feet –
>
> THE DEFENDANT: No.
>
> MR. O'BRIEN: – off of the floor, and he was completely unconscious and motionless and had to be revived.
>
> (The Defendant pressed the mute button, and an off-the-record discussion was held between the Defendant and his counsel.)

A01831-33.

After another struggle over the mute button, Mr. O'Brien attempted to articulate concerns arising from Mr. Paul's medical records, but was cut off by appellant and the court:

> MR. O'BRIEN: We also know that the... diagnosis schizophrenia appears –

> THE DEFENDANT: No.
>
> MR. O'BRIEN: – in his –
>
> THE DEFENDANT: I – hold on. I object to that.
>
> MR. O'BRIEN: – in his prison file.
>
> THE DEFENDANT: I was given some medication for sleep, and in the description of the medication, it says it is commonly used for schizophrenia as well, but I was given ten milligrams of something called Lozapine for irregular sleep patterns.
>
> As far as the hanging incident goes, what do you think I'm – what do you think I'm – what do you think I'm doing right now? I was just trying to – I was trying to save money. It cost Eighty Dollars the – for that (inaudible).
>
> THE COURT: All right, gentlemen, I – I – I think we're – *I think we're not doing anything useful right now. I believe the purposes of the hearing have been met*, and so I intend to close it, and explain to you that I will issue a written ruling as soon as I can possibly get to it.

A01838-39 (emphasis added). Judge Hendren later wrote that although Mr. Paul withdrew his request to be executed, the court heard enough at the hearing to find him competent and grant his request. A01866.

Mr. Paul could not maintain his composure for long. When the hearing concluded and the camera was turned off, "Jeff quickly became incoherent and emotional, . . . shedding tears and rambling and raging about the people controlling his life." A02336. This is significant in light of Dr. Halleck's observation:

> It is important to appreciate that Jeff has exceptional abilities to conceal his psychosis when he wants to. When he is "covering up" his psychosis cannot be detected unless he is interviewed in some detail. It is possible that his psychosis can go undetected for relatively long periods of time.

A02325.

Mr. Paul, on August 17, 2004, withdrew his request to waive his appeal, A01784. The court was silent until January 31, 2005, when Judge Hendren filed a Memorandum Opinion and Order denying relief, Add. 1, and orders denying funds for a mitigation specialist, denying mental health examiners permission to enter the prison, and denying travel funds for counsel's investigation.A01959, A1960.

This Court ordered a partial evaluation of appellant. On February 27, 2006, Dr. Halleck evaluated Jeff, based on more extensive historical data, and concluded that Jeff's "psychotic disorder most closely resembles a schizophrenic disorder, but a bipolar disorder must not be ruled out. The only certainty is that his psychosis is characterized by delusions, hallucinations and cognitive impairment." A02325. Drs. Halleck and Semone agree that appellant was incompetent at critical periods. Add. 100, A.02326.

Unlike prior examiners, Dr. Halleck reviewed documents establishing a significant history of mental illness in appellant's family:

> Jeff's grandfather, Hubert Massey... tried to kill himself with a shotgun when he was younger.... because he could

> not tolerate his alcoholic father beating him. Mr. Massey also reported that his brother's son had substance abuse problems and hung himself in jail. A niece... could not go beyond second grade in school. His wife's sister had tried to slit her wrists and was committed to a mental hospital. His wife's uncle had killed himself, he was a substance abuser. His wife's father was severely depressed and one of Jeff's uncles on the maternal side had been diagnosed as having schizophrenia.
>
> Mrs. Paula Paul reports that on her husband's side of the family his mother, father, sisters and brother were all alcoholics. Dennis' ... uncle had killed his mother while drunk, and one of Dennis' cousins had tried to kill himself.

A02310. Dr. Halleck found that Jeff was subject to extraordinarily violent rages by his father:

> It is reported that at times Jeff's father would pick him up by his ears and whirl him in the air until Jeff became very upset and cried and screamed for help. Sometimes Dennis would throw Jeff against walls. Some who wrote declarations noted that Jeff often had bruises.
>
> When Jeff was seven years old he was struck in the face with a knife his father had thrown. The wound, a deep one which went from the skin of his cheek to the inside of his mouth, required one hundred and two stitches to repair.

A02311. Jeff had a pet dog which lost the use of one leg from an injury inflicted by Dennis Paul "while in a fit of rage." A02312.

Dr. Halleck noted evidence that Jeff exhibited psychotic symptoms before the crime; "his mother and his maternal uncle, James Massey, describe him as having some type of hallucinatory experiences as a young child." Both doctors report that



Appellate Case: 05-3431 Page: 81 Date Filed: 07/03/2007 Entry ID: 3327284

Jeff saw people who were not there, and Mrs. Paul "notes that he always felt that his life was being controlled by some negative force." A02312. Jeff compulsively bit his knuckles or picked at his face until he developed sores. *Id*. Jeff has to touch a clock and a television set before he can go to the bathroom. A02322. Dr. Halleck believes "[i]t is also quite possible that after he attempted to hang himself he was probably anoxic for a period of time. There may have been brain damage which is now complicating the clinical picture." *Id.* Neuropsychological tests recommended by Dr. Halleck have not been performed.

