# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 05-3431

| | | |
|---|---|---|
| Jeffery William Paul, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Arkansas. |
| United States of America, | * | |
| | * | |
| Appellee. | * | |

Submitted: December 10, 2007
Filed: July 22, 2008

Before COLLOTON, BEAM, and BENTON, Circuit Judges.

COLLOTON, Circuit Judge.

A jury convicted Jeffery William Paul of murder, while aiding and abetting another, in violation of 18 U.S.C. §§ 2 and 1111(a), and for knowing use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924. The jury sentenced Paul to death under the Federal Death Penalty Act, 18 U.S.C. §§ 3591, *et seq*. This court affirmed Paul's conviction and sentence. *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000).

Paul then moved for a writ of habeas corpus under 28 U.S.C. § 2255, arguing, among other things, that he was denied his Sixth Amendment right to effective

assistance of counsel at trial and sentencing. The district court[1] denied relief without a hearing, and denied Paul's application for a certificate of appealability. A panel of this court granted a certificate on two questions relating to the assistance of counsel: (1) whether trial counsel were ineffective for failing to investigate and present evidence of Appellant's mental, medical, and physical history, and (2) whether trial counsel were ineffective for failing to investigate and assert Appellant's incompetence to stand trial. On appeal, Paul also contends that he was mentally incompetent to proceed in the district court during this habeas corpus action. This court granted a certificate of appealability on the question whether Appellant has a constitutional right to competence during federal habeas corpus proceedings and, if so, whether that constitutional right was violated. For the reasons that follow, we affirm the district court's denial of Paul's § 2255 motion.

## I.

Paul was convicted of murder, while aiding and abetting another, for the killing of 82-year-old Sherman Williams at the Hot Springs National Park in Arkansas.[2] According to evidence adduced at trial, on June 22, 1995, Paul and an acquaintance, Trinity Ingle, followed Williams from downtown Hot Springs to a walking trail in the National Park, where they first robbed and beat Williams, and then shot him in the head and shoulder. Paul and Ingle attempted to hide the body by dragging it away from the trail. Four days later, a hiker found Williams's body under logs and rocks, with hands and ankles bound by duct tape. A medical examiner testified that Williams

---

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

[2]Count One of the indictment charged that "Paul, and another individual known to the grand jury, while aiding and abetting each other, . . . did, with malice aforethought, kill Sherman Williams." (A 64). The verdict form stated that the jury found Paul "guilty of murder in the first degree as charged in Count 1 of the indictment." (A 159).



Appellate Case: 05-3431 Page: 2 Date Filed: 07/22/2008 Entry ID: 3453711

suffered gunshot wounds to the head and chest, and that the wound to the head caused his death. Williams's vehicle was found in a remote area of the park, and Ingle's latent fingerprint was recovered from inside the car.

As explained in our opinion resolving Paul's direct appeal, several of Paul's acquaintances testified that he confessed to involvement in the murder. Kris Rogers testified that Paul admitted that he and Ingle had killed an old man in the park after beating him and kicking him in the head. According to Rogers, Paul stated that he and Ingle both shot Williams before dragging the body into the woods. Christine Lapaglia testified that Paul told her that he had killed someone when he kicked him and broke his neck. Cindy Wallace testified that Paul had a recurring dream about following an old man, taking his money, beating him severely, and then shooting him in the head. Dan Coughlin testified that Paul admitted that he and another man had robbed an old man, and then shot and killed him. Paul's older brother testified that Paul and Ingle had picked him up on the afternoon of Williams's murder in a vehicle that matched the description of Williams's stolen car. *See Paul*, 217 F.3d at 995. Rebecca Pingle testified that she saw Paul on the day of the killing and that Paul "was limping." Paul told Kris Rogers the day after Williams was killed that "his foot hurt." And after admitting to Rogers that he had been involved in Williams's killing, Paul showed Rogers his shoe, "which looked like it had been splattered with blood."

Paul left Arkansas shortly after the murder, and he was eventually apprehended in South Carolina in August 1996. After his arrest, Paul confessed to participating in Williams's murder, but denied shooting Williams himself. Paul stated that after he and Ingle followed Williams into the federal park, Ingle drew a .38 caliber revolver from his waist and pointed it at Williams, demanding Williams's money and car keys. According to Paul's post-arrest statement, Ingle instructed Paul to bind Williams's wrists and ankles using duct tape, after which Ingle struck Williams using the butt of his gun and then kicked Williams twice in the head, while Paul kicked him once in the chest. Paul stated in the interview that he started to leave the scene when Ingle said



Appellate Case: 05-3431 Page: 3 Date Filed: 07/22/2008 Entry ID: 3453711

that he was not going to do prison time for the robbery. Paul said the two men turned and walked back to Williams, where Ingle shot him twice. Paul explained that he and Ingle then dragged the body approximately thirty feet off the hiking trail, and that Paul hid the victim's wallet under some rocks. Ingle was convicted in a separate trial for aiding and abetting first degree murder and use of a firearm during and in relation to a crime of violence. He was sentenced to life imprisonment. *See United States v. Ingle*, 157 F.3d 1147 (8th Cir. 1998).

Paul's trial counsel presented no witnesses during the guilt phase of proceedings, and relied on cross-examination of prosecution witnesses to develop evidence in support of a defense. During the penalty phase, Paul's counsel presented testimony from Paul's mother, Paula Paul, and an audio recording of Ingle, created surreptitiously by the government, in which Ingle made statements to a cellmate that arguably supported Paul's mitigation case.[3] After a short deliberation, the jury decided to impose a sentence of death.

Paul filed his § 2255 motion, spanning 340 pages, on January 30, 2002. The district court denied relief on January 31, 2005. With respect to alleged ineffective assistance of counsel regarding investigation of Paul's personal history, the district court, citing *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001), held that Paul's allegations were insufficient to allow an assessment of potential prejudice to the defense, because he had failed to identify the conjectural witnesses and the substance of their testimony. Alternatively, the court found no basis to conclude that the evidence discussed generally by Paul likely would have changed the result of the trial, because the proposed testimony would have been "cumulative at best." The court observed that the jury unanimously found four mitigating factors, that eight

---

[3]Interpreting the recording in the light most favorable to Paul, Ingle uses code names of "Andy" and "Bob" for Paul and himself, *see* T. Tr. 1071, and states at one point, referring to the Williams murder, that Paul "at first . . . didn't even want to shoot him," and that "Bob" (i.e., Ingle) "shot him first." (T. Tr. 1103).

jurors found a fifth mitigating factor, and that the jury thus apparently accepted the mitigation testimony of Paul's mother. As for counsel's assistance on the issue of Paul's competency, the court ruled that trial counsel was sufficiently diligent, and that it was highly unlikely that the court would have ordered another competency hearing if counsel had requested it. In response to this order, Paul filed a motion to reconsider or to vacate the order, pursuant to Federal Rule of Civil Procedure 59(e) and 60(b), and submitted witness declarations to support his claim of ineffective assistance of counsel. The district court denied the motion, concluding that the arguments and affidavits raised issues that were previously addressed, and did not alter the court's conclusions. (A 1995).

II.

The first issue identified in the certificate of appealability is whether Paul's constitutional right to effective assistance of counsel was violated when his attorneys failed to investigate and present evidence of Paul's mental, medical, and physical history. Paul argues that counsel's failure in this respect prejudiced him at both the guilt and penalty phases of the trial.

To establish ineffective assistance of counsel, Paul must show that his counsel's performance was deficient, and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, Paul must demonstrate a reasonable probability that the outcome would have been different but for the deficient performance. *Malcom v. Houston*, 518 F.3d 624, 626 (8th Cir. 2008). A reasonable probability is less than "more likely than not," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), but it is more than a possibility. *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005). A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.



