IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

Case No. 05-3431

---

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFREY WILLIAM PAUL

Appellant.

---

# APPELLANT'S EXHIBIT IN SUPPORT OF MOTION FOR REHEARING OR REHEARING EN BANC

---

Respectfully submitted,

SEAN D. O'BRIEN, #30116
JENNIFER A. MERRIGAN, #56733
Attorneys at Law
305 East 63rd Street
Kansas City, MO 64113
816-363-2795 ● Fax 816-363-2799
Email: sobrien@pilc.net

Counsel for Appellant

Appellate Case: 05-3431 Page: 1 Date Filed: 09/19/2008 Entry ID: 3472857

Declaration of Irving Kuo, M.D.

I am a psychiatrist currently practicing at the V.A. Hospital in North Little Rock, Arkansas, where I provide mental health care to military personnel and their families. In 1996, I maintained a private practice in psychiatry in Hot Springs, Arkansas. I treated patients with mental health issues and also did forensic evaluations.

In May, 1997, I was contacted by Steve Oliver and asked to evaluate Jeffery Paul, who was charged in the shooting death of an elderly gentleman named Sherman Williams. Mr. Paul had been evaluated at the U.S. Medical Center in Butner, North Carolina, and by Dr. Anthony Semone. I was aware of the findings of both evaluations. The government employees who evaluated Mr. Paul concluded that he had an anti-social personality. After testing and interviewing Mr. Paul, Dr. Semone believed that he was not competent to proceed, and that he might deteriorate further under the stress of a trial. I noted in my report that Dr. Semone had administered testing to Mr. Paul that indicated there "might be some psychotic process in the defendant." Dr. Semone wanted to know if it was necessary to medicate Mr. Paul to keep him stable during trial. He was concerned about a possible psychotic panic, which apparently was his way of describing mental deterioration under stress. In addition to these reports, Mr. Oliver gave me a general outline of the charges against Mr. Paul.

I evaluated Mr. Paul on May 14, 1997, in the Garland County Jail, where he was being held pending trial. I was not accompanied by Mr. Williams or Mr. Oliver. At times during my interview Mr. Paul was calm and rational, and at other times he expressed anger and frustration. I felt that his mood and affect were appropriate to the content of our discussion. Mr. Paul was upset that he was being prosecuted capitally for a crime that was committed by Trinity Ingle. He appeared to be having difficulty understanding or accepting the concept of accomplice liability. He expressed a belief that even though he did not intend to kill Mr. Williams, the law held him responsible for the murder because he was present and failed to report it. I understand this to be an inaccurate description of accessory liability, and for this and other reasons I described his insight as "fair" and his judgment as "poor."

Based on my observations at the time and the history that was given me, I did not conclude that Mr. Paul was mentally ill. My report reflects that I inquired about possible instances of hallucinations and paranoia, which are symptoms associated with serious mental illness. Mr. Paul told me that he was "delusionally paranoid," but he attributed it to his use of drugs, including LSD. At the time, I had no history which would cause me to discount Mr. Paul's minimization of these important symptoms. Similarly, I had reports of past suicide attempts, but Mr. Paul attempted to minimize those as well. The only family history that I had indicative of mental illness was an uncle who was diagnosed with schizophrenia; that was the only family history of mental illness that I referenced in my report. Jeff denied experiencing hallucinations, and I saw nothing that I interpreted at the time as evidence of delusional or paranoid ideation. Based on the information available, Mr. Paul's symptoms that would have pointed to an Axis I mental condition were attributed to drug abuse. He had been diagnosed at Butner as antisocial personality disorder, and I did not take issue with that conclusion at the time.

When I evaluated Mr. Paul, he was scheduled to be tried in early June. I had not previously been involved in the case, and my knowledge of Mr. Paul's history was based on the Butner report, Dr. Semone's report, and an oral briefing by Mr. Oliver about the general facts of the case. I was not asked to review records, interview members of Mr. Paul's family, and I did not speak with Ms. Tena Francis or review any documents generated by her. In fact, my involvement was minimal; I was asked to conduct a very narrow assessment of the need for anti-psychotic medication. I was not asked to explore the existence of developmental or emotional problems that might be relevant to a capital sentencing jury. Had I been asked to perform such an assessment, I would have asked counsel for substantially more information than I was provided, and I would have proceeded differently in my evaluation.