Dr. Halleck found appellant mentally incompetent following his attempted suicide:

> I also believe that since his hanging attempt in November 2003, his mental condition has deteriorated to such an extent that he is unable to assist his attorneys in the proceedings relevant to his appeal. He does not seem to comprehend the benefits of a successful appeal. He has difficulty in communicating rationally with his attorneys. His paranoid delusions, which sometimes include his attorneys, complicate communication further. Furthermore, his suicidal impulses related to his illness may cause him to irrationally seek an unfavorable outcome of his appeal.

A02326.

**II. Federal Law Mandating Meaningful Access to the Courts Requires That a Capital Prisoner Be Competent During Habeas Proceedings.**

A mentally incompetent habeas petitioner cannot be compelled to proceed on claims that could "potentially benefit from his ability to communicate rationally."



Appellate Case: 05-3431 Page: 82 Date Filed: 07/03/2007 Entry ID: 3327284

*Rohan v. Woodford*, 334 F.3d 803, 819 (9th Cir. 2003). The right to counsel in capital habeas proceedings would be meaningless to a prisoner who cannot communicate with counsel:

> In capital cases, prisoners challenging their convictions or sentences in federal court have a right to assistance of counsel. See 21 U.S.C. § 848(q)(4)(B). This prescription reflects Congress's belief that "federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty," *McFarland v. Scott*, 512 U.S. 849, 859 (1994), and that meaningful assistance of counsel is essential to secure federal constitutional rights. Counsel's assistance, however, depends in substantial measure on the petitioner's ability to communicate with him. And if meaningful assistance of counsel is essential to the fair administration of the death penalty and capacity for rational communication is essential to meaningful assistance of counsel, it follows that Congress's mandate cannot be faithfully enforced unless courts ensure that a petitioner is competent.

*Id.*, 812-13.

The statutory right to competence is intertwined with a "substantial" Fourteenth Amendment due process right to competence which stems from "fundamental fairness" and the Eighth Amendment's related need to ensure "fair administration of the death penalty." *Id.*, 813. Reliable determination of the constitutionality of a capital conviction requires that the prisoner be competent to remember and communicate to counsel historical facts of constitutional significance, such as his life history, the facts of the offense, and dealings with his allegedly ineffective trial



Appellate Case: 05-3431 Page: 83 Date Filed: 07/03/2007 Entry ID: 3327284

counsel. *Id.*, 812-13. "Having provided for collateral review of state sentences, Congress must supply procedures that comport with due process." *Id.*, 813.

Further, there is a "firmly entrenched common law right to competence persisting beyond trial," which is a "strong indicator of a constitutional due process right" to competence on habeas review. *Id.*, 813. "The prisoner's incompetence is relevant, not because it impairs his decision making, but because it prevents him from communicating information that he alone possesses." *Id.*, 816. Therefore, a prisoner must have "the capacity to understand his position and to communicate rationally with counsel." *Id.*, 819. This is especially important to investigation, as the petitioner is often counsel's only source of necessary information.

Common law required a prisoner to be sufficiently competent to "have offered some reason, if in his senses to have stayed [the] proceedings." William Blackstone, *Commentaries*, 389 (1769). Competence "mattered because it meant the ability to defend oneself,...while it now means the ability to assist counsel in one's defense." *Rohan*, 334 F.3d 808-09. The ability to communicate rationally with counsel was not explicitly incorporated into the constitutional standard for competence to be executed because "the efficacy of collateral review [is] among the reasons to discard the common law rational communication requirement at execution." *Ford v. Wainwright*, 477 U.S. 399, 420 n.1 (1986) (Powell, J., concurring). *Ford's* justification fails "[w]hen collateral review is compromised by the petitioner's incompetence." 334 F.3d

at 811. The court thus concluded, "From that perspective *Ford* can be seen not as removing common law protections, but merely as refocusing them where they now matter." *Id.*

Recognizing a "far from insubstantial" due process issue, the *Rohan* court found the statutory right to habeas counsel guarantees the right to proceed only when competent. *Id.*, 813-14. The court invoked the doctrine of avoidance of constitutional questions, interpreting the statute to require competency during habeas proceedings. "This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Coast Trades Council*, 485 U.S. 568, 575 (1988). The avoidance doctrine is not properly invoked without a "serious doubt" that a statute is constitutional in the case at hand, *Salinas v. United States*, 522 U.S. 52, 60 (1997).[21]

In *Rees v. Peyton*, 384 U.S. 312 (1966), the Court refused to permit a petitioner to waive his petition for writ of certiorari, following denial of postconviction relief, without first determining Rees' competence. Without a competency determination,

---

[21]Also see *Mines v. Dretke*, 118 Fed. Appx. 806, 812 (5th Cir. 2004), avoiding the constitutional issue "because statutes are interpreted in a manner so as to avoid substantial constitutional questions, we assume that the right is statutory in nature." Unlike Mr. Paul, Mines "failed to allege facts or present evidence showing that he is incompetent." *Id.*, 813.