Appellate Case: 05-3431 Page: 5 Date Filed: 07/22/2008 Entry ID: 3453711

Paul argues that counsel failed to interview and present prospective witnesses who could have strengthened his case at both phases of the trial. He points to several declarations gathered from these witnesses by post-conviction counsel to demonstrate that favorable evidence could have been presented on his behalf. Paul contends that if this evidence had been submitted to the jury, there is a reasonable probability that the jury would have acquitted him of capital murder or imposed a sentence of life imprisonment rather than death.

The government defends the professional competence of Paul's trial counsel, emphasizing that counsel spent several months preparing for trial, hired a mitigation specialist to compile background materials and to locate witnesses, requested additional funds (albeit unsuccessfully) when the specialist exhausted what was authorized by the district court, sought psychiatric experts to examine Paul, presented a mitigation case through Paul's mother and the tape-recording of Ingle, and succeeded in persuading many jurors to find several mitigating circumstances. The government also proffers strategic reasons why counsel may have limited their mitigation case to one live witness, pointing to Paul's disruptive behavior in the courtroom, and the potential that extending the trial in that situation would have caused the jury to react unfavorably to Paul. Indeed, the mitigation specialist declared that she learned that the defense chose not to present an extended mitigation case "because of Jeff's behavior in the court room." (A 2246).

The district court, however, rejected Paul's claims of ineffective assistance of counsel without a hearing, and the record is not developed concerning counsel's contemporaneous rationale for the actions that Paul now challenges. There appears to be a disagreement among the circuits on whether the reasonableness of counsel's performance may be assessed solely by reference to strategy that a hypothetical attorney might have pursued under the circumstances, without any inquiry as to counsel's actual strategy, *see, e.g.*, *Cofske v. United States*, 290 F.3d 437, 444 (1st Cir. 2002); *Chandler v. United States*, 218 F.3d 1305, 1315 & nn.16 & 17 (11th Cir.



Appellate Case: 05-3431 Page: 6 Date Filed: 07/22/2008 Entry ID: 3453711

2000); *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995), or whether the petitioner is entitled to inquire into whether his counsel actually employed a purposeful strategy before a decision is reached on the adequacy of performance, *see Thomas v. Varner*, 428 F.3d 491, 499-500 & nn.7 & 8 (3d Cir. 2005); *Greiner v. Wells*, 417 F.3d 305, 320 & n.17 (2d Cir. 2005). Our court has said that where trial counsel is unable to recall or explain the reasons underlying a decision at trial, we will examine counsel's "trial tactics and strategy as revealed by the state court record," and we have held counsel's performance competent in that situation where we could "readily reconstruct at least two strategic reasons why counsel may have made this decision." *Fretwell v. Norris*, 133 F.3d 621, 624, 627 (8th Cir. 1998). But we have located no circuit precedent that directly addresses how the court should evaluate counsel's performance in the absence of an evidentiary hearing or where counsel admits that a particular decision was negligent or not strategic. We deem it unnecessary in this case to delve into these matters, because we conclude the record shows conclusively that Paul did not suffer prejudice from what he now alleges was deficient performance by counsel. *See Hill v. Lockhart*, 474 U.S. 52, 60 (1985) ("Because petitioner in this case failed to allege the kind of 'prejudice' necessary to satisfy the second half of the *Strickland v. Washington* test, the District Court did not err in declining to hold a hearing on petitioner's ineffective assistance of counsel claim.").

With respect to the guilt phase, Paul argues that further investigation by counsel would have produced witnesses to testify that Paul had a history of exaggerating his "badness," and that trial counsel in 1996 also should have interviewed Paul's accomplice, Ingle, who provided a statement in 2005 that exculpates Paul. Paul argues that the evidence of his tendency to exaggerate, combined with Ingle's acceptance of responsibility for the murder of Williams, would have persuaded the jury to disbelieve Paul's admissions to several persons that he participated in the murder.



Appellate Case: 05-3431 Page: 7 Date Filed: 07/22/2008 Entry ID: 3453711

To support this claim, Paul presents a declaration from Richard McCaslin, a boyhood friend of Paul, who recounts that Paul once "made up a story about shooting a kid at a shopping mall, but it never happened." (A 2257). Paul cites a report of psychiatrist Seymour Halleck that when Paul was hospitalized at the Rivendell Psychiatric Hospital, he once reported to a counselor "that he had killed somebody," although "[t]his never happened." (A 2313). And he relies on a declaration of Michael Roberson, who knew Paul as a youth, that it "makes sense that Jeff tended to exaggerate his 'badness' to gain status with his peers, as he had learned this from [his father], who was not a true master at much except the art of lying and living a lie." (A 2293). The Ingle declaration from 2005 asserts that Paul tried to convince Ingle to leave the park before Williams was killed, and avers that Ingle alone shot Williams while Paul yelled at him to stop. (A 2254).

The district court concluded that Paul's contention that counsel was ineffective in declining to present a history of false admissions by Paul was "strained at best," and we conclude there is no reasonable probability that a jury would have acquitted Paul of capital murder if counsel had taken these additional steps. Paul's trial counsel already elicited evidence – from the same witnesses who reported Paul's admissions about the Williams murder – that Paul had a history of concocting stories. Christine LaPaglia testified that she did not believe Paul's admission about the Williams murder. She acknowledged that "he's just known to tell lies,"and said she thought Paul had made up the story "because [they] were breaking up." Cindy Wallace testified that Paul's admission "didn't sound real," and that she had "caught [Paul] several times" telling her things that were not true. Additional testimony that Paul had made up stories many years earlier about his "badness" would have been largely cumulative of evidence already presented, and likely less powerful than testimony already elicited from the very witnesses to whom Paul made admissions about the Williams murder.



Appellate Case: 05-3431 Page: 8 Date Filed: 07/22/2008 Entry ID: 3453711

The certificate of appealability does not encompass whether counsel were ineffective for failing to contact Ingle, because that matter does not relate to Paul's "mental, medical, and physical history." But even if we were to expand the certificate to consider the point, we do not think there is a reasonable probability that the guilty verdict would have been different if Paul's counsel also had sought to contact Ingle about testifying in Paul's defense. Most important, Paul provides no reason to believe that, *at the time of Paul's trial in June 1997*, Ingle would have offered to take full responsibility for the murder of Williams and to exculpate Paul. At that point, Ingle had just been convicted and sentenced to life imprisonment. He was about to commence a direct appeal, in which he argued that his conviction should be reversed, and the case remanded for a new trial. *See Ingle*, 157 F.3d 1147. There is scant reason to believe that Ingle, still represented by counsel in his direct appeal, would have waived his rights against self-incrimination and given public testimony that would have ensured his conviction in the event of a new trial. That alone is reason to conclude that Paul suffered no prejudice from counsel's failure to contact Ingle about testifying in Paul's defense.[4]

Even if Ingle had testified consistent with his 2005 declaration, moreover, the jury would have had good reason to be skeptical of Ingle's account. Ingle's declaration is inconsistent with statements he made in April 1996 during a recorded conversation with an FBI informant. In that discussion, Ingle used apparent code-

---

[4]The record supplied by the parties in this case does not reveal whether Ingle's sentence of life imprisonment was the result of a decision by a jury that the government failed to prove that death was the appropriate punishment, such that the death penalty would have been barred in a retrial, *see Bullington v. Missouri*, 451 U.S. 430, 446 (1981), or whether the life sentence was the consequence of a deadlocked jury, *see* 18 U.S.C. § 3594; *Jones v. United States*, 527 U.S. 373, 379-81 (1999), such that the death penalty could have been available in the event of a successful appeal. *See Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003). In the latter situation, of course, there would have been even more reason for Ingle to assert his privilege against self-incrimination if Paul sought to call him as a witness.