I have reviewed information that was not provided to me at the time of my 1997 evaluation of Mr. Paul. These include the declarations of Zach Dryden, Tena Francis, Dr. Seymour Halleck, Trinity Ingle, Richard McCaslin, Heather Miller, Hubert Massey, James Massey, Martha Massey, Paula Paul, Garland County Deputy Michael Roberson, Anthony Semone, and Susie Teague. A significant portion of the information contained in these documents was unknown to me when I examined Mr. Paul. I have been asked by Mr. Paul's present attorney, Sean O'Brien, to comment on how this information might have affected the scope of my examination and my findings. I have also been asked to address Dr. Semone's declaration describing Mr. Paul's behavior that he observed at the time of trial.

Before turning to the specific information about Mr. Paul, it is important to understand that symptoms of mental illness can wax and wane over time and according to circumstances, especially in what is called the prodromal stage of schizophrenia. The onset of the disease typically occurs in early adulthood, and is often manifested initially by isolated psychotic episodes. In diagnosing a young man entering his twenties, the diagnostically significant fact is that there are periods when symptoms are present, not that there are periods when the symptoms are absent. Furthermore, patients who suffer from mental illness often have poor judgment and insight, and may not accept the fact that certain perceptions, thoughts or feelings are the product of a mental illness. Individuals who do not wish to be thought of as mentally ill can be quite adept at hiding their symptoms or, as in Mr. Paul's case, attributing them to some other cause, such as drug abuse. Further, neither Mr. Williams nor Mr. Oliver accompanied me on my visit with Mr. Paul in the county jail. I note from the declarations of Tena Francis and Dr. Semone that there was significant tension between Mr. Paul and his lawyers, particularly Mr. Williams, and that Mr. Paul tended to be quite emotional in their presence. I did not have the benefit of their presence to observe this phenomenon. I tend to be soft-spoken, and there were no distractions or stressors present during my ninety minute meeting with Mr. Paul. In a structured, low-stress setting, Jeff could glue himself better and present a lucid facade. In a courtroom, however, when lots of eyes are directed at the defendant, it would be far more difficult for a person with schizophrenia to remain in control, especially if he is unmedicated. Even a medicated person with schizophrenia is liable to decompensate from the stress of feeling scrutinized by so many strangers. Therefore, it is very likely that I saw Jeff when he was relatively more stable than when Dr. Semone observed him during his meetings with counsel and



Appellate Case: 05-3431 Page: 3 Date Filed: 09/19/2008 Entry ID: 3472857

during trial.

Because of these factors, the fact that I did not detect symptoms of a major mental illness on May 14, 1997, does not rule out the existence of a mental illness and related symptoms in June of 1997. The same would be true of the Butner evaluation; the failure to detect symptoms of mental illness in March, 1997, does not establish that they were not present in June, 1997, when Mr. Paul went to trial. We were each simply taking a snapshot of how Mr. Paul presented at a particular 90-minute slice of time. Therefore, I would have to defer to the observations of Dr. Semone. I have no reason to discount the observations and conclusions described in Dr. Semone's declaration of February 12, 2005. A mental health professional who observes a patient at a time when the symptoms are active is at an advantage over one who evaluates him while his symptoms are not as apparent. This is why I typically conduct multiple interviews in order to observe the subject at different times over a long period. I didn't do that in this case because trial counsel's referral question was so narrow.

I never heard from either Mr. Oliver or Mr. Williams after I sent them my May 14, 1997 report. If they had additional concerns about Mr. Paul's mental condition, I would have been happy to address them. In fact, given Mr. Paul's behavior at the time of trial, it would have been important to assess his mental condition at that time. The deterioration of his behavior and hygiene is strongly indicative of a psychotic process. Even though I lived and worked in Hot Springs at the time of trial and I was readily available to see Mr. Paul, trial counsel did not call me to inquire about his changed condition or request that I conduct an additional assessment. Under the circumstances, it would be a serious mistake to rely on my report or the opinions of the Butner evaluation to conclude that Mr. Paul was not seriously mentally ill at the time of his trial. Neither evaluation can rule out a subsequent psychotic episode, especially in light of Dr. Semone's first-hand observations.

Another point that is important in this case is that it is always better to have more information about an individual to arrive at an accurate assessment. In the forensic work that I have done, I depend on counsel and other members of the defense team to conduct a thorough life history investigation. Because conducting such an investigation competently is such a time-intensive exercise, it would be very costly for a forensic psychiatrist to do the document collection, traveling and witness interviews necessary to prepare a thorough psycho-social history. This is typically done by a forensic social worker or a mitigation specialist. I was not given such a report in this case.