"[w]e do not consider ourselves in a position to determine what disposition should be made of Rees' petition for certiorari." *Id.*, 314. The Court ordered "psychiatric and other appropriate medical examinations" to determine whether Rees "is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Id.*

The severe restrictions on successive petitions imposed by AEDPA justifies a competency requirement for capital habeas petitioners. *Rohan*, 334 F.3d at 816. States which bar successive petitions require postconviction proceedings involving factual issues to be stayed until a prisoner regains competence. *Carter v. State*, 706 So.2d 873, 875 (Fla. 1988) ("a capital defendant's competency is crucial to a proper determination of a collateral claim when the defendant has information necessary to the development or resolution of that claim."); *State v. Debra A.E.*, 523 N.W.2d 727, 734 (Wis. 1994) (allowing successive petitions raising issues "that could not have been raised earlier because of incompetency."); *People v. Owens*, 564 N.E.2d 1184, 1190 (Ill. 1990) (courts must "consider whether a post-conviction petitioner is mentally competent to consult with counsel"). The court in *Rohan* noted that Pennsylvania and Oklahoma allow incompetent prisoners to litigate successive petitions if restored to competence. *Rohan*, 334 F.3d at 816.

While this Court has not explicitly addressed the *Rohan* issue, it has examined a closely related issue of whether a prisoner may waive his habeas petition, holding

that "a finding must be made as to whether the petitioner had, at the time of the waiver, 'capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.'" *O'Rourke v. Endell*, 153 F.3d 560, 567 (8th Cir. 1998), quoting *Rees*, 384 U.S. at 314. Further, this Court has recognized "'rare' cases in which dismissal for abuse of the writ was improper" because a petition was "filed *and litigated* without [the prisoner's] knowledge and participation." *Murray v. Delo*, 34 F.3d 1367, 1373 (8th Cir. 1994) (emphasis added); *see also Smith v. Armontrout*, 888 F.2d 530, 541 (8th Cir. 1989).

This Court has also suggested that a petitioner's incompetence may excuse procedural deficiencies in his petition. "[M]ental impairment can be an extraordinary circumstance interrupting the limitation period" under 28 U.S.C. § 2244(d). *Nichols v. Dormire,* 11 Fed. Appx. 633 (8th Cir. 2001)(unpublished opinion). This Court has examined on multiple occasions whether petitioner's incompetence might excuse an untimely petition. *See Nachtigall v. Class*, 48 F.3d 1076 (8th Cir.1995); *Anderson v. White*, 32 F.3d 320 (8th Cir. 1994); *Stanley v. Lockhart*, 941 F.2d 707 (8th Cir. 1991). Litigating a fact-intensive petition while a prisoner is incompetent is fundamentally inconsistent with the constitutional and statutory principles guiding these cases.



Appellate Case: 05-3431 Page: 87 Date Filed: 07/03/2007 Entry ID: 3327284

**III. Mr. Paul's Right to Be Competent During Habeas Was Violated**.

To be competent, a prisoner must be able to "communicate rationally with counsel." *Rohan*, 334 F.3d at 807 n.2, including the capacity to relate historical facts underlying his claims for relief, such as personal and family history, facts and circumstances of the crime, and dealings with counsel whose effectiveness is challenged. *Id*., 818. The proceedings must be stayed if "at least some of the claims in [the] petition could potentially benefit from [the prisoner's] assistance."). *Id.*

The petitioner in *Rohan* alleged trial counsel were ineffective for failing to pursue a competency hearing and failing to present adequate mitigating evidence, the same issues raised by Mr. Paul in Arguments 1 and 2. *Id*. The court observed that "most ineffective assistance claims . . . [involve] facts outside of the record." *Id*. On the pre-trial competence claim, a competent petitioner could "provide information" about his incompetence and "direct counsel to circumstantial evidence of his incompetence." *Id*. On his *Wiggins* claim, petitioner is "better positioned than anyone" to provide information about his own history and is in the "unique position" to detail his trial counsel's efforts to uncover such information. *Id*.

Appellant's mental illnesses existed before his November 2003 suicide attempt. Before trial, Dr. Semone warned that appellant was already incompetent, but would deteriorate under the stress of trial. During trial, Mr. Paul behaved erratically and against his best interests. Unquestionably, however, "since [Jeff's] hanging attempt



Appellate Case: 05-3431 Page: 88 Date Filed: 07/03/2007 Entry ID: 3327284

in November 2003, his mental condition has deteriorated to such an extent that he is unable to assist his attorneys in the proceedings relevant to his appeal." A02326. Ever since, counsel have been unable to communicate rationally with him. *See* A02329.

Appellant's claims would benefit from information that could be provided counsel, were he competent. Mr. Paul is unable to offer any insight into his own mental health or into his dealings with counsel. Both are crucial to the issues discussed in Arguments 1 and 2. If he "were competent today, he could provide information to bolster that claim." *Rohan*, 334 F.3d at 818. Appellant's paranoia and delusions, including delusions about counsel, prevent him from communicating rationally about his incompetence at trial, or about the performance of trial counsel.