Appellate Case: 05-3431 Page: 9 Date Filed: 07/22/2008 Entry ID: 3453711

names of "Bob" and "Andy" when describing the murder of Williams. *See* T. Tr. 1071. Although some portions of the recording could suggest that Paul was less culpable than Ingle, *see supra*, at 4 n.2, Ingle's statements clearly indicated that both participants played a role in the murder, to wit: "ANDY and BOB, they, you know, did this for some money, you know?" (T. Tr. 1063); "BOB and ANDY both did this," (T. Tr. 1068) (in response to the question, "Did both of y'all shoot him or just one of y'all?"); "Whenever one did it . . . both did it," (T. Tr. 1073); and "whenever BOB [making cocking of gun sounds again], ANDY automatically . . . . You know, they, they work together." (T. Tr. 1077). In the unlikely event that Ingle had volunteered to testify at Paul's trial, any testimony along the lines of the 2005 declaration could have been impeached substantially by Ingle's recorded statements in 1996. We therefore conclude that Paul has failed to make a sufficient showing to undermine confidence in the jury's guilty verdict on the capital offense.

Paul also contends that if trial counsel had conducted further investigation and presented additional witnesses at the penalty phase of his trial, then there is a reasonable probability that at least one juror would have voted to impose a sentence of life imprisonment rather than death. Because an evaluation of this contention requires a "predictive judgment" about how jurors would have weighed the totality of the evidence, including the new evidence that Paul now cites, *see Williams v. Taylor*, 529 U.S. 362, 397-98 (2000), it is important first to review the record that was created in the trial itself, and the findings made by the jury on that record.

The government presented a strong case on aggravating factors that supported a sentence of death. The jury unanimously found that Paul intentionally aided and abetted in the killing of Sherman Williams, and it unanimously found three statutory aggravating factors and six non-statutory aggravating factors in support of the death penalty: (1) the defendant committed the offenses in an especially heinous, cruel or depraved manner, in that they involved torture or serious physical abuse, (2) the defendant committed the offenses with the expectation of the receipt of something of



Appellate Case: 05-3431 Page: 10 Date Filed: 07/22/2008 Entry ID: 3453711

pecuniary value, (3) the victim was particularly vulnerable due to old age, (4) the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society, (5) the defendant successively eluded capture by the FBI until his arrest in August 1996, (6) the defendant demonstrated a lack of remorse for the capital offense, (7) the victim was killed to prevent the defendant from being identified as a participant in the robbery, (8) the "victim had personal characteristics as an individual human being," and (9) the family of the victim has suffered injury and loss as the result of the victim's death. (A 161-69). The new evidence proffered by Paul would not undermine any of the evidence in aggravation, or the jury's findings on those factors.

The mitigation case relied on the testimony of Paul's mother, Paula Paul, who spoke about Paul's background, including his mental, medical, and physical history. Paula testified about positive aspects of Paul's life, saying that he fostered an extremely close relationship with his maternal great-grandmother, loved a stray dog he adopted, carried a picture of Paula in his wallet, and helped support the family financially. In particular, Paula testified that Paul received excellent school grades, regularly attended church, Sunday school, and church camp, and was enthusiastic about the boy scouts, where he earned several merit badges. In the seventh grade, Paul received the "most outstanding achievement award for improved student."

Paula also testified about the hardships that Paul faced as a youth. These included an absentee and abusive father, the family's constant relocation, and marital problems experienced by his parents. Several times during Paul's childhood, Paul's father, Dennis, secretly packed up all of his belongings and "just disappear[ed]" for up to five weeks at a time. Dennis did not provide steady income to support Paul and his family, and never maintained a job for more than a year while Paul was growing up. As a result of Dennis's irregular employment, the Paul family moved at least four times during Paul's middle and high school years, enrolling him in new schools each time, and creating stress for Paul during his youth. Paul also experienced stress as a



Appellate Case: 05-3431 Page: 11 Date Filed: 07/22/2008 Entry ID: 3453711

result of the tumultuous relationship between Paula and Dennis, including a separation when Paul was three years old, and an extramarital affair conducted by Dennis in 1992. Paula described one instance in which Dennis severely cut Paul's face, when he was eight years old, in a knife-throwing demonstration that was designed to impress Dennis's friends. Dennis lied about the cause of the injury for years, claiming that Paul accidentally had fallen on the knife.

These and other stressors, according to Paula, began to influence Paul in a negative way during middle school. Paul fought with other children, and his grades declined from A's to D's and F's. Paul was charged in a juvenile proceeding for "making an obscene gesture towards" a neighbor. He failed the second half of the seventh grade, and later failed his first two years of high school. He stopped attending boy scouts and church. Around this time, Paul was caught stealing cigarettes, and later was arrested in separate incidents for stealing a car, burglarizing home electronics equipment, and shoplifting. When Paul turned 17, he was charged as an adult for pointing a shotgun at someone, and he spent several months in jail before his parents posted bail. Paul later violated the terms of his parole and spent approximately six months in state prison. Paula sought to counter Paul's criminal history by arguing his innocence.

Finally, Paula testified about Paul's troubled mental health history, including two stays at Rivendell psychiatric hospital, the possibility that Dennis had suffered a past mental breakdown, and a family history of alcoholism and drug abuse. As a young child, Paul was diagnosed with "Attention Hyper Activity Deficit Disorder" and placed on Ritalin. Paula testified that Paul had been treated twice as an inpatient at Rivendell "psychiatric residential treatment home," one time pursuant to court order after he was found guilty of auto theft, and a second time after Paul "tried to commit suicide." Paula testified that Dennis had been discharged from the military after having a "mental breakdown." She characterized Dennis as "a pathological liar" who created stories to impress people. Paula testified that Paul took after this habit of



Appellate Case: 05-3431 Page: 12 Date Filed: 07/22/2008 Entry ID: 3453711

Dennis's and often told "tall tales." Paula also testified that Paul has a family history of alcohol and drug abuse. Although Dennis does not drink, she said that Paul's paternal grandparents are alcoholics, and his uncles are either alcoholics or addicted to drugs. Paul's paternal grandfather has been involved in two drunk-driving related accidents, including twice when Paul was very young and in the car.

Paula recalled that Paul's mental state grew worse after he witnessed a shooting, which Paula characterized as "this little boy's head being blow off." According to Paula, Paul had frequent nightmares about the event and developed "insecurities," stopped sleeping regularly, ceased studying, and never wanted to be alone. Paul became unable to sleep unless he was in bed with his mother, and did not sleep apart from her until he was 17 years old. Paul's insecurity grew so acute that he even slept in Paula's hospital bed after she had surgery. Around this time, Paul developed a "nervous condition" of picking at his face until sores developed. And since he was a child, he had a habit of biting his knuckles until they bled. Paula testified that Paul had been treated for his behavioral problems at both the Child Study Center in the Little Rock Children's Hospital, and at "Community Counseling."

This evidence clearly had an effect on the jury, as Paul's trial counsel were successful in persuading the jurors unanimously to find four factors that mitigated against a sentence of death, namely: (1) that the defendant experienced parental neglect, abandonment, and corruptive influence, (2) that the defendant experienced parental abdication as to holding the defendant accountable for his behavior, (3) that the defendant experienced chaotic family instability, and (4) that the defendant identified with criminally convicted peers. In addition, eight jurors found the mitigating factor (5) that the defendant "experienced modeled parental irresponsibility;" six jurors found it mitigating (6) that the defendant was youthful at the time of the offense, and (7) that the defendant witnessed a shooting in a mall; and three jurors found (8) that there existed "any other factors in defendant's background or character that mitigate against imposition of the death sentence." (A 169-72).