The new evidence that I was recently provided is probative of several distinct aspects of Mr. Paul's diagnostic picture. This includes evidence of his positive character traits such as his sensitivity toward animals, evidence of his extensive family history of suicide and mental illness, evidence that he was violently maltreated by his father, and evidence that he himself exhibited signs of mental illness. Each type of evidence would influence my evaluation and findings in different ways. Evidence of his positive character traits would make an examiner less likely to conclude that he is anti-social. Evidence of his abusive upbringing raises the possibility of Post-Traumatic Stress Disorder, and in Mr. Paul's case was severe enough to warrant a neurological



Appellate Case: 05-3431 Page: 4 Date Filed: 09/19/2008 Entry ID: 3472857

consult. Evidence of the frequent occurrence of alcoholism, suicide and mental illness in Mr. Paul's family suggests a strong genetic predisposition to mental illness. His own history of hallucinations and odd thinking since childhood, much of it predating the offence, is consistent with a young man in the prodromal stage of schizophrenia.

Based on the limited information provided by counsel and my observations in my single interview of Mr. Paul, I believed that the objective behaviors reported in Jeff Paul's background justified consideration of anti-social personality disorder. However, the new evidence provided to me establishes conditions and circumstances in Mr. Paul's life history that provide alternative explanations. Children who are subjected to extreme physical punishment in the home often act out in ways that could be interpreted as anti-social, but such behavior would be more accurately perceived as a product of environmental stressors rather than a character deficiency. Paranoia may also produce behaviors that are objectively anti-social, but such behavior would more accurately be viewed as a symptom of a mental disease. In Jeff's case, for example, one of his most serious contacts with the law was an auto theft. Zach Dryden's declaration provides important context for that crime. Knowing that the auto theft conviction was in the context of an abused fourteen-year-old running away from a violent home diminishes the likelihood that it was the product of an anti-social personality. I also noted in the declarations of Heather Miller, Richard McCaslin, Martha Massey, Susy Teague and others that Mr. Paul was known to be a kind and sensitive person. He is consistently described by many people as caring for sick and injured animals, including a pet that was cruelly injured by Dennis Paul, and a raccoon and a duck Mr. Paul rescued in the wild. These behaviors weigh against his having an anti-social personality, and suggest that something different is at play. At the time of my pretrial examination, I had no information of this nature and quality.

I also question the conclusion that Jeff's acting out behavior at the time of trial was a manifestation of anti-social personality disorder. Typically, a person who is anti-social will adapt his or her behavior when it becomes self-defeating or otherwise places him at a disadvantage. Jeff's acting out during trial was clearly detrimental to his own interests, and not something that a person with anti-social personality would have persisted in once that fact became apparent. There are many other options that should have been explored before jumping to this questionable conclusion.

When I evaluated Mr. Paul, I had no information about the physical violence that his father committed against him. While I observed the prominent scar on his face, I was unaware that it was inflicted by his father throwing knives in his direction. Deputy Roberson's declaration describes Dennis Paul's extremely poor judgment, his violent disposition, and suggests grandiose delusions. I also was unaware of the severe beatings and maltreatment of Mr. Paul that were witnessed by Martha, Hubert and James Massey, and by Heather Miller and Susy Teague. The injuries described by Ms. Teague go well beyond any normal form of parental discipline, and reflect a level of parental violence that is unquestionably severely damaging to a child's physical and emotional development. With this history, post-traumatic stress disorder should be considered as a possible diagnosis for Mr. Paul. In addition, Mr. Paul may have suffered multiple closed head injuries as a result of the repeated beatings inflicted upon him. Multiple

blows to the head on different occasions are a significant risk factor for brain damage. Such injuries can render a person prone to impulsivity, irritability and anger, all of which can give an impression of being anti-social. Had I known this history, I likely would have recommended an evaluation by a neurologist. I also would have considered assessing Jeff for Post-Traumatic Stress Disorder because such treatment at the hands of a parent is extremely traumatizing to a child.