Although counsel have identified and interviewed important mitigation witnesses, Jeff could provide names and locations of other witnesses, and relate events relevant to developing innocence and penalty phase defenses. For example, little is known about his multiple visits to Rivendell psychiatric hospital, but he cannot identify relevant witnesses or advise counsel of potential areas of inquiry. Further, appellant is an important source of information about the brutal torture inflicted by his father, and his attempts to seek refuge with neighbors and friends.

Appellant's need to communicate rationally with counsel is highlighted in the district court's ruling on his *Brady* claim involving undisclosed cash rewards to witnesses. The court denied relief based on assumptions that only appellant can



Appellate Case: 05-3431 Page: 89 Date Filed: 07/03/2007 Entry ID: 3327284

address:

> If, in fact, no such conversation took place on June 24, 1995, as recounted by Rogers, that would have instantly been known to petitioner and his attorneys at the time of the trial when Rogers testified. Petitioner could then have called any one of three other people (Arbuckle, Davis or Cornish) to testify that no conversation occurred. If the conversation did occur, then petitioner, himself, was a party to it and would have immediately known if Rogers' statements were false of if they had been improperly influenced by police authorities.

A01651-52. The court denied appellant's *Brady* claim because appellant *personally* "does not suggest what portions of Rogers' testimony were false as a result of his allegedly having been promised payment for testifying falsely." A01652. When this ruling was filed on June 21, 2004, Mr. Paul was incapable of answering counsel's questions about the district court's factual assumptions. Thus, appellant's incompetence prevented counsel from addressing the factual underpinnings of Judge Hendren's order.

Numerous reliable sources establish that Jeffery Paul is incompetent. Dr. Halleck found appellant "unable to assist his attorneys in the proceedings relevant to his appeal," and that his "suicidal impulses related to his illness may cause him to irrationally seek an unfavorable outcome of his appeal." *See* A02326. *Rohan's* rule is harmonious with the law in this Circuit and provides appropriate guidance here. Because appellant could not communicate rationally with counsel, and his habeas

petition presented multiple claims that were factually driven, he meets *Rohan's* standard.

This Court should vacate the judgment below in its entirety, and remand the case to a different district court judge with directions to determine whether appellant is competent. If appellant is incompetent, the proceedings should be stayed until he has regained competency.



Appellate Case: 05-3431 Page: 91 Date Filed: 07/03/2007 Entry ID: 3327284

## ARGUMENT 4

**Mr. Paul's Right to Due Process of Law, as Guaranteed by *Brady v. Maryland*, 373 U.S. 83 (1963), Was Violated When Key Government Witnesses Received Cash Rewards After the Jury Was Told No Such Rewards Would Be Forthcoming.**[22]

Although testimony placed Mr. Paul with Trinity Ingle before and after the homicide, statements attributed to him are the only evidence of his role in the homicide. Kris Rogers and Cindy Wallace testified that appellant admitted to kicking and shooting Mr. Williams. T. 730-31. He allegedly told Chris LaPaglia that he killed someone by kicking him and breaking his neck. T. 707-08, 714. In his statement to FBI Agent John LaVoie, appellant said he was a witness to a homicide committed by Ingle. T. 812-13. Trial counsel attempted to discredit LaPaglia and Rogers with their expectation of a reward, which they denied. T. 691-92, 724. No physical evidence linked appellant to the homicide.

Defense counsel moved for a pretrial order compelling the Government to disclose any promises or consideration extended to witnesses. *See* A00028. Based on the Government's representation that "no promises, considerations, rewards or inducements were made to any witnesses in this case," A00054, the district court found appellant's request was "complied with." A00072. In response to the defense

---

[22]Although there is no COA on this issue, this Court has the discretion to expand the COA. *Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006).

argument that Rogers and LaPaglia shaded their testimony in hopes of a reward, the prosecutor told the jury, "no one has been promised anything in this case." T. 905-06.

In preparing appellant's petition, Mr. McGlasson requested law enforcement files pertaining to the case, and the Government refused. McGlasson then invoked the Freedom of Information Act, a time-consuming and cumbersome process administered through the Department of Justice in Washington, D.C. A00280-81. Those efforts produced less than half of the investigative reports (approximately 720 pages of the investigative file consisting of 1,500 to 1,600 pages). A00263. Further, hundreds of pages of the disclosed FBI investigative reports were heavily redacted, leaving only conjunctive words such as "but, and, or" and excluding names, dates or any substantive information. *Id*. McGlasson nevertheless determined that several Government witnesses were paid up to $3,000 for cooperating in Mr. Paul's case, contrary to the Government's representations during trial. Due to heavy redaction, he could not determine the amount or recipient of the rewards. A00267-68. One document reflected the reason for payment was that the "person involved assisted in the successful prosecution" of appellant. A01443.

When confronted with this evidence, the Government finally admitted that lay and law enforcement witnesses received money after trial, but claimed it "wasn't in exchange for testimony. It was in exchange for coming forward and providing information." A00268. AUSA Snyder advised the district court that "the FBI may

have paid $1,000 to witnesses *after they came forward*." *Id.* (emphasis added). Department of Justice counsel Margaret Griffey, on the other hand, told the court that rewards paid to two witnesses were initiated *after trial.* A01453. Mr. Snyder described the payments as "a standard law enforcement reward," A00268, but claimed that "it was *probably* after the trial and they didn't know they were going to get the money." A00269 (emphasis added). Either scenario–payments for "coming forward", A00268, or payments for testimony–creates incentives for witnesses to color their testimony.