Appellate Case: 05-3431 Page: 13 Date Filed: 07/22/2008 Entry ID: 3453711

Paul now contends that trial counsel should have investigated additional witnesses, and presented testimony from friends and relatives regarding Paul's medical, mental, and physical history. Much of the proposed testimony concerns abuse that Paul suffered at the hands of his father. Heather Iacobacci-Miller declared that Paul "bore the brunt of his father's raging fists." Cyrilda Sue Teague stated that Paul's father repeatedly beat Paul "black and blue," and that she observed him "beaten from head to toe" and with "bruises all over him – on his back, his stomach, his arms," including one occasion when Paul's eye was "swollen so badly he couldn't see out of it." Paul's uncle, James Massey, declared that a physical attack on Paul by his father "was just a very regular occurrence in that house," and that Paul's father frequently threw Paul into walls and choked him. Massey recounted the incident in which Paul's father hit Paul in the face with a thrown knife, leaving his face badly scarred. Michael Roberson's declaration described how Paul's face was cut when his father was "practicing one of these martial arts 'techniques' with him," and explained that Paul's father "had a tendency to lose control in fits of rage." Paul's maternal grandfather, Hubert Massey, stated that Paul's father repeatedly hurt Paul as a child, including by pulling him from the ground by the ears, throwing him against a wall in anger, or "wailing the tar" out of Paul in another room. Zach Dryden declared that Paul was very afraid of his father, and that Paul's father once "grabbed a kid by his testicles and shook him around and threw him against the wall."

Other proposed evidence cited by Paul pertains to his compassionate personality. Iacobacci-Miller declared that Paul had a well-known "concern for animals, especially vulnerable ones," and once picked up or rescued a "truly ugly mutt" from the side of a road. Hubert Massey stated that Paul was a "good little boy" who was "very gentle and loving" and "really cared for animals." Cyrilda Sue Teague declared that Paul was "one of the sweetest children I have ever met," while Martha Massey said that he had "the sweetest disposition," and Richard McCaslin proffered that he knew Paul "a kind and compassionate person," especially with the McCaslin children.



Appellate Case: 05-3431 Page: 14 Date Filed: 07/22/2008 Entry ID: 3453711

Viewing Paul's proffer in the context of the trial record as a whole, we are not persuaded that there is a reasonable probability that if Paul's trial counsel had gathered and presented this additional evidence, then the jury would not have selected a sentence of death. Much of the new evidence cited by Paul is largely cumulative of evidence that was presented through his mother at the penalty phase of the trial. Paul's mother testified about Paul's difficult childhood, including the incident in which Paul's father struck Paul in the face with a knife and produced a wound that required extensive surgery. The jury clearly gave weight to her account, unanimously finding three mitigating factors relating to Paul's troubled upbringing. The additional evidence that Paul proffers concerning his compassionate nature is also largely duplicative. Paul's mother testified at trial that he cared for animals, shared a close relationship with his great-grandmother, and supported his family financially.

If Paul's trial counsel had presented these additional witnesses at the penalty phase, moreover, it is likely that there would have been negative repercussions for Paul's case. A graphic description of a defendant's childhood can affect the jury's appraisal of his moral culpability, *see Williams*, 529 U.S. at 398, but the evidence proffered by the new witnesses in this case is not uniformly helpful. Two of the witnesses connected Dennis Paul's behavior with negative characteristics of the defendant. Iacobacci-Miller stated that Dennis Paul's "pushing [Paul] to be badder and tougher than he actually was had the effect of sending [Paul] into his gang group to prove himself." (A 2264). Roberson said it made sense to him that "Dennis' philosophy would lead [Paul] to associate with a street gang." (A 2293). McCaslin declared that Paul and Ingle were members of rival "gangs" until Paul negotiated "a peace treaty." (A 2257). Dryden's declaration explains that Paul once ran away from home and stole a car, although he attempted to minimize the seriousness of the incident. Extending the mitigation case also likely would have exposed the jury to more of Paul's inappropriate courtroom demeanor, thus hampering his efforts to secure a favorable verdict at the penalty phase. Paul's mitigation specialist averred that "the defense chose not to put on the mitigation that we had developed because of



Appellate Case: 05-3431 Page: 15 Date Filed: 07/22/2008 Entry ID: 3453711

Jeff's behavior in the court room," (A 2246), and one of the psychiatrists who examined Paul explained that counsel "called only one mitigation witness, Jeff's mother, feeling that any continuation of the trial would only result in Jeff damaging himself further." (A 2319).

We recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record. Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice. *See Williams*, 529 U.S. at 398; *Malone v. Vasquez*, 138 F.3d 711, 721 (8th Cir. 1998). The mitigation case at trial covered much of the same ground as the newly proffered evidence. The record at trial gave the jury an opportunity to consider the same mitigating factors to which the new evidence pertains for similar or identical reasons. We acknowledge that the evidence of physical abuse by Paul's father presented at trial was not as extensive as that proffered in this habeas proceeding, but the jury certainly was not given reason to develop a "benign conception" of Paul's childhood, as in *Rompilla v. Beard*, 545 U.S. 374, 391 (2005). Unlike the record in *Williams v. Taylor*, 529 U.S. 362, and *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003), the mitigation case here did include a good deal of mitigating information about Paul's childhood, sufficient to convince all jurors that Paul experienced "parental neglect, abandonment, and corruptive influence," "parental abdication as to holding the defendant accountable for his behavior," and "chaotic family instability," and to persuade eight jurors that Paul "experienced modeled parental irresponsibility." The double-edged nature of some of the proffered evidence, and further exposure of the jury to Paul's unruly behavior in the courtroom, likely would have increased the weight of the government's case in aggravation, and counteracted any incremental gain that might have been made on the mitigating side of the balance.



Appellate Case: 05-3431 Page: 16 Date Filed: 07/22/2008 Entry ID: 3453711

Taking the record as a whole, therefore, we conclude that Paul's proffered evidence concerning his medical, mental, or physical history is insufficient to undermine confidence in the jury's verdict in the penalty phase. Accordingly, even assuming that Paul could show that the performance of trial counsel was constitutionally deficient, he has not established resulting prejudice.[5]

B.

The second issue identified in the certificate of appealability is whether trial counsel were ineffective for failing to investigate and assert Paul's incompetence to stand trial. Paul contends that counsel performed deficiently in this respect, and that effective assistance would have resulted in a decision that he was incompetent to stand trial. To address this claim, it is necessary first to recount the proceedings in the district court regarding Paul's competence.

In November 1996, the district court granted a motion filed by Paul's trial counsel, and ordered Paul to undergo a psychiatric evaluation to determine whether he was insane at the time of the alleged offenses, and whether he was suffering from a mental disease or defect rendering him mentally incompetent to proceed with the

---

[5]Paul argues that trial counsel was ineffective for failing to contact Trinity Ingle with respect to the penalty phase as well. Based on the declaration executed by Ingle in 2005, Paul contends that Ingle would have testified in a mitigation case that he alone was responsible for the murder of Williams, and that Paul was both unaware of the plan and opposed to its execution. This contention does not relate to Paul's "mental, medical, and physical history," and it is therefore outside the scope of the certificate of appealability. In any event, for the reasons stated above, *supra*, at 9-10, we see no reasonable probability that Ingle would have waived the privilege against self-incrimination and testified consistent with his 2005 declaration while he was in the process of mounting a direct appeal of his own conviction in June 1997, or that testimony consistent with the 2005 declaration would have carried much weight in the face of impeachment by Ingle's recorded statements.