The additional information about Jeff Paul's family history described by Dr. Halleck, Hubert Massey, Martha Massey, James Massey and Paula Paul is extremely important. While the cause of schizophrenia is still not fully understood, it is well accepted that it has a genetic component. The existence of mental illness in one or more close relatives increases the likelihood that an individual will have a mental disease. In May of 1997, I knew only that Mr. Paul may have had an uncle diagnosed with schizophrenia. This apparently was James Massey, Paula Paul's brother. I did not know that Mr. Paul's paternal grandmother was institutionalized or that his father was discharged from the service for mental health reasons. There are numerous indications of mental illness on his mother's side of the family as well. Mr. Paul's grandfather, Hubert Massey, attempted suicide by shooting himself in the torso with a shotgun, and a maternal great aunt, Lenora Baker, was civilly committed after slitting her wrists in a nearly successful suicide attempt. Jeff Paul's great grandfather, Joe Card, shot himself to death, as did a great uncle, Troy Baker. Another relative, Buford Massey, hung himself to death in a county jail. Dennis Paul is also a likely candidate for a psychiatric diagnosis, given his grandiosity and his history of uncontrollable, violent rages. This information about family history provides an important context for Jeff's numerous suicide attempts both before and after his involvement in the homicide of Sherman Williams, and indicates that it may have been wrong to minimize that aspect of his history. If I had been aware of such a history, I would have insisted upon conducting multiple interviews over a period of time, and I would have sought out more collateral sources in my evaluation.

My report reflects that I was aware of, or at least inquired into, possible symptoms of psychosis that Jeff Paul experienced. Jeff attempted to explain those as drug related. However, the new information that was shown to me casts considerable question on that explanation. While he was in the Garland County Jail awaiting trial, his friend, Richard McCaslin, observed that Jeff believed that he was being controlled, that people hated him, and he had a very strong distrust of his lawyers. McCaslin described Jeff as "very paranoid and rambling and not making any sense." McCaslin said that Jeff felt that his lawyers were working for the government, and that they were "messing with [his] memory," and that "they" (Jeff didn't say who) were controlling him. This is classically delusional and paranoid thinking, and not easily dismissed as drug-related, since Jeff was incarcerated at the time. Moreover, evidence of mental illness and drug abuse are not mutually exclusive. Young people in the prodromal stage of schizophrenia often experiment with drugs in an attempt to quiet or control their mental illness. Jeff's history of drug use suggests a similar motive. He avoided drugs that dulled his senses, and preferred cognitive-altering types of drugs.

Jeff's family also describes behaviors that can be indicative of a mental illness. He told



Appellate Case: 05-3431 Page: 6 Date Filed: 09/19/2008 Entry ID: 3472857

his mother years before the crime that he felt his life "was already planned out," and that he felt trapped, and believed that someone or some thing was controlling him. Paula Paul and James Massey both report that Jeff saw people in his room who were not there. He described them to his uncle as strangers who wore dark clothing. These visions frightened him. None of the symptoms observed by James Massey, Paula Paul and Richard McCaslin were reported as being associated with drug use, and there is no reason to believe that they were. Childhood hallucinations and delusions are not unusual in the history of adults who suffer from schizophrenia.

If I had the benefit of the above evidence, it is likely that the scope of my evaluation would have been different, and that my conclusions might have been affected. I do not believe that any of these symptoms or his behavior in the courtroom can be dismissed as the product of an anti-social personality, and it would be inappropriate to use my report to justify dispensing with further examination. Dr. Semone and Dr. Halleck's declarations include references to events that occurred after my evaluation which are indicative of schizophrenia or other serious mental disease. These observations, which obviously could not be known by me prior to Mr. Paul's trial, are nevertheless strongly indicative that Jeff was in the prodromal stage of schizophrenia prior to his trial.

I have not re-evaluated Jeff Paul based on the new information, and it is not my intention to attempt to arrive at a definitive diagnosis. I am simply stating that I did not have evidence of the nature and quality of that described above when I conducted my examination in 1997, and that such evidence would have affected the scope of my examination. Further, the evidence provides valid reasons to question the assessment of anti-social personality disorder, and to consider instead a diagnosis of schizophrenia, which cannot be ruled out at this time.

I have read the foregoing declaration, and I declare under the penalty of perjury under the laws of the United States of America and the State of Arkansas, that the foregoing is true and correct to the best of my knowledge and belief.

Dated this 7th day of August, 2008.

Irving Kuo, M.D.



Appellate Case: 05-3431 Page: 7 Date Filed: 09/19/2008 Entry ID: 3472857