Mr. Paul moved for discovery of information relating to rewards, A01173-74, and alleged that the Government's representations at trial were misleading and violated appellant's right to due process of law. *See* A00561-67. Although witness names were redacted, counsel determined that Rogers was among several witnesses who received cash for testimony. A00270. When the government asserted privilege to justify continued suppression of the documents, A01453-54, McGlasson advised the court that he had obtained signed releases from Ingle, Rogers, Crystal Davis, Suzie Arbuckle and other relevant witnesses waiving privacy concerns. A01458-59.

Rogers was important to the Government. He testified that on June 24, 1995, Mr. Paul confessed to robbing and killing an old man after knocking him down and kicking him. T. 664-666. Rogers is the sole witness claiming appellant showed him blood on his shoe, allegedly from kicking Mr. Williams so hard that his eyeball came



Appellate Case: 05-3431 Page: 94 Date Filed: 07/03/2007 Entry ID: 3327284

out. T. 670, 683. Thus, the most inflammatory evidence in the Government's case was protected from impeachment by the expectation of a reward. Because the documents were heavily redacted, and the district court denied discovery, Mr. Paul could not identify other witnesses who could be impeached by their financial interest in the case.

The district court denied appellant's request for discovery of *Brady* material because appellant failed to show "good cause as to why he or his attorneys did not raise the issue of alleged false testimony of Rogers either during the trial or on the direct appeal," relying upon *McCleskey v. Zant*, 499 U.S. 467 (1991). A01649. However, since this is appellant's first habeas petition, *McCleskey* does not apply. *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996) ("Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty.") Judge Hendren's unorthodox application of *McClesky* is compounded by his flawed understanding of *Brady*. In *Strickler v. Greene*, 527 U.S. 263, 287-288 (1999), the Court held that "[i]n the context of a *Brady* claim, a defendant cannot conduct the 'reasonable and diligent investigation' mandated by *McCleskey* to preclude a finding of procedural default when the evidence is in the hands of the State." Given the court's pretrial finding that the Government had complied with its *Brady* obligations, trial counsel had no recourse from the Government's misleading representations. Trial



Appellate Case: 05-3431 Page: 95 Date Filed: 07/03/2007 Entry ID: 3327284

counsel's shortcomings, real or imagined, do not absolve the Government of responsibility for its misconduct. The Government knew that Rogers would be rewarded for his testimony, but affirmatively stated, in written responses to pre-trial discovery requests, *see* A00053-55, and in testimony and argument to the jury, *see* T. 905-06, that no witness had been paid or promised a reward. The only way defense counsel could know whether witnesses expected a reward was to ask the Government and rely on its response.

The district court's analysis fails to discuss the impeaching nature and value of the reward testimony. The defense was entitled to use the witnesses' financial interest to challenge their credibility. The Government's duty to disclose exculpatory evidence "encompasses impeachment evidence as well as exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995).

The district court reasoned that the concealed cash rewards could not have affected the outcome of trial because other witnesses gave similar testimony against Mr. Paul. Add. 38-39. The record does not support the district court's opinion that "[Mr. Paul's] confession to Special Agent LaVoie . . . is essentially the same" as his alleged confession to Kris Rogers. Add. 35. Appellant's statement to LaVoie denied



Appellate Case: 05-3431 Page: 96 Date Filed: 07/03/2007 Entry ID: 3327284

any intent to kill Williams, made no reference to kicking him in the head, and claimed innocence for the murder. *See* T. 810-814. "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419 (1995). The district court suggested that Mr. Paul cannot demonstrate materiality in light of other evidence implicating him in the crime, but that reasoning, too, is flawed:

> The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.

*Id.*, 434-35 (citing *United States v. Bagley,* 473 U.S. 667, 678 (1985)). The court further reasoned that since appellant was a party to the conversation to which Rogers testified, he could have objected if Rogers testified falsely. A01651. Thus, Judge Hendren erroneously imposed on appellant the burden to prove that Rogers' testimony was false and inadmissible as a precondition to obtaining discovery or relief on his *Brady* claim. *See* A01661. The court's judgment is incompatible with the purpose and function of the prosecutor's obligation under *Brady*:

> One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.



Appellate Case: 05-3431 Page: 97 Date Filed: 07/03/2007 Entry ID: 3327284

*Id.*, 419.

The fact that other witnesses attributed admissions to Mr. Paul does not justify denial of his discovery request or his *Brady* claim because they too may have received rewards. Without discovery, it is impossible to determine whether they also received cash for testimony. Nevertheless, appellant does not have to demonstrate *Brady* violations with respect to every witness to establish his right to relief. In *Kyles v. Whitley, supra, Brady* violations affected two of four identification witnesses. The Court rejected the argument that the two untainted witnesses precluded a finding of materiality; "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Id.*, 453.