Appellate Case: 05-3431 Page: 17 Date Filed: 07/22/2008 Entry ID: 3453711

trial. On February 20, 1997, health professionals in the Mental Health Division at FCI Butner, North Carolina, diagnosed Paul with antisocial personality disorder, but concluded that he was not "suffering from a mental disease or defect rendering him mentally incompetent" for purposes of trial. (A 90-97). Based on this report, Paul stipulated on April 4, 1997, that he was mentally competent to proceed with trial. Paul's trial counsel then retained a psychiatrist to help prepare mitigation evidence for use in a potential penalty phase. After conducting a psychiatric examination on May 12, 1997, the mitigation psychiatrist, Dr. Anthony Semone, concluded that Paul was "suffering from a borderline psychotic panic or possibly an acutely psychotic decompensation." Dr. Semone opined that Paul was "not now able sufficiently to understand the charges against him," that he was "unable to cooperate sufficiently with [counsel] in effectively assisting in his own defense," that he was "not now able at all to make a rational and informed decision with respect to the plea arrangement offered by the U.S. Attorney," and that he was "at serious risk of being unable to control himself throughout the rigors of trial." (A 137c). Based on this new report, Paul's trial counsel sought funding for a third psychiatric exam by Dr. Irving Kuo, and the district court granted the motion. Dr. Kuo, however, reached a conclusion contrary to that of Dr. Semone, and opined that Paul was competent. (A 2296, 2316). Thereafter, Paul's counsel did not seek a competency hearing in the district court, and the case proceeded to trial.

Paul now contends that trial counsel were ineffective for failing to investigate adequately his background and mental health, and failing to raise in the district court his competence to proceed. He relies on the report of Dr. Semone, his own disruptive behavior during the course of the trial, and declarations from several lay witnesses regarding his family and personal history. These declarations include statements of Paul's uncle that Paul "would see things, mostly people, in the room with us, which were not there," and that "[s]ometimes he told me they would talk to him." Paul's maternal grandfather describes a family medical history of alcoholism, drug use, depression, schizophrenia, and suicide: Five relatives have attempted suicide, one



Appellate Case: 05-3431 Page: 18 Date Filed: 07/22/2008 Entry ID: 3453711

family member has been diagnosed with schizophrenia, and one family member has been committed to a mental facility.

The district court rejected this claim of ineffective assistance, ruling that "trial defense counsel was sufficiently diligent in considering and pursuing the competency issue." The court found it "highly unlikely (as no doubt perceived by trial defense counsel) that the trial court would have interrupted the trial to order yet another competency hearing even if defense counsel had asked for same – because petitioner's behavior, while unwise and detrimental to him and his cause, did not indicate he was uncontrollable, or that he did not understand the situation."

Again, although the district court resolved this claim without a hearing, there are substantial reasons to believe that counsel's performance was not constitutionally deficient. Counsel sought a psychiatric examination before trial, but received a report concluding that Paul was competent to proceed. Counsel continued nonetheless to develop competency issues for purposes of mitigation, and when a second psychiatrist opined that Paul may be incompetent to proceed, counsel sought and received funding for an examination by a third psychiatrist. Only after this third psychiatrist reached an opinion contrary to the second, such that counsel was faced with two psychiatric opinions that Paul was competent to proceed, did counsel elect to forego a request for a formal competency hearing in the district court. The district court itself, moreover, observed that counsel "no doubt perceived" that it was "highly unlikely" that the court would have agreed to hold a competency hearing after the trial was underway.

Nonetheless, if we assume for the sake of argument that counsel's performance was deficient, we conclude that Paul has not shown a reasonable probability that the district court would have found him incompetent to stand trial. Two psychiatric examinations conducted for the purpose of determining whether Paul was competent to stand trial concluded that he was competent. Much of the family history cited by Paul is not directly relevant to the question whether Paul himself was competent to



Appellate Case: 05-3431 Page: 19 Date Filed: 07/22/2008 Entry ID: 3453711

stand trial in June 1996. It may have given counsel reason to investigate Paul's mental competence, but counsel in fact did investigate this point by obtaining three professional opinions. Much of Paul's family history of mental health problems, moreover, was detailed in the psychological report submitted to the court on February 20, 1997. (A 90-93). That report informed the trial court that Paul had been hospitalized at Rivendell mental health treatment facility in 1993 after attempting suicide, that Paul's uncle had been diagnosed with schizophrenia, and that Paul's brother had been discharged from the Navy for "mental reasons." Much of the family and personal history that Paul now cites is therefore cumulative of information that trial counsel discovered and disclosed through this report. The historical information, moreover, related to afflictions that Paul suffered years before the trial, and which thus had little if any bearing on his competence to proceed in June 1996. For these reasons, the alleged shortcomings of trial counsel in addressing Paul's competence to stand trial do not undermine our confidence in the outcome of the proceeding.

III.

The third issue identified in the certificate of appealability is whether Paul has a constitutional right to competence during federal habeas corpus proceedings and, if so, whether that constitutional right was violated.[6] Paul cites the English common-law prohibition on execution of the insane, and argues that it was justified as a way of preserving the condemned's ability to make arguments on his behalf. *See* 4 W. Blackstone, Commentaries 24-25 (1769) ("[I]f, after judgment, he becomes of non-

[6]Paul did not raise this claim in the district court, but an administrative panel of this court granted a certificate of appealability on the issue, and we will therefore proceed to consider it. In light of our resolution of the issue, we need not decide whether Paul's alleged incompetence should excuse a procedural default in the district court. *See United States v. Lawson*, 155 F.3d 980, 982 (8th Cir. 1998) ("[I]ssues not presented to the district court will not be considered on appeal unless a finding of waiver would be unfair or unjust.").



Appellate Case: 05-3431 Page: 20 Date Filed: 07/22/2008 Entry ID: 3453711

sane memory, execution shall be stayed: for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution."); *see also* 1 Sir Matthew Hale, The History of the Pleas of the Crown 35 (1736); Sir John Hawles, Remarks on the Trial of Mr. Charles Bateman, 11 How. St. Tr. 474, 477 (1685). It follows from this rationale, he contends, that a prisoner also has a right to a stay of habeas corpus proceedings – the post-conviction forum in which he may raise arguments on his behalf – until he can communicate rationally with counsel.

In his brief on appeal, however, Paul does not argue directly that he enjoys a *constitutional* right to be competent during a habeas corpus proceeding, and the authority most nearly on point runs against the claim. *O.K. v. Bush*, 344 F. Supp. 2d 44 (D.D.C. 2004); *see also Rector v. Clark*, 923 F.2d 570, 572 (8th Cir. 1991) (rejecting a contention that *Ford* should be extended, in the context of a first federal habeas proceeding, to include an "ability-to-assist counsel requirement" – that is, "a determination of whether the convict possesses the ability to inform counsel or the court of any fact which might exist which would make the punishment unjust or unlawful."); *Rector v. Bryant*, 501 U.S. 1239, 1240-43 (1991) (Marshall, J., dissenting from denial of certiorari) (explaining that the Eighth Circuit "concluded that petitioner's ability to recognize or communicate facts that might make his punishment unlawful or unjust was of no legal consequence," and acknowledging that Justice Powell in *Ford* rejected an "ability-to-assist counsel" definition of incompetence, but urging the Court to consider a "strong argument" to the contrary).