Rogers' testimony that appellant inflicted gratuitous violence upon Mr. Williams, and that he observed corroborating physical evidence, makes his credibility central to the Government's quest for a capital conviction. The scientific evidence did not back up Rogers' story. T. 578-79. Thus, evidence of a reward would give the jury reason to discredit Rogers' testimony about appellant's alleged admissions. Co-defendant Ingle, who was the actual shooter, received a life sentence in the absence of similar inflammatory evidence.

The district court denied this claim without allowing discovery or resolving factual issues regarding the covert rewards. Ms. Griffey's representation that the

payments were initiated "after trial" is contradicted by Mr. Snyder's assertion that the witnesses were rewarded for "coming forward." The identity of the witnesses, the amounts of the rewards, and the witnesses' expectations remain unknown, in spite of appellant's diligent efforts to discover the truth. The district court's denial of discovery or any reliable determination of facts violates its duty of fair, plenary habeas corpus review. *Blackledge v. Allison*, 431 U.S. 63, 78 (1977). Discovery is required "[w]here specific allegations before the Court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief . . ." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). A court abuses its discretion by denying discovery if it is "indispensable to a fair, rounded, development of the material facts." *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996).

Likewise, a hearing is required if the petitioner "make[s] allegations which, if proved, would entitle him to relief." *Medina v. Barnes*, 71 F.3d 363, 366 (10th Cir. 1995); *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986). The district court should hear evidence when the facts are in dispute, or when the court record is insufficient to resolve a mixed question of fact and law, such as a claim under *Brady* or *Strickland*. *See, e.g., Wade*, 798 F.2d at 307-08; *Edgemon v. Lockhart*, 768 F.2d 252, 255-56 (8th Cir. 1985). A habeas petition may not be dismissed without a full and fair hearing unless the factual allegations are "palpably incredible" or "patently

frivolous or false." *Houston v. Lockhart*, 982 F.2d 1246, 1250 (8th Cir. 1993).

This Court should issue a certificate of appealability on Mr. Paul's *Brady* claim, reverse the judgment below, and remand to a different judge with instructions to issue the Writ of Habeas Corpus, or in the alternative order discovery and adjudicate the claim based on reliably determined facts.



Appellate Case: 05-3431 Page: 100 Date Filed: 07/03/2007 Entry ID: 3327284

## ARGUMENT 5

**Because the Government Exposed the District Court to Improper *ex Parte* Communications, This Court, Pursuant to 28 U.S.C. § 2106, Should Remand Appellant's Case to a Different Judge to Preserve the Appearance and Reality of Impartial Justice.**

Mr. Paul asked the district court to recuse itself based on extrajudicial comments expressing hostility toward appellant and disapproval of a possible Government waiver of the death penalty, and based upon the court's sarcastic and impatient comments during Mr. Paul's mitigation case. A01581. Appellant renewed his motion after the Government improperly communicated prejudicial information *ex parte* to the court, and again after the Government asked to interview the court about the *ex parte* communications. A01717. All motions were denied, A01620, A01810-11, A02232, and this Court denied a COA on appellant's judicial bias claims.

Mr. Paul does not seek review of the rulings below on the disqualification issue. However, Arguments 1-4, inclusive, will likely result in remand to the district court. Therefore, pursuant to *United States v. Tucker*, 78 F.3d 1313, 1323-25 (8th Cir. 1996), appellant moves this Court to direct that upon remand, this case be assigned to a different judge "to preserve the appearance as well as the reality of impartial justice." *Id.* at 1325.

*Tucker* was an appeal by the Office of Independent Counsel investigating the



Appellate Case: 05-3431 Page: 101 Date Filed: 07/03/2007 Entry ID: 3327284

Whitewater scandal. The case was assigned to the Honorable Henry Woods, District Judge for the Eastern District of Arkansas. Judge Woods had appointed Hillary Clinton as counsel for a committee in a school desegregation case, and publicly stated that he had come to admire her through her work on that committee. 78 F.3d at 1323. Judge Woods also attended functions at the Clinton White House, and appellee, former Arkansas Governor Jim Guy Tucker, had also attended political fundraisers with the Clintons. *Id.* This Court granted the Independent Counsel's request to reassign the matter to a different judge upon remand. "The Independent Counsel made his request for reassignment in his appellant's brief. Under §2106, that is all that is required to make the request timely." *Id.*, 1324. This Court commonly exercises such authority "in order to preserve the appearance as well as the reality of impartial justice." *Id.*, 1325.

Unlike the appellant in *Tucker*, Mr. Paul raised his concerns in motions to disqualify the district court. His first motion involved extrajudicial statements by Judge Hendren expressing anger that the Government might waive the death penalty. On June 9, 1997, after co-defendant Ingle was sentenced to life, trial counsel asked the Government to withdraw the death notice pursuant to 18 U.S.C. §3592(a)(4), defining the mitigating factor that "another defendant..., equally culpable in the crime, will not be punished by death." A01548. On June 12, 1997, the Department of Justice advised the parties that its committee voted unanimously to waive the death penalty.



Appellate Case: 05-3431 Page: 102 Date Filed: 07/03/2007 Entry ID: 3327284

Attorney General Janet Reno had never deviated from a unanimous recommendation, so counsel for both parties believed that the death penalty was waived. A00435-42.