Paul argues instead that a right to competence is grounded in "federal law," and he relies principally on a decision of the Ninth Circuit in *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), which recognized a *statutory* right to competence during the course of a first federal habeas petition. *Rohan* concluded that the petitioner's constitutional claim of a right to competence was "debatable," *id.* at 814, but substantial enough to trigger the principle that statutes should be interpreted

to avoid substantial constitutional questions. The court then implied a right to competence from the statutory right to counsel for death penalty defendants provided by 21 U.S.C. § 848(q)(4)(B), now codified at 18 U.S.C. § 3599(e), reasoning that "if meaningful assistance of counsel is essential to the fair administration of the death penalty and capacity for rational communication is essential to meaningful assistance of counsel, then it follows that Congress's mandate cannot be faithfully enforced unless courts ensure that a petitioner is competent." 334 F.3d at 813. The Ninth Circuit held that the petitioner was entitled to a stay of habeas corpus proceedings until he regained competence to communicate rationally with counsel, and Paul seeks the same relief here.

Our certificate of appealability does not encompass Paul's *statutory* claim to a right of competence, and Paul's argument might be rejected on this basis alone. *See* 28 U.S.C. § 2253(c); *United States v. Taylor*, 454 F.3d 1075, 1079 (10th Cir. 2006). To overcome that problem, Paul relies on *Slack v. McDaniel*, 529 U.S. 473, 483-85 (2000), which held that a certificate should issue on a non-constitutional procedural issue, where a petitioner demonstrates that jurists of reason would find it debatable (1) whether the petition states a valid claim of a denial of a constitutional right, and (2) whether the district court was correct in its procedural ruling that barred consideration of the constitutional claim. *See also Nichols v. Bowersox*, 172 F.3d 1068, 1070 n.2 (8th Cir. 1999) (en banc). As we understand Paul's argument, he contends, in a variation on *Slack*, that his ability to communicate rationally with counsel is necessary to the presentation of his constitutional claims, so that consideration of his statutory claim is necessarily antecedent to consideration of his constitutional claims. In particular, he asserts that claims of ineffective assistance of counsel often depend on facts outside the record, and that a litigant cannot effectively pursue such claims unless he is competent. *See Rohan*, 334 F.3d at 818.

At least on the facts of this case, we are not persuaded that the certificate of appealability should be expanded to encompass Paul's claim of a statutory right to



Appellate Case: 05-3431 Page: 22 Date Filed: 07/22/2008 Entry ID: 3453711

competence. Paul alleges that his incompetence arose after his attempted suicide in November 2003. As of that date, however, Paul already had filed his 344-page habeas corpus motion and a 514-page, two-volume appendix on December 17, 2002. The government had responded on June 2, 2003, and the court issued its decision based on those lengthy pleadings. To the extent counsel needed assistance from Paul in developing facts outside the record, that work was completed before November 2003.

This is not a situation, therefore, where counsel must speculate about what the petitioner might have told him if the petitioner had been competent when the post-conviction arguments were formulated. *Cf. Rohan*, 334 F.3d at 818. If there is a statutory right to competency in post-conviction proceedings, the scope of the right must correspond to what mental capabilities the litigant needs to assist in the conduct of the litigation. *See Holmes v. Buss*, 506 F.3d 576, 581 (7th Cir. 2007). Once a habeas corpus motion is submitted to the court, and the parties are merely awaiting a decision, there is no need for rational communication between counsel and client in furtherance of the motion. Unlike the constitutional claims in *Slack*, therefore, consideration of Paul's constitutional claims were not "barred" by a preliminary ruling – or, more precisely in this case, by the district court's failure *sua sponte* to stay the proceedings after November 2003 – because Paul's alleged incompetence did not bar Paul from presenting his Sixth Amendment claims.[7]

---

[7]Paul's brief does complain that his incompetence "prevented counsel from addressing the factual underpinnings" of the district court's order on his due process claim based on *Brady v. Maryland*, 373 U.S. 83 (1963). But the assertion that Paul could not respond effectively to the district court's order *after* it was entered, presumably for purposes of appeal, provides no basis to say that the district court should have stayed its own proceedings *before* the order was entered. As for the appeal, it must be grounded in the record created in the district court, without new factual information supplied by the petitioner. *See* Fed. R. App. P. 10(a). While litigants must sometimes make strategic decisions about what issues to pursue on appeal, we see no reason to conclude that Paul's 191-page application for a certificate of appealability winnowed the issues on appeal in a way that may have prejudiced a

Even were we to follow Paul this far down the path, however, and expand the certificate of appealability in a manner that presents his claim to a *statutory* right to competence, our reaction to the claim is similar to that of the Seventh Circuit in *Holmes*:

> As a matter of first impression, we might doubt the legal significance of a person's lacking the mental competence to prosecute, or to assist his lawyer in prosecuting, a federal habeas corpus proceeding. Technically, habeas corpus is a civil proceeding rather than a criminal one. Realistically, it is a stage initiated by the criminal defendant rather than by the state; and it is odd to think that someone who initiates a proceeding can then freeze it by claiming to be mentally incompetent. An incompetent person can of course have a legal claim, and it will be prosecuted by his guardian or (in the antiquated legal phrase) his "next friend," but the fact of his incompetence will not be allowed to interrupt or delay the proceeding.

506 F.3d at 578. The Seventh Circuit, nonetheless, declined to reject *Rohan*, and thereby to create a conflict in the circuits, because the State in that case did not challenge the claimed right to competence and assumed it throughout the proceedings. By contrast, the government here vigorously disputes the existence of a statutory right to competence.

We also find it unnecessary, for different reasons, to reach a definitive conclusion on the question whether a statutory right to competence exists. As in *Clayton v. Roper*, 515 F.3d 784, 790 (8th Cir. 2008), we conclude that even assuming that a habeas petitioner has a right to competence during habeas proceedings, a right that encompasses the ability to communicate rationally with counsel, this petitioner is not entitled to relief. The district court here determined during the course of the

---

petitioner who could not communicate rationally with counsel. Assuming, again for the sake of argument, that there is a statutory right to competence that extends even to an appeal in a first federal habeas corpus action, we see no basis for a stay.

habeas proceeding that Paul was competent to proceed, and this finding is neither clearly erroneous nor prejudicial. The court's factual finding was made in light of events that occurred during the habeas corpus proceeding, so we recount them here in some detail.

As we have explained, the district court authorized two mental health examinations of Paul to assess his competence to stand trial. The report of the first experts concluded that Paul was competent. The record shows that after Paul's mitigation expert, Dr. Semone, voiced an opinion that Paul was not competent to stand trial, a second expert, Dr. Kuo, was retained to examine that question, and he expressed an opinion that Paul was competent. (A 2296, 2316). The defense then elected not seek a competency hearing, and the case proceeded to trial. In its order denying the § 2255 motion, the district court considered the record, including its personal observations of Paul's disruptive behavior at trial, and said it had "no difficulty in concluding that petitioner was competent to stand trial and to assist in his own defense."

The issue of mental competence arose in this habeas proceeding on November 21, 2003, when counsel moved to authorize access to Paul by mental health professionals. Counsel advised the court that Paul had attempted suicide by hanging at the federal penitentiary on November 18. Counsel later reported, in September 2004, that informal conversations with correctional officers led them to understand that Paul was not breathing when he was found hanging by his neck on November 18, but that he was resuscitated by correctional officers. Counsel also stated that Paul broke through a glass window in the observation unit to which he was moved, and then attempted to cut himself with shards of glass. Counsel conducted a telephone call with Paul on November 19, the day after the attempted suicide, and according to what one of Paul's attorneys described as his "armchair psychology," Paul made statements during the call that were "clearly delusional." (A 1568). On December 2, the court



Appellate Case: 05-3431 Page: 25 Date Filed: 07/22/2008 Entry ID: 3453711

granted the motion, and authorized a consultation between Paul and two mental health professionals.