Judge Hendren, on June 13, 1997, conducted a pre-trial conference,[23] during which, according to defense counsel, he expressed extreme displeasure with the possible death waiver. A01601. He expressed strong feelings that the death penalty should be sought, and said he would refuse the Government's waiver of the death penalty. *Id.* Mr. Williams described Judge Hendren as very upset by the vote.[24] Attorney General Janet Reno unexpectedly rejected her committee's vote to waive the death penalty.

On June 14 and 15, 1997, Ingle's attorney, Cathi Compton, spoke at an Arkansas Bar Association meeting in Hot Springs, Arkansas. Judge Hendren talked to her about the Paul case, and repeated the sentiments described by Mr. Williams. Judge Hendren was "visibly upset with and angered by the DOJ committee's decision to de-certify Jeff Paul's death penalty case." A02306. Further, "Judge Hendren made clear during this conversation that if he was right and that [if] he had control over whether the case would proceed as a death penalty case, he would not allow the death

---

[23] There is no transcript or recording of this conference. Appellant unsuccessfully requested discovery of any record of that conference.

[24] Mr. Williams' time records reflect that after that hearing, he spent two hours researching whether the judge had authority to order the Government to seek the death penalty.

notice in Mr. Paul's case to be withdrawn." *Id.*

In addition to his angry extrajudicial statements, Judge Hendren injected himself into the proceedings. He sat patiently through the Government's penalty phase presentation. However, at the beginning of the defense mitigation case, the district court made light of the gravity of the proceedings, telling counsel, in the presence and hearing of the jury, "Remember the Court's rule that if we show movies, we must have popcorn for the jury." T. 971. During the one-witness mitigation case, Judge Hendren impatiently interrupted Mrs. Paul's testimony as she attempted to tell the jury about her husband's grandiose lies:

> By the Court: Let me interrupt here. Is it necessary to that we know the details of this tall tale?
>
> By Mr. Williams: Yes, sir. I will –
>
> By the Court: Well, let's try to move it along.

T. 1042.

On February 26, 2004, Judge Hendren denied appellant's motion to disqualify, without a hearing, stating:

> It is not suggested by defendant, or his declarants, that the undersigned expressed "extreme displeasure" toward defendant or his counsel or that the undersigned was "visibly upset" with defendant or his counsel. Instead, it is asserted that these sentiments were directed toward the attorney general and her committee and concerned whether they, alone, could delay and/or change an indictment then before the court for trial by jury.

A01625. From Mr. Paul's vantage point, this is a distinction without a difference.

Judge Hendren rejected Ms. Compton's declaration, stating, "[s]he is mistaken. Beyond that, the undersigned has no comment on either the content of her statement or her motives for making it." A01626. Judge Hendren concluded that statements attributed to him "amount at most to 'expressions of impatience, dissatisfaction, annoyance, and even anger' which are not sufficient to justify recusal." A01626.

Even more germane to this Court's exercise of its discretion under 21 U.S.C. §2106 are *ex parte* communications to the district court by Assistant United States Attorney Steve Snyder and Bureau of Prisons employee Brad Shoemaker. The court wrote counsel July 28, 2004, that the government had "inadvertently" twice passed information to the court "without the knowledge of Mr. Paul." A01691a. In separate conversations, Snyder and Shoemaker told the court that appellant's fellow inmate, David Hammer, was "influencing Mr. Paul to some degree." *Id.* Hammer had asked to be executed, and withdrew his request at the last minute. Shoemaker and Snyder told the court that "Mr. Hammer's tactics were done purely for the sake of delay in his case," implying that Mr. Paul was doing likewise. A01691a-A01691c. At the time of these improper communications, issues before the court included Mr. Paul's mental health and his *pro se* request to be executed. Without further inquiry, Judge Hendren stated, "The court has no reason to believe that either communication was intended to improperly influence the court," and promised not to be influenced by them.

A01691c.

Appellant renewed his motion to disqualify Judge Hendren on August 5, 2004, stating that he did not share "the Court's confidence as to the innocent nature of these improper communications." A01694. Counsel could not imagine "a *benign* motive for such communications." A01696. The information was negative and prejudicial, and was repeated by two Government agents in separate conversations with chambers on the same day. *Id.* Counsel suggested that appellant's right to a fair and impartial tribunal, *In re Murchison*, 349 U.S. 133, 136 (1955), warranted adversarial inquiry into the *ex parte* communications. A01696. Appellant's motions were summarily denied the next day, without awaiting a Government response.

While appellant's application for COA was pending before the district court, Department of Justice counsel H. Marshall Garret on August 17, 2005, wrote Judge Hendren asking for an interview about Snyder's *ex parte* communication with the court. A02011. Based on Garret's letter, appellant renewed his motion to disqualify Judge Hendren, arguing that the letter established that the district court is a witness to Government misconduct in his case, and a recipient of improper *ex parte* communications. Judge Hendren summarily denied the motion.