Two days later, however, the court received a handwritten letter from Paul, in which Paul asked "to be declared competent to waive further appeals hindering the imposition of this sentence upon me." Paul further stated, "I do know that I am guilty of the crime which resulted in Mr. Williams (Sherman) untimely and unnatural death," and "I regret the pain caused by my robbing, kicking and incapacitating Mr. Williams." The letter concluded: "Please consider my appeals dropped." (A 1579). In response to this letter, the court requested that Paul's counsel postpone any meetings between Paul and mental health professionals until further notice from the court. On December 9, after visiting Paul, Paul's counsel filed a document, prepared by counsel and signed by Paul, in which Paul withdrew his "uncounseled expression of his desire to waive his appeal." This document stated that Paul would continue to pursue his § 2255 motion, and that he repudiated the positions expressed in his *pro se* letter to the court.

Paul corresponded again with the court in May 2004. In a one-page typewritten letter to the district judge, Paul explained that he had a case before the court at the "2255; Habeas Corpus stage," and asked the court to consider the applicability of the Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004), decided on February 24, 2004. In a one-page handwritten addendum, Paul wrote that if the court did not conclude that he was entitled to "a new trial or vacated guilty verdict" based on *Banks*, then he did "not wish to proceed to the 8th Circuit and would ask for an execution date to be set." (A 1630). In an order dated June 21, 2004, the court concluded that *Banks* was distinguishable from Paul's case, and denied Paul's request for discovery to pursue a claim based on *Banks* and *Brady v. Maryland*.

On July 14 and 15, 2004, the court received yet another pair of letters directly from Paul. In these letters, Paul again expressed his desire to terminate post-



Appellate Case: 05-3431 Page: 26 Date Filed: 07/22/2008 Entry ID: 3453711

conviction litigation and to proceed with the sentence handed down by the court. Paul wrote, among other things, that he had experienced a "supernatural amount of punishment" since he was moved to the death row unit at Terre Haute, and that "no one would choose to appropriate a living death such as this for themselves." Paul stated that he had "no reliable source to acquire answers needed to remedy an unbearable situation." The court then scheduled a hearing on the matter via video conference on August 6, 2004. On August 5, the day before the hearing, Paul's counsel renewed their request that the court authorize mental health experts to meet with Paul. The motion was accompanied by a declaration of Dr. Halleck, the psychiatrist, recounting that Halleck had spoken with Paul by telephone on January 7, 2004, and that Paul "expressed some very bizarre and disjointed ideas and beliefs."[8] Dr. Halleck said he formed the "firm impression" that Paul was "very likely experiencing a serious psychotic illness that could interfere with his ability to make rational choices or understand his legal rights," but that it would be necessary for Halleck to evaluate Paul in person to reach "a definitive conclusion." (A 1772).

The court then proceeded on August 6 with the hearing, which included a lengthy colloquy between the court and Paul via video conference. Early in the

---

[8]Dr. Halleck declared that Paul made the following statements:

1. "I see things outside of my mind and body."
2. "My attorneys may be involved in letting me become a fall guy."
3. "Everything I see on T.V. I saw before T.V. is directed at me. Everything that happens to me happened before."
4. "During my last phone call the words I spoke were not my own. Words were put in my mouth."
5. "My girlfriend Cary is not a woman. She's a hermaphrodite. She's in love with a black inmate."
6. "People are calling me things like a 'maggot pedophile.' They want me to kill myself. I'm being programmed."
7. "I have conversations with voices only I can hear."



Appellate Case: 05-3431 Page: 27 Date Filed: 07/22/2008 Entry ID: 3453711

hearing, during discussions between the court and counsel, Paul interjected the following statement:

> Paul: I would like to – my attorneys are emotionally close to me in this case, and – and I love them dearly, but I'm – I'm fully competent to make this decision on my own. Although I'm not going to sit up here and try to speak legalese with you, the decision that I've made is to forego the habeas 2255 petition, waive it, and I would like to proceed forward with an execution date before November, as per the judgment rendered against me by the jury in your court and upheld by you through your rulings on my direct appeal and the rulings, the concurrent rulings, of the Eighth Circuit. That's what I want to do.
>
> And I do appreciate the work that my attorneys have done for me. I – if you have any questions about my psychiatric stability at the moment, the Justice Department's psychiatrist team here in the prison, as well as North Carolina, have all declared me competent, and you can – I'm sure they could fax you copies of any report or whatnot that you would need. I am competent, and I would like to secure an execution date before November, if possible, and if you will work with me on that I'd appreciate it. That's what I want to do.

(A 1806-07).

Paul later discussed with the court his May 2004 letters regarding *Banks v. Dretke*, acknowledged receipt of the court's ruling on that point, and expressed his understanding that if his habeas corpus waiver was approved, then he would be put to death by execution. Paul then had the following exchanges with the court:

> The Court: Now . . . your lawyers have said for you, that they think you've been doing crazy things and funny things, that they're – they have a serious question that you really know what you're doing, that you're in there. Is there any reason they should think that?



Appellate Case: 05-3431 Page: 28 Date Filed: 07/22/2008 Entry ID: 3453711

Paul: Well, obviously they think so, but that's not the issue I'm speaking with you, and if – if that's what you think, then feel free to question me on it and let me consider the questions that – specifically, in specific, that you have about that. . . . As far as the staff here is concerned, I have report after report saying that my affect is normal and that my behavior, with the exception of a couple of disciplinary problems is fine, competent.

The Court: But would you agree with me that if a person doesn't know for sure where he is or he's hallucinating, hears voices, or maybe tries to take his own life, there might be a question that he's okay?

Paul: I agree. I agree. Yeah, I agree wholeheartedly with what you're saying and – and I don't believe that train of thought really applies to me. I know where I'm at.

I hear voices when people are talking to me, but – and as far as taking my own life, I have a death sentence. I didn't – I don't have to, you know, so – I'm not hearing any voices that aren't speaking to me.

The Court: Is anybody trying to convince you that you ought to give up the ship and just let it happen, or is this something you are trying to decide or deciding on your own?

Paul: Well, the – are you – are you speaking of – basically, what you're implying is are there some kind of undue influence on me? No, not that . . . this is the decision that I'm making after having been convicted of aiding and abetting murder and having my direct appeal denied and being sentenced to death. I didn't make this decision for myself. I was convicted by a jury of my peers, which is what you know for a fact is the truth. I was convicted. I was sentenced to death. This decision was taken out of my hands. What I'm asking you, Your Honor, and would basically be appreciative, or I hope so, is that – is that we forego this pro forma appellate review, and if you could help me facilitate an execution date for some closure before November, that's all I'm asking.

* * *

> The Court: I want you to – to understand as clearly as I can convey it to you that this is a matter of great concern to me, that I be able to read you correctly and fairly. It's a heavy responsibility. . . . So please understand, I am trying my best to be sure that I understand what you're saying to me, and that nobody is forcing you or that you're not out of your mind or anything, but that you're just laying it out and saying it man-to-man how you feel about it. Is that what you're doing?
>
> Paul: Well, I – no one – no one is forcing me to speak right now, and – and as far as some personal insight, I'm ready, and that's a – you know – that's all there is to it. I'm ready. I'm – I'm not a – a – a rambling moron. I – I can't presume to know what will happen after a man dies, and so obviously there's some – some trepidation about that, but it's inevitable, and there you go. I mean, I have to face it. I have to face it. I don't want to be, you know, on this yo-yo any longer, and, you know, on a personal level, I – I wish that you would understand that, and if – I do want to say that – and, you know, obviously, I feel favorably about my counsel. If they have to be released from – from – from my appointment in order to facilitate this before November, then please consider this a verbal request to do so. I – I regret everything that's happened, but I'm ready.