Because "[i]t is the appearance of bias or partiality that matters here, not actual bias," *United States v. Tucker*, 78 F.3d at 1324, this Court routinely directs the appointment of a different judge where the district court receives inappropriate

information, even if the court is not at fault for its exposure to such matters. Such circumstances reasonably call into question the court's impartiality, which justifies reassignment of the case:

> Federal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes alone, but on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances,' 28 U.S.C. § 2106." Thus we are empowered to "direct the entry of such appropriate . . . order . . . as may be just under the circumstances," 28 U.S.C. § 2106 (1994), including reassignment of the case where, in the language of 28 U.S.C. § 455(a) (1994), the district judge's "impartiality might reasonably be questioned.

*United States v. Tucker*, *supra*, 1323-24 (internal citations omitted). Even though this Court was confident that Judge Woods would handle Tucker's case fairly and impartially, "we believe this step is necessary in order to preserve the appearance as well as the reality of impartial justice." *Id.* at 1325.

This Court has directed assignment of a different judge on remand at the government's request when the district court considered impermissible factors to justify a lenient sentence. *United States v. Pepper*, 486 F.3d 408 (8th Cir. 2007); *United States v. Rogers*, 448 F.3d 1033, 1035 (8th Cir. 2006). Similarly, this Court directs the assignment of a different judge where the Government injects matters into a sentencing hearing in violation of a plea agreement. *Brunelle v. United States*, 864 F.2d 64 (8th Cir. 1988) (remanding to a different judge with directions that "the



Appellate Case: 05-3431 Page: 107 Date Filed: 07/03/2007 Entry ID: 3327284

government abide by the plea agreement and additionally refrain from bringing Brunelle's original sentence to the attention of the sentencing court.") Accord, *United States v. McCray*, 849 F.2d 304 (8th Cir. 1988); *United States v. DeWitt*, 366 F.3d 667, 672 (8th Cir. 2004); *United States v. Thompson*, 403 F.3d 1037, 1041 (8th Cir. 2005). Reassignment purges the taint of the improper evidence or argument to which the court was exposed.

Appellant presents compelling circumstances for exercising this Court's discretion under 28 U.S.C. § 2106. The Government communicated to the district court, *ex parte*, improper matters pertaining to issues pending before the court and reflecting negatively on Mr. Paul. Even though Judge Hendren declared that the improper communications would not influence him, "[t]he fact that the district court stated that the government's remark did not influence its decision does not ameliorate the government's breach." *United States v. McCray*, 849 F.2d 304, 305 (8th Cir. 1988). This Court emphasized in *McCray* that its reassignment order "is in no sense to question the fairness of the sentencing judge; the fault here rests on the prosecutor, not the sentencing judge." *Id.* at 306. "The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact." *Liljeberg v. Health Services. Acquisition Corp.*, 486 U.S. 847, 869-70 (1988).

For the foregoing reasons, Mr. Paul urges this Court upon remand to direct the



Appellate Case: 05-3431 Page: 108 Date Filed: 07/03/2007 Entry ID: 3327284

assignment of a different judge to maintain the appearance and reality of a fair and impartial tribunal.



Appellate Case: 05-3431 Page: 109 Date Filed: 07/03/2007 Entry ID: 3327284

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court and issue the writ of habeas corpus discharging appellant from custody unless the Government grants him a new trial, or, in the alternative, remand the case with instructions to assign Mr. Paul's case to a different district court judge, or grant such further relief as the Court deems just.

Respectfully submitted,


/s/ Sean D. O'Brien
SEAN D. O'BRIEN, Mo #30116

/s/ Jennifer A. Merrigan
JENNIFER A. MERRIGAN, Mo #56733
Attorneys at Law
305 East 63rd Street
Kansas City, MO 64113
816-363-2795 ● Fax 816-363-2799
E-mail: sobrien@pilc.net

/s/ Robert L. McGlasson
ROBERT L. MCGLASSON
Georgia Bar No. 492638
Attorney at law
1024 Clairemont Ave.
Decatur, GA 30030
404-314-7664 Fax 404-373-9338
E-mail: rlmcglasson@comcast.net

Attorneys for Appellant

## CERTIFICATE OF SERVICE

I, Sean O'Brien, do hereby certify that a true and correct copy of the foregoing Brief has been served upon counsel for respondent this 2nd day of July, 2007, by sending a copy of same via U.S. mail to:

Mr. Robert C. Balfe
William Cromwell
United States Attorney's Office
Western District of Arkansas
P.O. Box 1524
Fort Smith, AR 72901

Mr. J. Richard Broughton
Attorney, Capital Case Unit
United States Department of Justice
Criminal Division
1331 F. Street, NW
Washington, D.C. 20530
Richard.broughton@usdoj.gov

/s/ Sean D. O'Brien
SEAN D. O'BRIEN



Appellate Case: 05-3431 Page: 111 Date Filed: 07/03/2007 Entry ID: 3327284

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document is printed in 14 point proportionally spaced type (Times New Roman), that it was prepared with Corel Suite 8 WordPerfect software and according to this software the document contains 23,553 words.

Respectfully submitted,

/s/ Sean D. O'Brien
SEAN D. O'BRIEN



Appellate Case: 05-3431 Page: 112 Date Filed: 07/03/2007 Entry ID: 3327284