(A 1820-24).

Later in the hearing, Paul's counsel attempted to advise the district court about the details of Paul's suicide attempt in November 2003, but Paul repeatedly pressed the "mute" button on the videoconferencing equipment, and argued that the information was "irrelevant." (A 1831-33). Paul also objected when counsel advised the court that a diagnosis of schizophrenia appears in Paul's prison file. Paul told the court that he was given some medication "for sleep," not for schizophrenia, and that "as far as the hanging incident goes, . . . I was just trying to save money." (A 1839).

After this hearing, the court invited briefs from the parties on whether Paul was competent to waive his petition for writ of habeas corpus, and to request that his death



Appellate Case: 05-3431 Page: 30 Date Filed: 07/22/2008 Entry ID: 3453711

sentence be carried out. *See Rees v. Peyton*, 384 U.S. 312 (1966). On August 19, however, Paul's counsel filed a motion seeking to terminate the proceedings relating to Paul's attempted waiver. This filing included a document signed by Paul, which said that his earlier decisions were made before consulting with his attorney and without understanding what he was doing, and that Paul wished to withdraw his request to drop his appeals.[9]

In January 2005, the court entered its final order on the habeas corpus petition. In that order, the court found, based on the results of the hearing on August 6, 2004, that "petitioner is fully capable of being able to determine whether he wishes his post conviction efforts to continue." The court said that Paul "impressed the Court as being fully lucid and aware that both his attorneys were desperately trying to dissuade him from the course of action he appeared to want to follow," and that Paul "showed

---

[9]During the course of this appeal, on February 5, 2007, Paul filed a *pro se* motion to dismiss his appeal. The motion stated that Paul did not want to pursue the appeal, as "any favorable results would only serve to prolong the judicial proceedings and would not facilitate his release from confinement," that after ten years of imprisonment, he was "ready to be executed as promptly as possible," that his decision to seek dismissal had not been forced or coerced in any way, and that he realized the motion would receive opposition from counsel, including a likely challenge to his competency to waive the appeal. On February 20, 2007, after meeting with Paul, counsel filed on behalf of Paul a notice that Paul "withdraws his uncounseled, *pro se* motion to dismiss his appeal." The notice explained that Paul's motion was prompted by "the cumulative effect of the conditions of his confinement, the stress of his pending sentence of death, and his despair of obtaining a just result in his case," and that Paul "did not kill Sherman Williams, nor did he intend for Mr. Williams to be killed by Trinity Ingle," but that Paul feels he did not receive a fair trial. The notice was accompanied by a document signed by Paul, which stated that he withdrew his *pro se* motion to dismiss the appeal, "which was filed without prior consultation with counsel." This court permitted Paul to withdraw the previously-filed motion to dismiss the appeal.



Appellate Case: 05-3431 Page: 31 Date Filed: 07/22/2008 Entry ID: 3453711

remarkable patience with his attorneys." The court then made the following findings regarding Paul's competence to determine the course of proceedings:

> The Court has no reservations about petitioner's mental ability to determine whether he wishes to proceed with the appellate process. Based upon his letters to the Court and his conduct, conversation, and general demeanor during the video conference hearing, the Court believes petitioner was and is fully capable of determining whether he wants to proceed. That said, it follows that if petitioner be fully competent to determine that he wished to terminate the appellate process, he is also fully competent to change his mind – on advice of counsel – and determine that he wishes to proceed with that process. This is what petitioner has done and the Court agrees with both petitioner and respondent that the Court should proceed to a disposition of the pending petition without further delay.

The court also denied Paul's motion for access to mental health professionals, finding in light of the August 6 hearing and the record as a whole that there was no basis for allowing such access.[10]

---

[10]After Paul filed his notice of appeal, he moved this court to authorize access to mental health experts and to provide funds to conduct a mental examination. An administrative panel of this court authorized Dr. Halleck to examine Paul. In a June 2006 report, Dr. Halleck stated that Paul's mental status during a February 2006 interview "was certainly better than it was" during his two previous telephone conversations with Paul in January and August 2004. Nonetheless, Dr. Halleck opined that there was "considerable evidence of recent severe psychosis as well as some residuals of psychosis insofar as his cognitive functions were concerned." The report concluded that "since [Paul's] hanging attempt in November 2003, his mental condition has deteriorated to such an extent that he is unable to assist his attorneys in proceedings relevant to his appeal," and that Paul has "difficulty in communicating rationally with his attorneys." (A 2326).

The government notes that the report also includes evidence that Paul may have been malingering. Dr. Halleck recounted that Paul made the following statements to



Appellate Case: 05-3431 Page: 32 Date Filed: 07/22/2008 Entry ID: 3453711

It is evident from these findings that the district court believed Paul was capable of rational communication with his attorneys and with the court regarding the habeas corpus proceeding. We are not left with the definite and firm conviction that the court was mistaken; the finding is not clearly erroneous. The district court did not come to this matter with a blank slate. Paul had been examined by mental health professionals prior to trial, and he was found competent by doctors at FCI Butner and by Dr. Kuo. Paul's counsel cite the subsequent suicide attempt in November 2003, and Dr. Halleck's "firm impression" from a telephone conference that Paul was thereafter experiencing a serious mental illness in January 2004, as evidence of a change in circumstances. But after these events, the court received written communications directly from Paul in May and July 2004 and spoke directly with Paul during a video conference in August 2004. These interactions, together with the pre-trial reports about Paul's competence, gave the court a sufficient basis for its finding that Paul was "fully lucid" and "fully capable" of making decisions about his habeas corpus action. *See Ford*, 477 U.S. at 426 (Powell, J., concurring in part and in judgment) ("[I]n order to have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a

---

Dr. Bill Elliott, the chief psychologist at the penitentiary, shortly after the suicide attempt in November 2003: "Look Elliott, you and I both know that I am competent and I'm not going to kill myself. I am going to beat this case and be out of here in two years. My lawyer is working on a psychological angle and I'm just trying to help out the cause. Just give him a call and he'll explain everything. We don't need to go through all of this bullshit." (A 2320). Dr. Halleck explained that Dr. Elliott viewed this as a "virtual admission of malingering," and removed Paul from suicide watch. (A 2320-21). Dr. Halleck, however, was "puzzled as to why the psychologists who were working with [Paul] were so committed to viewing him as malingering," and stated that he would have "strongly questioned statements [Paul] gave to this psychologist that he was malingering." (A 2325-26).

Based on Dr. Halleck's report, Paul moved this court to remand the case to the district court for further proceedings. The administrative panel denied the motion, and then granted a certificate of appealability on the three issues discussed in this opinion.



Appellate Case: 05-3431 Page: 33 Date Filed: 07/22/2008 Entry ID: 3453711

serious question for the trial court. The State therefore may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process.”).

Mental competence ultimately is an issue for the court, and it is not inappropriate for the court to consider its own observations of the petitioner, and even to disagree with experts on mental functioning where warranted. *Holmes*, 506 F.3d at 581. The court's finding here is adequately supported. Moreover, as noted in our discussion regarding the scope of the certificate of appealability, we see no potential prejudice to Paul from alleged incompetence arising after November 2003, given the stage of the habeas litigation and the role of a litigant in the period after claims are developed and briefs are filed. *Cf. Rohan*, 334 F.3d at 818 (considering prejudice arising from “[c]onducting *an entire habeas proceeding* while a petitioner is incompetent”) (emphasis added).

* * *

For the foregoing reasons, the judgment of the district court is affirmed.



Appellate Case: 05-3431 Page: 34 Date Filed: 07/22/2008 Entry ID: 3453711